Robert C. Schubert S.B.N. 62684
Willem F. Jonckheer S.B.N. 178748
Amber L. Schubert S.B.N. 278696
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel.: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
Rachel Kesten (*pro hac vice* forthcoming)
Yuanchen Lu (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com
ylu@lowey.com

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

PHILIP MCDONALD, STEVE DELLASALA, BOB WARDEN, and VINCE TOPHONEY individually and on behalf of all others similarly situated,

Plaintiff,

v.

SAMBA TV, INC.

Defendant.

Case No. _____

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Philip McDonald, Steve DellaSala, Bob Warden, and Vince Tophoney individually and on behalf of all other similar situated individuals, assert the following against Defendant Samba TV, Inc. ("Samba TV") based upon personal knowledge, information and belief (where applicable), and the investigation of counsel.

## SUMMARY OF ALLEGATIONS

1.      Nearly 80% of U.S. households own a Smart TV, which enables them to access traditional cable television, as well as streaming services, like Hulu and Amazon Prime.

2.      What they don't know is one company—Samba TV—has been embedding its chip set in popular Smart TVs since 2011. This chip set enables (among other things) Samba TV's patented Automatic Content Recognition ("ACR") technology, which uses video fingerprinting and machine learning to accurately identify what the viewer is watching on their Smart TV.

3.      This business practice isn't just creepy, it's extremely lucrative. Samba TV has a stronghold on video-viewing data, and it sells access to this data to advertisers and other companies.

4.      Samba TV's ACR data is particularly valuable because of its ability to uniquely identify ***individual consumers and each of their devices***.

5.      Samba TV can identify and target people at the individual-level because of the Samba TV Identity Graph and its closely related SambaID—its proprietary universal identifier.

6.      Samba TV uses probabilistic and deterministic algorithms that match signals (IP address, operating system, etc.) from Plaintiffs' and Class Members' Smart TVs to their other devices, such as smart phones and tablets. Through this process, Samba TV can identify which devices belong to which specific individuals. It assigns a SambaID to each individual and each of their respective devices, which it uses to enable cross-device tracking and advertising.

7.      This type of targeting is particularly sought out by advertisers today, as many companies have begun to move away from traditional user-based online tracking in recognition that it is privacy invasive. This began in the early 2010s when Apple Inc. announced it would no longer allow companies to collect UDID, which is a permanent device identifier that was used for online advertising. Similar changes followed in the next decade, with the roll out of additional privacy-preserving features like Apple Inc.'s "Do Not Track" setting, which sought to  prevent the collection of advertising IDs from

CLASS ACTION COMPLAINT

mobile device users, as well as updates by several browsers to block "third-party" cookies (i.e., text files placed on a user's device from domains they are not visiting), which are used to track users across multiple websites.

8. Through Samba TV's identity solution—and complimentary ACR product—Samba TV has been secretly harvesting and monetizing identifiable video-viewing data from tens of millions of U.S. residents without their knowledge and consent.

9. Individuals have a baseline expectation of privacy, in which they do not expect any company to engage in wide-spread surveillance of all their video-viewing habits or to market their identifiable video-viewing data to third parties for profit.

10. Plaintiffs and Class Members had no knowledge that Samba TV was using a unique, persistent identifier to track them across their devices, or that it was using this identifier and their private video-viewing history to facilitate highly specific targeted advertising.

11. Samba TV's interception of the contents of Plaintiffs' and Class Members' video-viewing history violates (at least) the Video Privacy Protection Act ("VPPA"), and its installation of a tracking device on Plaintiffs' and Class Members' televisions violates Cal. Penal Code § 638.51(a), as well as other laws.

## PARTIES

### A. Plaintiff McDonald

12. Plaintiff Philip McDonald is a resident of Shelby County, Tennessee.

13. Plaintiff McDonald owns Sony XR-55X90J and Sony KD-43X85J televisions. Plaintiff McDonald watches video-viewing content on his Sony televisions, including content through streaming services. He also previously viewed video content through cable television on his Sony televisions.

14. Unbeknownst to Plaintiff McDonald, Samba TV used its chip set embedded in Plaintiff McDonald's televisions to intercept unique identifiers, including his IP address. Samba TV used Plaintiff McDonald's IP address and other information to identify him as the owner of his televisions, as well as his other devices, including his computers, iPhone and iPad.

15. Samba TV used each of these identifiers to create an identity graph for Plaintiff McDonald that contained each of his identifiers and devices—which Samba TV tied to a universal

SambaID.

16.     Samba TV intercepted Plaintiff McDonald's private video-viewing data in real time, including what he watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff McDonald.

17.     Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff McDonald ads across his TV, phones, computers, and tablets. Samba TV also used this data to place Plaintiff McDonald in custom audiences and its lucrative panel product (defined further below).

18.     Plaintiff McDonald did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for-profit.

**B. Plaintiff DellaSala**

19.     Plaintiff Steve DellaSala is a resident of Burk County, North Carolina.

20.     Plaintiff DellaSala owns Sony XDR-65A8H and Sony XR-55A80J televisions. Plaintiff DellaSala watches video-viewing content on his Sony televisions, including content on streaming services.

21.     Unbeknownst to Plaintiff DellaSala, Samba TV used its chip set embedded in Plaintiff DellaSala's televisions to intercept unique identifiers, including his IP address. Samba TV used Plaintiff DellaSala's IP address and other information to identify him as the owner of his televisions, as well as his other devices, including his iPhone, tablets, and computers.

22.     Samba TV used each of these identifiers to create an identity graph for Plaintiff DellaSala that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

23.     Samba TV intercepted Plaintiff DellaSala's private video-viewing data in real time, including what he watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff DellaSala.

24.     Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff DellaSala ads across his TV, phones, computers, and tablets. Samba TV also used this data to place Plaintiff DellaSala in custom audiences

and its lucrative panel product.

25.     Plaintiff DellaSala did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for-profit.

**C. Plaintiff Warden**

26.     Plaintiff Bob Warden is a resident of Tulsa County, Oklahoma.

27.     Plaintiff Warden owns Sony XBR-55X850C television. Plaintiff Warden watches video-viewing content on his Sony television, including content on cable television and through streaming services.

28.     Unbeknownst to Plaintiff Warden, Samba TV used its chip set embedded in Plaintiff Warden's television to intercept unique identifiers, including his IP address. Samba TV used Plaintiff Warden's IP address and other information to identify him as the owner of his television, as well as his other devices, including his Android mobile phone and computers.

29.     Samba TV used each of these identifiers to create an identity graph for Plaintiff Warden that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

30.     Samba TV intercepted Plaintiff Warden's private video-viewing data in real time, including what he watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff Warden.

31.     Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff Warden ads across his TV, phones, and tablets. Samba TV also used this data to place Plaintiff Warden in custom audiences and its lucrative panel product.

32.     Plaintiff Warden did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for-profit.

**D. Plaintiff Tophoney**

33.     Plaintiff Vince Tophoney is a resident of Wake County, North Carolina.

34.     Plaintiff Tophoney owns Sony XBR-75X800H television. Plaintiff Tophoney watches

video-viewing content on his Sony television, including content on cable television and through streaming services.

35.    Unbeknownst to Plaintiff Tophoney, Samba TV used its chip set embedded in Plaintiff Tophoney's television to intercept unique identifiers, including his IP address. Samba TV used Plaintiff Tophoney's IP address and other information to identify him as the owner of his television, as well as his other devices, including his iPhone and computer.

36.    Samba TV used each of these identifiers to create an identity graph for Plaintiff Tophoney that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

37.    Samba TV intercepted Plaintiff Tophoney's private video-viewing data in real time, including what he watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff Tophoney.

38.    Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff Tophoney ads across his TV, phone, and computer. Samba TV also used this data to place Plaintiff Tophoney in custom audiences and its lucrative panel product.

39.    Plaintiff Tophoney did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for-profit.

**E.  Defendant**

40.    Samba TV is a Delaware corporation with its principal place of business located in San Francisco, California.

41.    Samba TV knowingly and intentionally incorporated its chip set into televisions to track Plaintiffs' and Class Members' video-viewing history and other activity.

42.    Samba TV knowingly and intentionally developed a persistent, unique identifier designed to accurately link Plaintiffs' and Class Members' video-viewing history and online activity to their individual identities.

43.    Samba TV knew that its unique identifier and identity graph solution were inconsistent with expectations of privacy because it had publicly stated that tracking individuals in such a manner

raised privacy concerns.

44.    Samba TV knowingly and intentionally used its identifiers, and video-viewing data associated with it, to facilitate targeted advertisements for profit.

## JURISDICTION AND VENUE

45.    Jurisdiction is proper under 28 U.S.C. § 1331 because Plaintiffs bring claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* The Court may exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' and Class Members' state law claims because these claims arise from a common nucleus of operative facts relating to Samba TV's interception and use of Plaintiffs' and Class Members' unique identifiers and other personal data.

46.    Jurisdiction is also proper under 28 U.S.C § 1332(d) because: (1) the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, (2) there are more than 100 putative members of the Class, and (3) a significant portion of Class Members are citizens of a state different from Samba TV.

47.    This Court has personal jurisdiction over Samba TV because its principal place of business is in California. Additionally, this Court has personal jurisdiction over Samba TV because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in California, including Samba TV's interception and use of Plaintiffs' unique identifiers and other personal data.

48.    Venue is proper under 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District. Furthermore, Samba TV is headquartered in this District and subject to personal jurisdiction in this District.

49.    This action arises in San Francisco County, in that a substantial part of the events which gave rise to the claims asserted herein occurred in San Francisco County. Pursuant to L.R. 3-2(e), all actions that arise in San Francisco County shall be assigned to the San Francisco or Oakland Division.

## BACKGROUND OF USER TRACKING

50.    Over a decade ago, Apple announced it would no longer allow app developers to intercept "UDIDs" which are unique, device-specific identifiers. These persistent identifiers were deprecated because they are seen as privacy intrusive—they cannot be reset and were used to facilitate device-specific targeted advertising.

51.     This trend only continued. Starting in 2020, Apple and Google announced the eventual deprecation of advertising identifiers (IDFA and ADID) and third-party cookies in favor of more privacy-preserving mechanisms.

52.     The loss of some of the most common unique identifiers raised serious concerns within the multi-billion-dollar digital advertising industry. Digital advertisers relied on these identifiers and cookies to uniquely identify individuals who use their products and services—and other entities' products and services—to serve targeted advertisements to individuals based on profiles of information reflecting web and app activity indexed to unique identifiers present in third-party cookies.

53.     For instance, a mobile app developer would use identifiers like the IDFA and ADID created by iOS and Android phones to track user activity across their mobile application, understand what actions users took and their preferences, interests, and other information. The company would then send that information to an advertising company, such as Google, to serve targeted advertisements to that customer using this unique identifier.

54.     Proposed solutions to make up for these unique identifiers and third-party cookies were not nearly as effective. For instance, some companies sought to track user "sessions" (i.e., one interaction with the webpage until the user closes out) in lieu of other unique identifiers. However, this alternative was not nearly as powerful as directly tracking an individual at the user or device-level.

**SAMBA TV'S UNIQUE IDENTIFIER**

55.     Samba TV was well aware of the privacy implications associated with tracking users at an individual level, as well as Google's plan to deprecate these types of identifiers on its own platform.

56.     Its SVP & Head of Data Products, Chris Squire, authored an article on May 25, 2021, confirming this:

> The loss of some identifiers will inhibit the ability to deliver one-to-one targeted advertising compared to the ways of old. ***Truth be told, this may actually be good for advertisers in the long run. Reaching individuals is fraught with privacy implications.***

57.     Samba TV's co-founder and CEO echoed these concerns about the lack of first-party cookies and mobile IDs:

> Cookie and mobile ID deprecation is coming faster than advertisers would like to believe, and many simply aren't prepared for a world where they'll lose the identifier they've relied on thus far . . . . ***Without these IDs*** to deliver and measure campaigns,

*advertiser's budgets will be wasted* on campaigns that fail to coordinate messaging for target audiences across devices. This gets even more complicated as TV consumption shifts towards OTT. *There is plenty of opportunity for advertisers to target and message their desired consumers, but they need an identifier that will survive the death of cookies and help them understand omniscreen performance.*

58.    Despite that Samba TV's own executive recognized that tracking users at the individual-level raises "privacy implications[,]" Samba TV sought to fill the hole left by Google and others by creating a unique, user-level identifier of its own: SambaID—which is powered by Samba TV's Identity Graph.

59.    Samba TV marketed its Identity Graph and SambaID precisely as a solution for the "changes with identity" currently taking place in the advertising industry. It calls its solutions "[f]uture proof" and adaptable to "ever-changing privacy regulations."[1]

## FIGURE 1[2]

IDENTITY TODAY

### Unprepared for the changes with identity?

As policies for mobile IDs and cookies evolve, advanced solutions are required for targeting and measurement.

- Lack of omniscreen identity in media hinders campaign performance
- Shift towards cord-cutting is making modern TV measurement more challenging
- Firms struggle to match IDs across multiple datasets

IDENTITY TODAY

### Have confidence in your identity solution

For years, Samba TV has leveraged a multi-identifier approach, using various types of digital identifiers as well as first party TV data. As a result, we can identify at 90%+ accuracy which phones, tablets, PCs, and TVs belong to an individual by using the SambaID identifier produced by our own proprietary identity platform.
Read more on Forbes >

60.    SambaID and its Identity Graph are built on top of proprietary technology from Screen6, which Samba acquired in 2019.

61.    The technology enables cross-device tracking through highly accurate deterministic and probabilistic algorithms. It processes over a dozen signals from a device (e.g., IP address, device ID, time stamp, operating system, hardware, etc.) and matches which devices (e.g., tablets, smartphones, TVs, and laptops) are owned by the same individual.

62.    The "anchor" for the SambaID and Samba's Identity Graph is its ACR technology (discussed further below), incorporated in the chip set of Smart TVs. Through this "anchor" (i.e., Smart TVs) Samba intercepts IP addresses and other device information directly from consumer's Smart TVs,

---

[1] Samba TV, Bridge datasets in the evolving identity world, https://www.samba.tv/business/identity.
[2] *Id.*

CLASS ACTION COMPLAINT

which is how its proprietary technology can begin identifying which specific users are interacting with the Smart TV and their separate individual devices.

**FIGURE 2[3]**



63.     According to Samba TV, this "multi-identifier pattern recognition model[4] creates a "robust and accurate Identity Graph, ensuring that advertisers get a view into ***all of the devices in a household***." Samba TV refers to this as its "[f]irst-party data advantage."

64.     Samba TV offers advertisers and publishers access to its "[a]ccurate real-time private identity graph[s] across devices and all properties." Through this technology, "advertisers can identify any type of TV viewer, target them based on how and when they consume TV, and then engage them on their phone, tablet, PC, or TV."

65.     Additionally, advertisers can "easily share and match [their own] data" with the data offered by Samba TV. This "bridge" between datasets allows advertisers who already have extensive data on individuals to combine this data with Samba TV's for even more advanced targeting, measurement, and optimization across devices through their existing ad solutions.

---

[3]  Samba TV, Bridge datasets in the evolving identity world, https://www.samba.tv/business/identity.
[4]  Samba TV's patents—including Patent No. 10,880,340—confirm the same. This patent describes how Samba TV's technology matches identification data from the Smart TV to identification data from other devices on the network to identify and associate the information with a specific user. The purpose of this technology is because there is a "revenue opportunity" whereby an "interested party (e.g., a content creator, a retailer, a manufacturer, an advertiser)" can show the individual relevant content, i.e., advertisements.

**FIGURE 3[5]**



66.    Samba TV's identity solution gives it a significant advantage over competing ad tech companies—which is precisely how it markets this technology to advertisers.

**FIGURE 4[6]**



**SAMBA'S ACR TECHNOLOGY**

67.    As described in above, the "anchor" for Samba TV's identity solution is its ACR technology embedded in Smart TVs.

68.    Samba TV's ACR technology works by listening and recognizing content being viewed on the Smart TV—a process called video fingerprinting.

69.    Through this technology, Samba TV can tell exactly what movie, show, episode, video game, or ad is being viewed, regardless of whether it is from a cable network, streaming service, or even a video game console. Samba TV intercepts and processes the content in real-time, often in just a few

---

[5] Samba TV, True Reach & Frequency, https://www.samba.tv/business/measurement-truereachandfrequency.
[6] *Id.*

seconds.

70.    Samba TV bills itself as the "Heartbeat of Television" precisely because of the insights it gains through its ACR technology. It boasts that it "capture[s] second-by-second viewership data" from over 13 million households, which it "feeds into the largest TV data capture footprint in the industry" – all "owned and controlled by Samba TV."

**FIGURE 5[7]**





71.    As shown in Figure 5—which comes from Samba TV marketing materials—it can identify the exact show, season, and episode viewed by the user, as well as their household ID, location, the devices "mapped" in the household, and the time and date the material was viewed.

72.    Using AI, Samba can now tell even more information about what specific viewers are watching. Samba TV advertises that the "second-by-second on-screen metadata" it captures can depict "actors, music, visual descriptions, and objects" all so it can have a "deeper understanding" of what the consumer is viewing.

73.    Samba TV also supplements its actual data collection efforts with data it licenses from

---

[7] Sapna Maheshwari, *How Smart TVs in Millions of U.S. Homes Track More Than What's On Tonight*, NY Times (July 5, 2018), available at, https://www.nytimes.com/2018/07/05/business/media/tv-viewer-tracking.html.

set-top box providers. Together, it claims to have access to 46 million TV households globally and 28 million in the United States.

74.     Samba TV processes and stores this data on its own systems—which it uses to create audiences, panels, and otherwise service advertising needs—all of which is tied back to the universal SambaID identifiers it assigns to specific individuals.

## SAMBA TV SHARES AND SELLS ACCESS TO IDENTIFIABLE DATA FOR PROFIT

75.     Samba TV packages and shares this identifiable data in a number of ways, including through its panel product and audience segments, as well as directly with advertisers and publishers.

76.     ***The Samba Panel.*** Samba packages and normalizes all the data it obtains about individuals—tied to SambaID—into a data panel, which it sells for profit. This panel is so extensive that Samba TV actively markets is as comparable to U.S. census data. It claims the millions of individuals represented in its panel have "between a .00003% and .01% delta compared to U.S. census for gender, ethnicity, age & income."

77.     ***Custom Audience Solution.*** Samba TV places individual consumers into custom audiences based on their unique video-viewing habits and other data Samba TV compiles about them. Samba TV provides this information to advertisers and publishers so they can target the individuals contained within these audiences with advertisements.

78.     These audiences provide unique insights about Plaintiffs and Class Members, including their demographics, hobbies, political beliefs, and more.

79.     For instance, Samba TV can determine an individual's political leanings based on their TV viewing habits. Samba TV packages individuals with similar political leanings into the same audience.

CLASS ACTION COMPLAINT

**FIGURE 6[8]**



| Politics > 2024 State of the Union Address<br>Reach TV households that have likely watched 2024 State of the Union Address. | Select a Platform ✓ Politics | Data Segment | | 15.6M |
| Politics > Heavy Viewers of Conservative News<br>Reach TV households that have likely watched conservative-affinity news networks. | Select a Platform ✓ Politics | Data Segment | - | 5.9M |
| Politics > Heavy Viewers of Liberal News<br>Reach TV households that have likely watched liberal-affinity news networks. | Select a Platform ✓ Politics | Data Segment | - | 5.3M |
| Politics > Liberal Affinity TV News<br>Reach TV households that have likely watched TV networks most trusted by liberals (CNN, MSNBC, etc.) | Select a Platform ✓ Politics | CTV PMP | $25 | 38.6M |
| Politics > Conservative Affinity TV News<br>Reach TV households that have likely watched TV networks most trusted by conservatives (Fox News, etc.) | Select a Platform ✓ Politics | Online Video PMP | $15 | 34M |

80.    As shown in Figure 6, Samba TV uses video-viewing habits to see who has an "affinity" for conservative or liberal news, as well as who it considers to be a "[h]eavy [v]iewers" of such content.

81.    Samba TV also created custom audiences indicating who watched content in foreign languages, including Chinese-Mandarin, Japanese, and Korean TV.

**FIGURE 7[9]**



| Demographics > TV Language > Chinese-Mandarin TV<br>Reach TV households that have likely watched Chinese-Mandarin-speaking TV shows and movies. | Select a Platform ✓ Demographics | Data Segment | - | 8.5M |
| Demographics > TV Language > Japanese TV<br>Reach TV households that have likely watched Japanese-speaking TV shows and movies. | Select a Platform ✓ Demographics | Data Segment | - | 10M |
| Demographics > TV Language > Korean TV<br>Reach TV households that have likely watched Korean-speaking TV shows and movies. | Select a Platform ✓ Demographics | Data Segment | - | 10.3M |

82.    It created even more specific audiences geared to niche content, like individuals who

---

[8] Samba TV, Audiences, https://www.samba.tv/business/audience/ui.
[9] *Id.*

watched content associated with Pride Month, Mother's Day, and Black History Month.

**FIGURE 8**[10]



| | | | | |
|---|---|---|---|---|
| **Holiday & Trending Events > Pride Month Specials**<br>Reach TV households that have likely watched movies or television programming associated to Pride Month<br>What's included? ⌄ | Select a Platform ⌄ | Holiday & Trending Events | Data Segment | - | 29.4M |
| **Holiday & Trending Events > Mother's Day Specials**<br>Reach TV households that have likely watched movies or television programming associated to Mother's Day<br>What's included? ⌄ | Select a Platform ⌄ | Holiday & Trending Events | Data Segment | - | 31.3M |
| **Holiday & Trending Events > Black History Month Specials**<br>Reach TV households that have likely watched movies or television programming associated to Black History Month<br>What's included? ⌄ | Select a Platform ⌄ | Holiday & Trending Events | Data Segment | - | 30.2M |

83.    Samba TV also creates audiences beyond video-viewing data, including audiences reflecting what video games users play, like Skryim, God of War, and the FIFA series.

**FIGURE 9**[11]



| | | | | |
|---|---|---|---|---|
| **Gaming Genre > Action > Skyrim Console Fans**<br>Reach households that have likely played Skyrim video games | Select a Platform ⌄ | Video Gamers | Data Segment | - | 8.3M |
| **Gaming Genre > Action-Adventure > God of War Console Fans**<br>Reach households that have likely played God of War video games | Select a Platform ⌄ | Video Gamers | Data Segment | - | 8.8M |

84.    These audiences can be immediately incorporated into existing advertiser and data broker accounts, including Free Wheel, Google Ads, LiveRamp, the Trade Desk, and Yahoo. All an advertiser needs to do is copy the "Deal ID" into their platform of choice to start targeting these individuals in an

---

[10] *Id.*
[11] *Id.*

CLASS ACTION COMPLAINT

advertising campaign. Samba TV routinely refreshes this data so these advertisers "have access to the latest audiences available."

85.    Samba TV also helps its advertising partners create audiences that suit their own specific business needs. For instance, Samba TV helped one client create audiences based on characteristics like "25 to 40 year-old fitness enthusiasts."

86.    ***Audience Amplification Solution***. Advertisers can also integrate Samba TV's user "attributes" with their "DSP of choice." A "DSP" is an entity that sits on the demand-side of real-time bidding and places bid requests on advertising space on behalf of the advertiser. Similar to its custom audiences, advertisers can "[l]everage more than 2,800 attributes" about consumers in Samba TV's database to ensure they target the right individuals at the right time through their DSP.

87.    ***Sync & Retarget Solution.*** Samba TV's Sync & Retarget solution is used by advertisers to connect with what Samba TV deems "[u]nreachables" i.e., users who the advertisers previously did not have access to. More than 400 advertisers use this solution, which enables them to link their own data to Samba TV's extensive database to identify and then target individual consumers with advertisements across devices.

88.    ***Data Sharing Partnerships.*** Samba TV enters partnerships with other companies in the advertising space to super-charge the data it already has on Plaintiffs and Class Members. For instance, it recently announced a partnership with HyphaMetrics, through which the two companies will create a "commingled multi-million device dataset" that they will make available to "brands, agencies, publishers, and currency providers[.]" Thus, Plaintiffs' and Class Members' extensive data will end up in the hands of even ***more advertisers***.

<u>**SAMBA TV MARKETS ITS PRODUCTS AS PRIVACY-PRESERVING**</u>

89.    Despite the above, Samba TV markets its identity solution and ACR technology as ***privacy-preserving***. It claims:

> Since its inception, Samba TV has been ***a proponent of the right to privacy*** and pioneered Smart TV opt-in and data protection policies in advance of General Data Protection Regulation (GDPR), California Consumer Privacy Act (CCPA), and the California Privacy Rights Act (CPRA).

90.    Samba TV boldly asserts that "[p]rivacy" is "central" to its mission. Consistent with this

claim, it publicly asserts that its data sets are "***anonymized***" and only measure online activity at the "household level."

**FIGURE 10[12]**

**Our data sets are anonymized.** Privacy is central to all we do. All of our data sets are anonymized, and we do not have contact with any opted-in users. We measure at a household level, not individual users, and household information is measured without directly identifiable information (such as names or email addresses) for maximum privacy.

91.     These statements are patently false. Samba TV's data is not anonymized by any definition of the word. This is because Samba TV collects and shares IP addresses and other information recognized—under both the California Consumer Privacy Act and the GDPR—as ***identifiable data***.

92.     The California Consumer Privacy Act defines "personal information" as "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." It expressly includes "Internet Protocol address[es]" and other "unique personal identifier[s]" as falling within this definition.

93.     Under the General Data Protection Regulation GDPR, Article 4(1), "any information relating to an identified or identifiable natural person" is personal information. This too expressly includes "[o]nline identifiers" including IP addresses.

94.     The data Samba TV collects, processes, and shares is ***especially*** identifiable because Samba TV goes out of its way—through its identity solution—to identify individuals, ***not*** households, and tracks them through its global SambaID.

95.     Despite this, Samba TV publicly represents that it is "GDPR and CCPA compliant" "100% privacy compliant" and that "PII [is] never shared."

**FIGURE 11[13]**

**Privacy Focus**

GDPR and CCPA compliant, PII never shared, 100% consumer opt-in data

---

[12] Justin Lundvall, What's the difference between your data and other data providers?, Samba TV, https://help.samba.tv/hc/en-us/articles/4405728421659-What-s-the-difference-between-your-data-and-other-data-providers.
[13] Samba TV, Engage and Measure TV Audiences, https://web.archive.org/web/20200618175206/https://samba.tv/business/.

CLASS ACTION COMPLAINT

96.    Samba TV goes so far as to include graphics representing its purported compliance with both the GDPR and California law.

**FIGURE 12[14]**



97.    Samba TV also claims it complies with Children's Online Privacy Protection Act ("COPPA")—a federal law designed to protect children online—and uses a COPPA Safe Harbor Certification provided by PRIVO.

**FIGURE 13[15]**



98.    Samba states "The PRIVO COPPA certification Seal posted on this page indicates Samba TV has established COPPA compliant privacy practices and has agreed to submit to PRIVO's oversight and consumer dispute resolution process."

---

[14] *See supra* n.3.
[15] Samba TV, Your Privacy Handbook, https://www.samba.tv/users/your-privacy-handbook.

99.    Consistent with its COPPA claims, Samba TV states that "***neither Samba TV nor its third-party business partners are able to individually identify your child with any data that we collect***."

100.    This too is a lie. By virtue of how Samba TV's ACR technology and Identity Graph work, Samba TV is identifying every individual member of a household—including children. It uniquely identifies these children (and other individuals) through its SambaID and other identifying information, which it shares with advertisers and publishers.

## USERS HAVE A REASONABLE EXPECTATION OF PRIVACY

101.    Internet users do not expect to be tracked across every single one of their internet-connected devices, including their TVs, tablets, computers, and phones.

102.    Indeed, the advent of privacy-preserving mechanisms like Apple's "Do Not Track" feature, which can prevent companies from collecting IDFA/ADID from individuals who opt-out, and similar features described above, have confirmed this expectation.

103.    One 2021 study by Flurry Analytics shows that 88% of iOS users worldwide have availed themselves of this feature, indicating consumers' intent to prevent tracking on their mobile devices.

104.    Users do not know—and did not expect—that Samba TV would create a new identifier—SambaID—to continue tracking consumers at an individual level. Plaintiffs and Class Members reasonably expected that they would not be tracked by an unknown company, let alone that it would use a unique identifier to facilitate targeted advertising across each of their devices for profit.

## SAMBA TV DOES NOT OBTAIN CONSENT

105.    Samba TV claims to have a direct relationship with consumers that "always starts with providing a clear-cut choice to opt-in or opt-out of using our services and providing equally clear-cut controls to change or tailor this choice at any time."

## FIGURE 14[16]

### 100% privacy focus

We are building a future where the consumer experience is paramount. Our technology helps you navigate the modern TV landscape, empowering you to control your data and manage privacy while connecting with content you love.



---

[16] Samba TV, Making your smart TV smarter, https://www.samba.tv/users.

CLASS ACTION COMPLAINT

106.    This is false. At the outset, Samba TV tracks each individual within a household at the individual level. This includes individuals who never agreed to ***anything*** with Samba TV because they did not set up or enable any settings on the Smart TV.

107.    Separately, Samba TV does not obtain consent from any individual—including those who set up or change settings on their Smart TVs—to perform the kind of omni-present tracking across all of their devices through its Identity Graph or to package and share this data with hundreds of advertisers.

108.    For instance, according to Sony, users who wish to enable or disable Samba Interactive TV on their Sony Smart TVs are only told that doing so will allow them to "[i]nteract with [their] favorite shows. Get recommendations based on the content [they] love. Connect [their] devices for exclusive content and special offers."



**FIGURE 15[17]**



109.    There is no mention that Samba TV will also: (1) intercept all their video-viewing data in real-time; (2) locate and identify each of their individual devices—phones, tablets, computers, etc.; (3)

---

[17] Sony, Sony Support, Information about Samba TV, https://www.sony.com/electronics/support/articles/00182856.

CLASS ACTION COMPLAINT

profile each individual and all their devices through its Identity Graph and Samba ID; (4) market and sell their identifiable video-viewing data through its data panel; or (5) use and share their private identifiable data with hundreds of other companies to facilitate cross-device targeted advertising.

110.    Moreover, Samba TV begins intercepting data from Smart TV devices *before* it ever prompts the user to "enable" its service (if it does so at all). Samba TV does this through TLS handshakes, which is a process through which Samba TV creates a secure connection with the Smart TV. Through testing, we observed that Samba TV triggered multiple TLS handshakes with a Smart TV before Samba TV was ever enabled. Through this process, Samba TV receives, at least, data including (1) the Samba TV domain being contacted (e.g., events.cid.samba.tv, manager.tvp.samba.tv, etc.); (2) the IP address of both the sender and receiver; and (3) the time the connection was made.

111.    That Samba TV does not obtain actual consent is also clear from its own statistics. Samba TV itself advertises that only *40% of consumers would share data if they have full knowledge* of a company's data collection and use practices. That means 60% of users would *__not__* share data even if there are extremely clear disclosures.[18]

### FIGURE 15



User Preferences If Fully Informed (According to SambaTV)

40%

60%

■ Opt-In  ■ Opt-Out

---

[18] Samba TV, Three Ways Samba TV Data is Creating a Better Viewing Experience for Everyone, https://www.samba.tv/resources/three-ways-samba-tv-data-is-creating-a-better-viewing-experience-for-everyone.

112.    According to Samba TV, its ACR technology reaches 111 million households and 517 million devices.[19] In 2023, it claimed to have received only ***66 opt-out requests***.[20]

113.    Thus, per Samba TV's own statistics, only 1 in approximately every 1.68 million households are opting out of its data collection. Stated differently, only .00000059%—a rate so vanishingly small that it is statistically indistinguishable from zero.

### FIGURE 16



114.    Samba's apparent "opt-out" rate is nowhere close to the 60% opt-out rate Samba TV represents will occur when there are accurate disclosures and an opt-in process.

115.    The staggering discrepancy between Figure 7 and Figure 8 confirms that Samba TV's so-called "opt-in" process is deceptive, misleading, and otherwise fails to provide users with meaningful consent.

### IDENTIFIABLE VIEWING DATA HAS OBJECTIVE VALUE

116.    The private data collected by Samba TV is extremely lucrative, which is why Samba TV was able to make an entire business model centered around selling access to this data to publishers and

---

[19] Samba TV, Target TV Viewers on Any Device, https://www.samba.tv/business/audience.
[20] Samba TV, Privacy Policy, https://www.samba.tv/users/privacy-policy?lang=en.

CLASS ACTION COMPLAINT

1  advertisers.

2  117.    Advertisers spent over 18.6 billion on Smart TV ads in 2022 alone. And video-viewing

3  data accompanied by IP addresses—like the data here—is actively bought and sold every day.

4  118.    For instance, advertisers and publishers can buy U.S. residents' CTV viewership data

5  listing their IP address, location, and title of the video they viewed for $14,850 a month a $148,500 a

6  year.

7  **FIGURE 17[21]**



19  119.    The existence of a supply-side and sell-side for this type of data shows that there is an

23  active market for this type of private information and that it has objective, monetary value.

24  **TOLLING AND CONCEALMENT**

25  120.    The earliest Plaintiffs and Class Members could have discovered Samba TV's conduct

26  was shortly before the filing of this Complaint. Plaintiffs became aware of Samba TV's conduct through

28  [21] Datarade, TV Viewership Data - CTV Analytics, https://datarade.ai/data-products/datastream-ctv-viewership-data-datasys.

CLASS ACTION COMPLAINT

communications with counsel that are protected from disclosure.

121.    Plaintiffs and Class Members, despite their due diligence, could not have discovered Samba TV's conduct by virtue of how its technology works and its lack of disclosures.

122.    Samba TV does not publicly disclose which Smart TV models use its technology. Its interception and use of Plaintiffs' and Class Members' identifying information, including IP addresses, and assignment of a SambaID happens inconspicuously in the background. This process is undetectable to an ordinary person, highly technical, and thus, prevented Plaintiffs and any Class Member from uncovering it.

123.    Samba TV had exclusive knowledge that SambaID was tracking Plaintiffs and Class Members across their internet-connection devices. Similarly, Samba TV had exclusive knowledge that it was using this information to propagate one of the largest targeted advertising systems.

124.    Samba TV's fraudulent conduct prevented Plaintiffs and Class Members from discovering its conduct. Samba TV publicly held out its identifier and technology as privacy-preserving mechanisms, even though they were not.

125.    Samba TV was under a duty to disclose the nature and significance of its data interception and use practices—especially in light of its public statements—but did not do so. Samba TV is therefore estopped from relying on any statute of limitations by virtue of the discovery rule and doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

126.    Plaintiffs bring this action under Fed. R. Civ. P. 23 individually and on behalf of the following Classes:

> **Identifier Class:** All natural persons in the United States for whom Samba TV intercepted their identifying information, or for whom Samba TV created a SambaID and/or Identity Graph.

> **ACR Class:** All natural persons in the United States who had their video-viewing data intercepted, used, or disclosed by Samba TV without their consent.

127.    The Classes exclude: (1) any judge presiding over this action or their immediate families; (2) Samba TV, its subsidiaries, affiliates, parents, successors, predecessors, and any other entity in which Samba TV has a controlling interest; (3) Samba TV's current and former employees, officers, and

directors; and (4) Plaintiffs' and Samba TV's counsel.

128. **_Numerosity._** While the precise size of the Classes is currently unknown to Plaintiffs, each of the Classes consists of well over a million individuals and members of each of the Classes can be identified through Samba TV's records.

129. **_Predominant Common Questions._** The Classes' claims present several common questions of law and fact that predominant over questions (if any) that affect individual class members. This includes:

a. Whether Samba TV violated Plaintiffs' and the Classes' privacy rights;

b. Whether Samba TV engaged in unfair and deceptive conduct;

c. Whether Samba TV's acts and practices violate the California Invasion of Privacy Act;

d. Whether Samba TV's acts and practices violate the Video Privacy Protection Act;

e. Whether Plaintiffs and Class Members are entitled to damages and/or equitable relief, including injunctive relief, restitution, and disgorgement; and

f. Whether Samba TV was unjustly enriched.

130. **_Typicality._** Plaintiffs' claims are typical of all Class Members because they arise from the same conduct and are based on the same legal theories.

131. **_Adequate Representation._** Plaintiffs will (and have) fairly and adequately represented the Classes and protected the interest of all Class Members. Plaintiffs have retained competent counsel with significant experience in class action and data privacy litigation. Plaintiffs and counsel have no interest that conflicts with the interests of the Classes and are not subject to any unique defenses. Plaintiffs and their counsel will vigorously prosecute this action to advance the interest of the Classes and have the resources necessary to do so.

132. **_Substantial Benefits._** A class action is superior to all other possible methods to fairly and efficiently adjudicate this case and controversy, and joinder of all Class Members is impracticable. Proceeding as a class case has significant advantages to individual litigation, including: (1) comprehensive oversight by a single court, which avoids inconsistent outcomes; and (2) saving time and expense by litigating the same claims arising from the same conduct all in one action.

133. Plaintiffs reserve all rights to revise or modify the lass allegations based on facts and

legal developments following additional investigation or discovery.

## CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

134.    California law applies to every Class Member's claims. Samba TV maintains its principal place of business in California and conducts substantial business in California, including the activities giving rise to Plaintiffs' and Class Members' claims. Samba TV's decision to reside in California and avail itself of California's laws makes the application of California law to its conduct alleged herein constitutionally permissible. Samba TV also elects to apply California law in its Terms of Use.

135.    Under California's choice of law rules, the application of California law is appropriate because California has significant contacts to the claims and parties in this action, and California has a greater interest in applying its laws, given Samba TV's residency in the State and the location of the conduct at issue, over any other state.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of Common Law Invasion of Privacy (Intrusion Upon Seclusion)**
**On Behalf of the Plaintiffs and Classes**

136.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

137.    Intrusion upon seclusion requires pleading: (1) that the defendant intruded on a place, conversation, or matter in which Plaintiffs have a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

138.    Samba TV's collection, interception, and use of Plaintiffs' and Class Members' personally identifiable information constitutes an intentional intrusion. As does its use of this information to create "identity graphs," the latter of which is based off these identifiers to track and profile Plaintiffs and Class Members based on their online activity.

139.    Samba TV's interception and use of Plaintiffs' and Class Members' private video-viewing history, associated with their assigned SambaID and other identifying information, is likewise an intentional intrusion upon Plaintiffs' and Class Members' solitude.

140.    Plaintiffs and Class Members reasonably expected their unique identifiers and other personal data, alongside their video-viewing activity, would not be intercepted or used by an unknown

third-party.

141.    The types of identifying information Samba TV stored in "identity graphs" are particularly private because they are often directly identifiable, permanent identifiers (e.g., IP address, etc.). Plaintiffs and Class Members reasonably expected this information would remain private and confidential and would not be intercepted or used by third parties without their consent.

142.    Plaintiffs and Class Members did not consent to, authorize, or understand Samba TV's interception or use of their private data.

143.    Samba TV's conduct is highly offensive because it violates established social norms. Consumers do not expect to be surveilled whenever they use the internet, especially in light of state laws requiring companies to make adequate disclosures regarding their collection and use of data.

144.    Samba TV's conduct is particularly offensive in light of the secretive nature in which it takes place. Plaintiffs and Class Members had no way of knowing that Samba TV collected their unique identifiers or assigned them a global SambaID to be tracked across their devices.

145.    Samba TV's conduct caused Plaintiffs and Class Members harm and injury, including a violation of their privacy interests.

146.    Plaintiffs and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Samba TV as a result of its intrusion upon seclusion.

147.    Defendant's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' and Class Members' rights. Thus, Plaintiffs and Class Members are entitled to punitive and exemplary damages.

148.    Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

**<u>SECOND CAUSE OF ACTION</u>**
**Violation of Article I, Section 1 of the California Constitution (Invasion of Privacy)**
**On Behalf of the Plaintiffs and Classes**

149.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

150.    Article I, Section 1 of the California Constitution provides: "All people are by nature free

and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1

151.    To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

152.    The right to privacy in California's Constitution creates a right of action against private and government entities.

153.    Plaintiffs and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section I of the California Constitution.

154.    The identifiable and private information Samba TV intercepted, stored, and used without Plaintiffs' and Class Members' consent was used to track them consistently, and persistently, across internet-connected services and to serve targeted advertisements. The manner in which Samba TV intercepted this information defeated established privacy-mechanisms and social norms.

155.    This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there is an entity intercepting their video-viewing data and linking it to a global unique identifier, let alone using it for profit.

156.    Samba TV's conduct violated the privacy of hundreds of thousands (if not millions) of Class Members, including Plaintiff. Samba TV did not have consent to intercept this information, let alone use it.

157.    Plaintiffs and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Samba TV as a result of its intrusion upon seclusion.

158.    Defendant's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' or Class Members' rights. Thus, Plaintiffs and Class Members are entitled to punitive and exemplary damages.

159.    Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

### THIRD CAUSE OF ACTION
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631**
**On Behalf of the Plaintiffs and Classes**

160.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

161.    CIPA § 631 prohibits any person who by means of any "machine, instrument, contrivance" or in "any other manner:" (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable, or instrument;" (2) willfully and without consent of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learns the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within" California; (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way" information so obtained; or (4) from aiding, agreeing, employing, or conspiring with "any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

162.    Samba TV is a person under CIPA § 631.

163.    Samba TV maintains its principal place of business in California, which is where it designed, created, conspired, and effectuated the interception and use of Plaintiffs' and Class Members' unique identifiers and other personal data and private communications.

164.    Samba TV ACR technology and Plaintiffs' and Class Members' computers, mobile devices, and connected TVs are each a "machine, instrument, contrivance, or . . . other manner" under CIPA § 631.

165.    At all relevant times, Samba TV used its technology to make unauthorized connections with the lines of communication and instruments used by Plaintiffs and Class Members to access online services without the consent of all parties to those communications.

166.    Samba TV willfully, and without consent, read or attempted to read, or learn the contents and meaning of, Plaintiffs' and Class Members' communications with online services while those

communications were in transmit or passing over a wire, line, or cable, or were being sent or received within California through its tracking technology, as described herein. This interception happens prior to or at the same time they would be received by the intended recipient.

167. Samba TV used, and attempted to use, these identifiable, private communications for its own benefit, including targeted advertising as described herein.

168. Samba TV also aided, agreed with, employed, and conspired with Smart TV brands and advertising entities to intercept and use this data for profit.

169. The interception and use of Plaintiffs' and Class Members' communications was without authorization or consent from Plaintiffs and Class Members.

170. Plaintiffs and Class Members have been harmed as a result of Samba TV's conduct. Their private data has been intercepted, viewed, and used for targeted advertising and has not been destroyed. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

171. Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and Class Members in an amount to be proven at trial, as well as injunctive or other equitable relief.

**FOURTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 632**
**On Behalf of the Plaintiffs and the Classes**

172. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

173. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication[.]"

174. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

175.    Plaintiffs' and Class Members' communications with their Smart TVs are confidential communications for purposes of § 632 because Plaintiffs and Class Members had an objectively reasonable expectation of privacy in this data.

176.    Plaintiffs and Class Members expected their communications would not be shared with Samba TV, as there were no adequate disclosures that Samba TV would secretly eavesdrop upon or record their information and communications.

177.    Samba TV ACR technology and Identity Graph solution are electronic amplifying or recording devices for purposes of § 632.

178.    By contemporaneously intercepting and recording Plaintiffs' and Class Members' confidential and identifiable communications through this technology, Samba TV eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

179.    At no time did Plaintiffs or Class Members consent to Samba TV's conduct, nor could they reasonably expect that their communications with their Smart TVs would be overheard and recorded by Samba TV.

180.    Samba TV utilizes these private communications for their own benefit, including to serve targeted advertisements and develop user profiles.

181.    Plaintiffs and Class Members have been harmed as a result of Samba TV's conduct. Their private data has been intercepted, viewed, and used for targeted advertising and has not been destroyed. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

182.    Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and Class Members in an amount to be proven at trial, as well as injunctive or other equitable relief.

**FIFTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 638.50 & 638.51**
**On Behalf of the Plaintiffs and the Classes**

183.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

184.    CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

185.    Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

186.    CIPA § 638.51 prohibits a person from installing either a pen register or trap and trace device without a court order.

187.    Samba TV is a person under CIPA § 638.51.

188.    Samba TV implemented and installed the ARC technology and its identity solution—which are pen registers and/or trap and trace devices—on Plaintiffs' and Class Members' devices, including their Smart TVs.

189.    These processes captured "routing, addressing, or signaling information" because they intercept, at least (1) the Samba TV domain being contacted (e.g., events.cid.samba.tv, manager.tvp.samba.tv, etc.); (2) the IP address of both the sender and receiver; (3) the time the connection was made; and (4) other identifiers, like SambaID.

190.    Samba TV was not authorized by any court order to use a pen register or trap and trace device to record or capture Plaintiffs' and Class Members' routing, addressing, or signaling information.

191.    Plaintiffs and Class Members did not consent to Samba TV's installation of a pen register or trap and trace device on their devices and browsers.

192.    Plaintiffs and Class Members have been harmed as a result of Samba TV's conduct. Samba TV did not have authorization to use pen registers and/or trap and trace devices to surveille and

identify Plaintiffs and Class Members or to intercept other routing, addressing, and signaling information.

193.    Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

194.    Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and Class Members in an amount to be proven at trial, as well as injunctive or other equitable relief.

**SIXTH CAUSE OF ACTION**
**Violation of the Comprehensive Computer Data Access and Fraud Act**
**Cal. Penal Code § 502 ("CDAFA")**
**On Behalf of the Plaintiffs and the Classes**

195.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

196.    The California Legislature enacted CDAFA to "expand the degree of protection afforded. . . from tampering, interference, damage, and unauthorized access to ([including the extraction of data from)] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

197.    Plaintiffs' and Class Members' devices on which Samba TV's tracking technology is installed, including their computers, smart phones, and tablets, constitute "Computer system" within the meaning of the CDAFA. *Id*. § 502(b)(5).

198.    The data that Samba TV accessed and collected from Plaintiffs' and Class Members' devices constitute "Data" within the meaning of the CDAFA. *Id*. § 502(b)(8).

199.    Samba TV violated § 502(c)(1) of the CDAFA by knowingly accessing without permission Plaintiffs' and Class Members' devices in order to wrongfully obtain and use their personal data, in violation of users' reasonable expectations of privacy in their devices and data.

200.  Samba TV violated § 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiffs' and the Class Members' unique identifiers and other personal data from their devices.

201.  Samba TV's tracking technology incorporated on Plaintiffs' and the Class Members' devices constitute "computer services" within the meaning of the CDAFA. Samba TV violated § 502(c)(3) by knowingly and without permission using those computer services, and/or causing them to be used. Samba TV violated § 502(c)(7) by knowingly and without permission accessing those devices, and/or causing them to be accessed.

202.  Samba TV violated §§ 502(c)(6) and (c)(13) of the CDAFA by knowingly, and without permission from Plaintiffs and the Class Members, providing and/or assisting in providing advertisers and publishers the ability to access Plaintiffs' and the Class Members' personal data via its audiences, panels, and ad integrations.

203.  Under § 502(b)(12) of the CDAFA a "computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Samba TV violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via its tracking technology incorporated on Plaintiffs' and the Class Members' devices, which intercepted their personal data. As described *supra*, the tracking technology is deeply hidden; Plaintiffs and Class Members had no way to remove it or opt out of its functionality.

204.  Plaintiffs and Class Members suffered damage and loss as a result of Samba TV's conduct. Samba TV's practices have deprived Plaintiffs and the Class Members of control over their valuable property (namely, their sensitive personal data), the ability to receive compensation for that data, and the ability to withhold their data for sale.

205.  Plaintiffs and the Class Members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

206.  Plaintiffs and Class Members have also suffered irreparable and incalculable harm and injuries from Samba TV's violations. The harm will continue unless Samba TV is enjoined from further violations of this section. Plaintiffs and Class Members have no adequate remedy at law.

207.    Plaintiffs and the Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Samba TV's violations were willful and, upon information and belief, Samba TV is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiffs and Class Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

**SEVENTH CAUSE OF ACTION**
**Violation of the Video Privacy Protection Act**
**18 U.S.C. § 2710, *et seq.***
**On Behalf of the Plaintiffs and the Classes**

208.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

209.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally[] identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

210.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

211.    Samba TV is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because its technology is incorporated in Smart TVs, which deliver prerecorded videos. Samba TV advertises its technology precisely as providing a "better viewing experience" "immersive on-screen experiences" and a "more tailored ad experience" through its technology.

212.    As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiffs and Class Members are subscribers because they used Samba TV-enabled Smart TVs to view video content and Samba TV received, at a minimum, their IP addresses and other identifying information, as well as the title and ID of the video content they viewed.

213.    As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" includes "information which identifies a person as having requested or obtained specific video materials or

35

services from a video tape service provider."

214. Defendant knowingly caused Plaintiffs' and Class Members' video viewing information, as well as their unique identifying information (e.g., IP address, SambaID, etc.) to be disclosed to third parties, including to advertisers, publishers, and data brokers. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class Member to third parties as an individual who viewed specific video content. This information allowed each third party, including advertisers, to identify each Plaintiff's and Class Member's specific individual video viewing preferences and habits.

215. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Defendant failed to obtain informed, written consent under this definition.

216. As described in Paragraphs 105-115, Samba TV did not obtain consent consistent with the VPPA.

217. By knowingly disclosing Plaintiffs' and Class Members' personal viewing content, Defendant violated Plaintiffs' and Class Members' statutorily protected right to privacy in their video-watching habits and Plaintiffs and Class Members were damaged. *See* 18 U.S.C. § 2710(c).

218. As a result of the above violations, Defendant is liable to Plaintiffs and Class Members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "actual damages but not less than liquidated damages in an amount of $2,500 per violation." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Defendant is also liable for reasonable attorney's fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Defendants in the future.

## EIGHTH CAUSE OF ACTION
### Unjust Enrichment
### On Behalf of the Plaintiffs and the Classes

219. Plaintiffs re-allege and incorporates the preceding allegations of this Complaint with the

36

same force and effect as if fully restated herein.

220.    Samba TV receives benefits from Plaintiffs and Class Members in the form of their unique identifiers and other personal data and private online communications. Samba TV acquired this information without Plaintiffs' and Class Members' authorization and without providing corresponding compensation.

221.    Samba TV acquired and used this private data for its own benefit, including tangible economic benefits from companies that used Samba TV for targeted advertising.

222.    Had Plaintiffs and Class Members known of Samba TV's misconduct, they would not have agreed Samba TV could acquire and use their private data.

223.    Samba TV unjustly retained these benefits at the expense of Plaintiffs and Class Members. Plaintiffs and Class Members were harmed by this conduct and were not provided any commensurate compensation.

224.    The benefits Samba TV received and derived benefit from Plaintiffs' and Class Members' private data rightly belonging to Plaintiffs and Class Members. It is inequitable under unjust enrichment principles for Samba TV to retain the profits and other intangible benefits they derived through its wrongful conduct.

225.    Samba TV should be compelled to disgorge these profits and other inequitable proceeds in a common fund for the benefit of Plaintiffs and Class Members.

## <u>NINTH CAUSE OF ACTION</u>
**Injunctive Relief**
**On Behalf of the Plaintiffs and the Classes**

226.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

227.    Samba TV's conduct has and continues to cause harm to Plaintiffs' and Class Members' privacy and autonomy, as it continues to store unique persistent identifiers, as well as the private contents of their communications, on its own systems. Samba TV routinely uses this information for targeted advertising.

228.    Accordingly, Plaintiffs and Class Members seek injunctive relief, including an order permanently restraining Samba TV from continuing to use and store this information without consent

and/or a court order, and requiring Samba TV to delete this information from its systems.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the putative Classes requests the Court enter an Order:

    a.   Certifying the Classes and appointing Plaintiffs as Class Representatives;

    b.   Finding Samba TV's conduct unlawful;

    c.   Awarding injunctive and other equitable relief as is just and proper;

    d.   Awarding Plaintiffs and the Classes statutory, actual, compensatory, punitive, nominal, and other damages, as well as restitution and/or disgorgement of unjust and unlawful profits;

    e.   Awarding pre-judgment and post-judgment interest;

    f.   Awarding reasonable attorneys' fees, costs, and expenses; and

    g.   Granting any other relied as the Court sees just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: April 18, 2025

    */s/ Willem F. Jonckheer*
Robert C. Schubert S.B.N. 62684
Willem F. Jonckheer S.B.N. 178748
Amber L. Schubert S.B.N. 278696
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel.: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
Rachel Kesten (*pro hac vice* forthcoming)
Yuanchen Lu (pro hac vice forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035

38

clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com
ylu@lowey.com

*Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT