Robert C. Schubert S.B.N. 62684
Willem F. Jonckheer S.B.N. 178748
Amber L. Schubert S.B.N. 278696
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel.: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law

Christian Levis (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
Rachel Kesten (*pro hac vice*)
Yuanchen Lu (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com
ylu@lowey.com

*Attorneys for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

STEVE DELLASALA, BOB WARDEN, and VINCE TOPHONEY, individually and on behalf of all others similarly situated,

Plaintiff,

v.

SAMBA TV, INC.

Defendant.

Case No. 3:25-cv-03470

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Steve DellaSala, Bob Warden, and Vince Tophoney (collectively, "Plaintiffs") individually and on behalf of all other similarly situated individuals, assert the following against Defendant Samba TV, Inc. ("Samba TV") based upon personal knowledge, information and belief (where applicable), and the investigation of counsel.[1]

## SUMMARY OF ALLEGATIONS

1. Nearly 80% of U.S. households own a Smart TV, which enables them to access traditional cable television, as well as streaming services, like Hulu and Amazon Prime.

2. What they don't know is one company—Samba TV—has been embedding its chip set in popular Smart TVs since 2011. This chip set enables (among other things) Samba TV's patented Automatic Content Recognition ("ACR") technology, which uses video fingerprinting and machine learning to accurately identify what the viewer is watching on their Smart TV.

3. This business practice isn't just creepy, it's extremely lucrative. Samba TV has a stronghold on video-viewing data, and it sells access to this data to advertisers and other companies.

4. Samba TV's ACR data is particularly valuable because of its ability to uniquely identify ***individual consumers and each of their devices***.

5. Samba TV can identify and target people at the individual-level because of the Samba TV Identity Graph and its closely related SambaID—its proprietary universal identifier.

6. Samba TV uses probabilistic and deterministic algorithms that match signals (IP address, operating system, etc.) from Plaintiffs' and Class Members' Smart TVs to their other devices, such as smart phones and tablets. Through this process, Samba TV can identify which devices belong to which specific individuals. It assigns a SambaID to each individual and each of their respective devices, which it uses to enable cross-device tracking and advertising.

7. This type of targeting is particularly sought out by advertisers today, as many companies have begun to move away from traditional user-based online tracking in recognition that it is privacy invasive. This began in the early 2010s when Apple Inc. announced it would no longer allow companies to collect UDID, which is a permanent device identifier that was used for online advertising. Similar

[1] Plaintiffs intend to file a Second Amended Class Action Complaint that will supersede this amended complaint if the Court grants the Parties' stipulation filed concurrently today to add California plaintiffs and claims under Federal Wiretap Act, 18 U.S.C. § 2510, *et. seq.* and California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.

changes followed in the next decade, with the roll out of additional privacy-preserving features like Apple Inc.'s "Do Not Track" setting, which sought to prevent the collection of advertising IDs from mobile device users, as well as updates by several browsers to block "third-party" cookies (i.e., text files placed on a user's device from domains they are not visiting), which are used to track users across multiple websites.

8. Through Samba TV's identity solution—and complimentary ACR product—Samba TV has been secretly harvesting and monetizing identifiable video-viewing data from tens of millions of U.S. residents without their knowledge and consent.

9. Individuals have a baseline expectation of privacy, in which they do not expect any company to engage in wide-spread surveillance of all their video-viewing habits or to market their identifiable video-viewing data to third parties for profit.

10. Plaintiffs and Class Members had no knowledge that Samba TV was using a unique, persistent identifier to track them across their devices, or that it was using this identifier and their private video-viewing history to facilitate highly specific targeted advertising.

## PARTIES

### A. Plaintiff DellaSala

11. Plaintiff Steve DellaSala is a resident of Burk County, North Carolina.

12. Plaintiff DellaSala has owned a Sony XDR-65A8H television and a Sony XR-55A80J television for less than four years. Plaintiff DellaSala watches video-viewing content on his Sony televisions, including content on streaming services. The video-viewing content Plaintiff DellaSala selected and watched in the privacy of his own home is inherently private.

13. Unbeknownst to Plaintiff DellaSala, Samba TV used its chip set embedded in Plaintiff DellaSala's televisions to intercept unique identifiers associated with his device, including his IP address, GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID.[2] Upon information and belief, Samba TV supplemented the identifiers it collected from Plaintiff DellaSala with other identifying information it receives from advertisers and partners, including SHA256 hashed email addresses, mobile advertising IDs, and any additional IP addresses and CTV device IDs.

---

[2] These identifiers are described in ¶¶ 72-78.

14. Samba TV used Plaintiff DellaSala's IP address and the other identifiers it collected directly, as well as information from other partners and advertisers, to identify his televisions, as well as his other devices, including his iPhone, tablets, and computers.

15. Samba TV used each of these identifiers to create an identity graph for Plaintiff DellaSala that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

16. Samba TV also intercepted Plaintiff DellaSala's private video-viewing data in real time, including what he watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff DellaSala.

17. Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff DellaSala ads across his TV, phones, computers, and tablets. Samba TV also used this data to place Plaintiff DellaSala in custom audiences and its lucrative panel product.

18. Plaintiff DellaSala did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

**B. Plaintiff Warden**

19. Plaintiff Bob Warden is a resident of Tulsa County, Oklahoma.

20. Plaintiff Warden has owned a Sony XBR-55X850C television since approximately 2015. Plaintiff Warden watches video-viewing content on his Sony television, including content on cable television and through streaming services. The video-viewing content Plaintiff Warden selected and watched in the privacy of his own home is inherently private.

21. Unbeknownst to Plaintiff Warden, Samba TV used its chip set embedded in Plaintiff Warden's television to intercept unique identifiers associated with his device, including his IP address, GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID. Upon information and belief, Samba TV supplemented the identifiers it collected from Plaintiff Warden with other identifying information it receives from advertisers and partners, including SHA256 hashed email addresses, mobile advertising IDs, and any additional IP addresses and CTV device IDs.

22. Samba TV used Plaintiff Warden's IP address and the other identifiers it collected directly,

as well as information from other partners and advertisers, to identify his television, as well as his other devices, including his Android mobile phone and computers.

23. Samba TV used each of these identifiers to create an identity graph for Plaintiff Warden that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

24. Samba TV intercepted Plaintiff Warden's private video-viewing data in real time, including what he watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff Warden.

25. Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff Warden ads across his TV, phones, and tablets. Samba TV also used this data to place Plaintiff Warden in custom audiences and its lucrative panel product.

26. Plaintiff Warden did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

**C. Plaintiff Tophoney**

27. Plaintiff Vince Tophoney is a resident of Wake County, North Carolina.

28. Plaintiff Tophoney has owned a Sony XBR-75X800H television for approximately four years. Plaintiff Tophoney watches video-viewing content on his Sony television, including content on cable television and through streaming services. The video-viewing content Plaintiff Tophoney selected and watched in the privacy of his own home is inherently private.

29. Unbeknownst to Plaintiff Tophoney, Samba TV used its chip set embedded in Plaintiff Tophoney's televisions to intercept unique identifiers associated with his device, including his IP address, GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID. Upon information and belief, Samba TV supplemented the identifiers it collected from Plaintiff Tophoney with other identifying information it receives from advertisers and partners, including SHA256 hashed email addresses, mobile advertising IDs, and any additional IP addresses and CTV device IDs.

30. Samba TV used Plaintiff Tophoney's IP address and the other identifiers it collected directly, as well as information from other partners and advertisers, to identify his televisions, as well as

his other devices, including his iPhone and computer.

31. Samba TV used each of these identifiers to create an identity graph for Plaintiff Tophoney that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

32. Samba TV intercepted Plaintiff Tophoney's private video-viewing data in real time, including what he watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff Tophoney.

33. Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff Tophoney ads across his TV, phone, and computer. Samba TV also used this data to place Plaintiff Tophoney in custom audiences and its lucrative panel product.

34. Plaintiff Tophoney did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

**D. Defendant**

35. Samba TV is a Delaware corporation with its principal place of business located in San Francisco, California.

36. Samba TV knowingly and intentionally incorporated its chip set into televisions to track Plaintiffs' and Class Members' video-viewing history and other activity.

37. Samba TV knowingly and intentionally developed a persistent, unique identifier designed to accurately link Plaintiffs' and Class Members' video-viewing history and online activity to their individual identities.

38. Samba TV knew that its unique identifier and identity graph solution were inconsistent with expectations of privacy because it had publicly stated that tracking individuals in such a manner raised privacy concerns.

39. Samba TV knowingly and intentionally used its identifiers, and video-viewing data associated with it, to facilitate targeted advertisements for profit.

## JURISDICTION AND VENUE

40. Jurisdiction is proper under 28 U.S.C. § 1331 because Plaintiffs bring claims under the

Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq*. The Court may exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' and Class Members' state law claims because these claims arise from a common nucleus of operative facts relating to Samba TV's interception and use of Plaintiffs' and Class Members' unique identifiers and other personal data.

41. Jurisdiction is also proper under 28 U.S.C § 1332(d) because: (1) the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, (2) there are more than 100 putative members of the Class, and (3) a significant portion of Class Members are citizens of a state different from Samba TV.

42. This Court has personal jurisdiction over Samba TV because its principal place of business is in California. Additionally, this Court has personal jurisdiction over Samba TV because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in California, including Samba TV's interception and use of Plaintiffs' unique identifiers and other personal data.

43. Venue is proper under 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District. Furthermore, Samba TV is headquartered in this District and subject to personal jurisdiction in this District.

44. This action arises in San Francisco County, in that a substantial part of the events which gave rise to the claims asserted herein occurred in San Francisco County. Pursuant to L.R. 3-2(e), all actions that arise in San Francisco County shall be assigned to the San Francisco or Oakland Division.

## BACKGROUND OF USER TRACKING

45. Over a decade ago, Apple announced it would no longer allow app developers to intercept "UDIDs" which are unique, device-specific identifiers. These persistent identifiers were deprecated because they are seen as privacy intrusive—they cannot be reset and were used to facilitate device-specific targeted advertising.

46. This trend only continued. Starting in 2020, Apple and Google announced the eventual deprecation of advertising identifiers (IDFA and ADID) and third-party cookies in favor of more privacy-preserving mechanisms.

47. The loss of some of the most common unique identifiers raised serious concerns within the multi-billion-dollar digital advertising industry. Digital advertisers relied on these identifiers and cookies

to uniquely identify individuals who use their products and services—and other entities' products and services—to serve targeted advertisements to individuals based on profiles of information reflecting web and app activity indexed to unique identifiers present in third-party cookies.

48. For instance, a mobile app developer would use identifiers like the IDFA and ADID created by iOS and Android phones to track user activity across their mobile application, understand what actions users took and their preferences, interests, and other information. The company would then send that information to an advertising company, such as Google, to serve targeted advertisements to that customer using this unique identifier.

49. Proposed solutions to make up for these unique identifiers and third-party cookies were not nearly as effective. For instance, some companies sought to track user "sessions" (i.e., one interaction with the webpage until the user closes out) in lieu of other unique identifiers. However, this alternative was not nearly as powerful as directly tracking an individual at the user or device-level.

**SAMBA TV'S IDENTITY GRAPH & SAMBA ID**

50. Samba TV was well aware of the privacy implications associated with tracking users at an individual level, as well as Google's plan to deprecate these types of identifiers on its own platform.

51. Its SVP & Head of Data Products, Chris Squire, authored an article on May 25, 2021, confirming this:

> The loss of some identifiers will inhibit the ability to deliver one-to-one targeted advertising compared to the ways of old. ***Truth be told, this may actually be good for advertisers in the long run. Reaching individuals is fraught with privacy implications.***

52. Samba TV's co-founder and CEO echoed these concerns about the lack of first-party cookies and mobile IDs:

> Cookie and mobile ID deprecation is coming faster than advertisers would like to believe, and many simply aren't prepared for a world where they'll lose the identifier they've relied on thus far . . . . ***Without these IDs*** to deliver and measure campaigns, ***advertiser's budgets will be wasted*** on campaigns that fail to coordinate messaging for target audiences across devices. This gets even more complicated as TV consumption shifts towards OTT. ***There is plenty of opportunity for advertisers to target and message their desired consumers, but they need an identifier that will survive the death of cookies and help them understand omniscreen performance.***

53. Despite that Samba TV's own executive recognized that tracking users at the individual-level raises "privacy implications[,]" Samba TV sought to fill the hole left by Google and others by

creating a unique, user-level identifier of its own: SambaID—which is powered by Samba TV's Identity Graph.

54. Samba TV markets its Identity Graph and SambaID precisely as a solution for the "changes with identity" currently taking place in the advertising industry. It calls its solutions "[f]uture proof" and adaptable to "ever-changing privacy regulations."[3]

**FIGURE 1[4]**




55. SambaID and its Identity Graph are built on top of proprietary technology from Screen6, which Samba acquired in 2019.

56. The technology enables cross-device tracking through highly accurate deterministic and probabilistic algorithms. It processes over a dozen signals from a device (e.g., IP address, device ID, time stamp, operating system, hardware, etc.) and matches them with other devices that share the same signals and identifiers (e.g., tablets, smartphones, TVs, and laptops) to uncover which specific devices are owned and used by the same individual.

57. The "anchor" for the SambaID and Samba's Identity Graph is its ACR technology (discussed further below), incorporated in the chip set of Smart TVs. Through this "anchor" (i.e., Smart TVs) Samba intercepts IP addresses, unique device identifiers, and other device and signaling information directly from consumers' Smart TVs, which is how its proprietary technology can begin identifying which specific users are interacting with the Smart TV and their separate individual devices.

[3] Samba TV, Bridge datasets in the evolving identity world, https://www.samba.tv/business/identity.
[4] *Id.*

**FIGURE 2**[5]




58. Samba TV obtains additional data from advertisers and other Samba TV "partners." This "bridge" between datasets allows advertisers and Samba TV—who already have extensive data on individuals—to combine data for even more advanced targeting, measurement, and optimization across devices through their existing ad solutions. The types of additional identifying information Samba TV receives from advertisers and partners—and adds to its existing user profiles—include SHA256 hashed email addresses[6], mobile advertising IDs (i.e., Android Advertising ID (AAID) and Apple Advertising ID (IDFA), mobile device IDs (i.e., IDFV and Android ID), and additional IP addresses and CTV device IDs.[7]

59. For example, one way Samba TV gets its hands on additional data from "partners" that it adds to its identity profiles is through its application programming interfaces ("APIs"), which are available for use on Android, iOS, tvOS, and websites. Any third parties can incorporate Samba TV's API, so long as they receive an API Key from Samba TV. Using these APIs, Samba TV receives identifiers associated with consumers' other devices, such as their mobile phones and tablets.

60. Using all this data Samba TV gets its hands on, Samba TV's "multi-identifier pattern

---

[5] Samba TV, Bridge datasets in the evolving identity world, https://www.samba.tv/business/identity.

[6] SHA256 hashing does nothing to protect or obscure the underlying information. *See* Staff in the Office of Technology, *No, hashing still doesn't make your data anonymous*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous (July 24, 2024).

[7] *Samba Identity Resolution*, SAMBA TV, https://marketplace.databricks.com/details/ad4ff8fa-fc08-4e30-8ae7-914b9fad61a2/Samba-TV_Samba-Identity-Resolution?utm_source=chatgpt.com (last visited December 1, 2025); *Event*, MPARTICLE, https://docs.mparticle.com/integrations/samba-tv/event/ (last visited December 1, 2025).

recognition model[8] creates a "robust and accurate Identity Graph, ensuring that advertisers get a view into ***all of the devices in a household***." Samba TV refers to this as its "[f]irst-party data advantage." Combining its ACR technology and data it gets from partners and advertisers, Samba TV's Identity Graph "can identify at the household, person [and] device level (including all digital devices – phones, tablets, PCs, etc."[9] All of this information, alongside video-viewing data, is stored in individual user profiles.

61. Samba TV offers advertisers and publishers access to its "[a]ccurate real-time private identity graph[s] across devices and all properties." Through this technology, "advertisers can identify any type of TV viewer, target them based on how and when they consume TV, and then engage them on their phone, tablet, PC, or TV."

**FIGURE 3[10]**




62. Samba TV's identity solution gives it a significant advantage over competing ad tech companies—which is precisely how it markets this technology to advertisers.

---

[8] Samba TV's patents—including Patent No. 10,880,340—confirm the same. This patent describes how Samba TV's technology matches identification data from the Smart TV to identification data from other devices on the network to identify and associate the information with a specific user. The purpose of this technology is because there is a "revenue opportunity" whereby an "interested party (e.g., a content creator, a retailer, a manufacturer, an advertiser)" can show the individual relevant content, i.e., advertisements.

[9] Amanda Festa, *Ask a Samba TV Expert: A deep dive into Samba TV viewership insights*, SAMBATV, https://www.samba.tv/resources/a-deep-dive-into-samba-tv-viewership-insights (last visited December 4, 2025).

[10] *True Reach & Frequency*, SAMBA TV, https://www.samba.tv/business/measurement-truereachandfrequency. (last visited December 4, 2025).

**FIGURE 4[11]**




**SAMBA TV'S ACR TECHNOLOGY**

63. As described above, the "anchor" for Samba TV's identity solution is its ACR technology embedded in Smart TVs.

64. Samba TV's ACR technology works by listening and recognizing content being viewed on the Smart TV—a process called video fingerprinting. Samba TV intercepts the frames (i.e., images from the video content shown on the TV) directly from the TV, as well as over two dozen metadata fields, including certain geolocation information, channel, subchannel, volume percentage, whether the TV is muted, width, height, and more.

65. Using this data, Samba TV can tell exactly what movie, show, episode, video game, or ad is being viewed, regardless of whether it is from a cable network, streaming service, or even a video game console. Samba TV intercepts and processes the content in real-time, often in just a few seconds.

66. Samba TV bills itself as the "Heartbeat of Television" precisely because of the insights it gains through its ACR technology. It boasts that it "capture[s] second-by-second viewership data" from over 13 million households, which it "feeds into the largest TV data capture footprint in the industry" –all "owned and controlled by Samba TV."

[11] *Id.*

**FIGURE 5[12]**




67. As shown in Figure 5—which comes from Samba TV marketing materials—it can identify the exact show, season, and episode viewed by the user, as well as their household ID, location, the devices "mapped" in the household, and the time and date the material was viewed.

68. Using AI, Samba TV can now tell even more information about what specific viewers are watching. Samba TV advertises that the "second-by-second on-screen metadata" it captures can depict "actors, music, visual descriptions, and objects" all so it can have a "deeper understanding" of what the consumer is viewing.

69. Samba TV also supplements its actual data collection efforts with data it licenses from set-top box providers. Together, it claims to have access to 46 million TV households globally and 28 million in the United States.

70. Samba TV processes and stores this data on its own systems—which it uses to create audiences, panels, and otherwise service advertising needs—all of which is tied back to the universal SambaID and user profiles it creates for specific individuals through its Identity Graph.

[12] Sapna Maheshwari, *How Smart TVs in Millions of U.S. Homes Track More Than What's On Tonight*, NY Times (July 5, 2018), available at, https://www.nytimes.com/2018/07/05/business/media/tv-viewer-tracking.html.

**SAMBA TV'S COLLECTION OF IDENTIFIERS THROUGH ITS ACR TECHNOLOGY**

71. None of the data Samba TV intercepts through its ACR technology is deidentified, anonymized, or aggregated. As soon as Plaintiffs and Class Members set up their device, Samba TV assigns a GUID, which is a unique long-term identifier for that specific TV. Samba TV first tries to set the GUID by checking for a specific ID set by the TV manufacturer (e.g., Sony) and, if none is available, sets the GUID as a hashed Android ID (intercepted as "UUID"). The Android ID/UUID is yet another unique device identifier set by Android that Samba TV also intercepts and uses. Both the GUID and Android ID/UUID persist across reboots and app updates, as does the IP address that Samba TV also intercepts.

72. Samba TV also assigns and intercepts a number of additional identifiers used to track the TV, specific users, and each of their video-viewing sessions. For instance, Samba TV intercepts the device's Android Advertising ID ("AAID"), which is an additional unique identifier for the TV that is set by Android specifically for advertising. Samba TV also sets and intercepts two of its own additional identifiers, the Samba Advertising ID (SDADID) and Samba Measurement ID (SMID).

73. Samba TV also tracks specific TV "sessions." In each session, Samba TV intercepts information about that specific video-viewing instance, including the unique GUID, Android ID/UUID, AAID, and timestamps, as well as the "tvSessionId" and "lastTVSessionId." These SessionIDs are derived by hashing the Android ID/UUID with a timestamp. Because the SessionID and Android ID/UUID are transmitted together, Samba TV can always associate a particular SessionID with the Android ID/UUID. These sessions further enable long-term tracking of Plaintiffs and Class Members' specific video-viewing activities.

74. In addition to these identifiers, Samba TV constructs fingerprint maps and uses metadata enrichment to uncover even more information about the specific device. This includes platform information, make, model_id, firmware_version, device_name, device_language, brand, and model_year.

75. Further ensuring Samba TV can track Plaintiffs' and Class Members' specific video-viewing habits, Samba TV sends data directly from the TV to Mixpanel, a separate third party. Mixpanel receives its own device_id set by Mixpanel, as well as the GUID.

76. By using multiple identifiers, Samba TV makes it virtually impossible for Plaintiffs and Class Members to disable Samba TV's tracking. Even if Plaintiffs and Class Members were able to

uncover this conduct (and they were not) and tried to reset the "device advertising ID" on their TVs, this would be a futile act. While this feature is represented by Samba TV as allowing consumers to "clear the data associated with your advertising profile," this functionality can only reset the AAID and SDADID—it would have no impact on the GUID or Android ID/UUID. And since these identifiers are all sent together, Samba TV can simply associate the new AAID and SDADID with the existing GUID and Android ID/UUID. Thus, Samba TV can continue consistently tracking each consumer regardless of this reset even if consumers tried to use this functionality.

77. As described above, each of these identifiers is used as the "anchor" for Samba TV's Identity Graph, which enables Samba TV to identify and profile not only Plaintiffs' and Class Members' specific TVs, but each of their other personal devices, including their individual phones, tablets, and PCs through deterministic and probabilistic matching.

## SAMBA TV SHARES AND SELLS ACCESS TO IDENTIFIABLE DATA FOR PROFIT

78. Samba TV packages and shares this identifiable data in a number of ways, including through its panel product and audience segments, as well as directly with advertisers and publishers.

79. ***The Samba Panel.*** Samba TV packages and normalizes all the data it obtains about individuals—tied to the SambaID—into a data panel, which it sells for profit. This panel is so extensive that Samba TV actively markets it as comparable to U.S. census data. It claims the millions of individuals represented in its panel have "between a .00003% and .01% delta compared to U.S. census for gender, ethnicity, age & income."

80. ***Custom Audience Solution.*** Samba TV places individual consumers into custom audiences based on their unique video-viewing habits and other data Samba TV compiles about them. Samba TV provides this information to advertisers and publishers so they can target the individuals contained within these audiences with advertisements.

81. These audiences provide unique insights about Plaintiffs and Class Members, including their demographics, hobbies, political beliefs, and more.

82. For instance, Samba TV can determine an individual's political leanings based on their TV viewing habits. Samba TV packages individuals with similar political leanings into the same audience.

**FIGURE 6**[13]

| | | | | | |
|---|---|---|---|---|---|
| **Politics > 2024 State of the Union Address** Reach TV households that have likely watched 2024 State of the Union Address. | Select a Platform | Politics | Data Segment | | 15.6M |
| **Politics > Heavy Viewers of Conservative News** Reach TV households that have likely watched conservative-affinity news networks. | Select a Platform | Politics | Data Segment | - | 5.9M |
| **Politics > Heavy Viewers of Liberal News** Reach TV households that have likely watched liberal-affinity news networks. | Select a Platform | Politics | Data Segment | - | 5.3M |
| **Politics > Liberal Affinity TV News** Reach TV households that have likely watched TV networks most trusted by liberals (CNN, MSNBC, etc.) | Select a Platform | Politics | CTV PMP | $25 | 38.6M |
| **Politics > Conservative Affinity TV News** Reach TV households that have likely watched TV networks most trusted by conservatives (Fox News, etc.) | Select a Platform | Politics | Online Video PMP | $15 | 34M |

83. As shown in Figure 6, Samba TV uses video-viewing habits to see who has an "affinity" for conservative or liberal news, as well as who it considers to be a "[h]eavy [v]iewers" of such content.

84. Samba TV also created custom audiences indicating who watched content in foreign languages, including Chinese-Mandarin, Japanese, and Korean TV.

**FIGURE 7**[14]

| | | | | | |
|---|---|---|---|---|---|
| **Demographics > TV Language > Chinese-Mandarin TV** Reach TV households that have likely watched Chinese-Mandarin-speaking TV shows and movies. | Select a Platform | Demographics | Data Segment | - | 8.5M |
| **Demographics > TV Language > Japanese TV** Reach TV households that have likely watched Japanese-speaking TV shows and movies. | Select a Platform | Demographics | Data Segment | - | 10M |
| **Demographics > TV Language > Korean TV** Reach TV households that have likely watched Korean-speaking TV shows and movies. | Select a Platform | Demographics | Data Segment | - | 10.3M |

85. It created even more specific audiences geared to niche content, like individuals who watched content associated with Pride Month, Mother's Day, and Black History Month.

[13] Samba TV, Audiences, https://www.samba.tv/business/audience/ui.
[14] *Id.*

**FIGURE 8**[15]

| | | | | | |
|---|---|---|---|---|---|
| **Holiday & Trending Events > Pride Month Specials**<br>Reach TV households that have likely watched movies or television programming associated to Pride Month<br>What's included? | Select a Platform | Holiday & Trending Events | Data Segment | - | 29.4M |
| **Holiday & Trending Events > Mother's Day Specials**<br>Reach TV households that have likely watched movies or television programming associated to Mother's Day<br>What's included? | Select a Platform | Holiday & Trending Events | Data Segment | - | 31.3M |
| **Holiday & Trending Events > Black History Month Specials**<br>Reach TV households that have likely watched movies or television programming associated to Black History Month<br>What's included? | Select a Platform | Holiday & Trending Events | Data Segment | - | 30.2M |

86. Samba TV also creates audiences beyond video-viewing data, including audiences reflecting what video games users play, like Skyrim, God of War, and the FIFA series.

**FIGURE 9**[16]

| | | | | | |
|---|---|---|---|---|---|
| **Gaming Genre > Action > Skyrim Console Fans**<br>Reach households that have likely played Skyrim video games | Select a Platform | Video Gamers | Data Segment | - | 8.3M |
| **Gaming Genre > Action-Adventure > God of War Console Fans**<br>Reach households that have likely played God of War video games | Select a Platform | Video Gamers | Data Segment | - | 8.8M |

87. These audiences can be immediately incorporated into existing advertiser and data broker accounts, including Free Wheel, Google Ads, LiveRamp, the Trade Desk, and Yahoo. All an advertiser needs to do is copy the "Deal ID" into their platform of choice to start targeting these individuals in an advertising campaign. Samba TV routinely refreshes this data so these advertisers "have access to the latest audiences available."

[15] *Id.*
[16] *Id.*

88. Samba TV also helps its advertising partners create audiences that suit their own specific business needs. For instance, Samba TV helped one client create audiences based on characteristics like "25 to 40 year-old fitness enthusiasts."

89. ***Audience Amplification Solution***. Advertisers can also integrate Samba TV's user "attributes" with their "DSP of choice." A "DSP" is an entity that sits on the demand-side of real-time bidding and places bid requests on advertising space on behalf of the advertiser. Similar to its custom audiences, advertisers can "[l]everage more than 2,800 attributes" about consumers in Samba TV's database to ensure they target the right individuals at the right time through their DSP.

90. ***Sync & Retarget Solution.*** Samba TV's Sync & Retarget solution is used by advertisers to connect with what Samba TV deems "[u]nreachables" i.e., users who the advertisers previously did not have access to. More than 400 advertisers use this solution, which enables them to link their own data to Samba TV's extensive database to identify and then target individual consumers with advertisements across devices.

91. ***Data Sharing Partnerships.*** Samba TV enters partnerships with other companies in the advertising space to super-charge the data it already has on Plaintiffs and Class Members. For instance, it recently announced a partnership with HyphaMetrics, through which the two companies will create a "commingled multi-million device dataset" that they will make available to "brands, agencies, publishers, and currency providers[.]" Thus, Plaintiffs' and Class Members' extensive data will end up in the hands of even ***more advertisers***.

**SAMBA TV MARKETS ITS PRODUCTS AS PRIVACY-PRESERVING**

92. Despite the above, Samba TV markets its identity solution and ACR technology as ***privacy-preserving***. It claims:

> Since its inception, Samba TV has been ***a proponent of the right to privacy*** and pioneered Smart TV opt-in and data protection policies in advance of General Data Protection Regulation (GDPR), California Consumer Privacy Act (CCPA), and the California Privacy Rights Act (CPRA).

93. Samba TV boldly asserts that "[p]rivacy" is "central" to its mission. Consistent with this claim, it publicly asserts that its data sets are "***anonymized***" and only measure online activity at the "household level."

**FIGURE 10[17]**

> **Our data sets are anonymized.** Privacy is central to all we do. All of our data sets are anonymized, and we do not have contact with any opted-in users. We measure at a household level, not individual users, and household information is measured without directly identifiable information (such as names or email addresses) for maximum privacy.

94. These statements are patently false. Samba TV's data is not anonymized by any definition of the word. This is because Samba TV collects and shares IP addresses and persistent device identifiers that—under both the California Consumer Privacy Act and the GDPR—are classified as ***identifiable data***.

95. The California Consumer Privacy Act defines "personal information" as "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." It expressly includes "Internet Protocol address[es]" and other "unique personal identifier[s]" as falling within this definition.

96. Under the General Data Protection Regulation GDPR, Article 4(1), "any information relating to an identified or identifiable natural person" is personal information. This too expressly includes "[o]nline identifiers" including IP addresses.

97. The data Samba TV collects, processes, and shares is ***especially*** identifiable because Samba TV goes out of its way—through its identity solution—to identify individuals, ***not*** households, and tracks them through its global SambaID.

98. Despite this, Samba TV publicly represents that it is "GDPR and CCPA compliant" "100% privacy compliant" and that "PII [is] never shared."

**FIGURE 11[18]**

> **Privacy Focus**
>
> GDPR and CCPA compliant, PII never shared, 100% consumer opt-in data

99. Samba TV goes so far as to include graphics representing its purported compliance with both the GDPR and California law.

[17] Justin Lundvall, What's the difference between your data and other data providers?, Samba TV, https://help.samba.tv/hc/en-us/articles/4405728421659-What-s-the-difference-between-your-data-and-other-data-providers.

[18] Samba TV, Engage and Measure TV Audiences, https://web.archive.org/web/20200618175206/https://samba.tv/business/.

**FIGURE 12[19]**




100. Samba TV also claims it complies with Children's Online Privacy Protection Act ("COPPA")—a federal law designed to protect children online—and uses a COPPA Safe Harbor Certification provided by PRIVO.

**FIGURE 13[20]**

COPPA SAFE HARBOR CERTIFICATION KiDS PRIVACY ASSURED BY PRIVO

101. Samba TV states "The PRIVO COPPA certification Seal posted on this page indicates Samba TV has established COPPA compliant privacy practices and has agreed to submit to PRIVO's oversight and consumer dispute resolution process."

102. Consistent with its COPPA claims, Samba TV states that "***neither Samba TV nor its third-party business partners are able to individually identify your child with any data that we collect***."

103. This too is a lie. COPPA requires companies falling within its purview to meet certain requirements prior to collecting, using, or disclosing personal information about children, who are defined

[19] *See supra* n.3.

[20] Samba TV, Your Privacy Handbook, https://www.samba.tv/users/your-privacy-handbook.

as individuals under the age of 13.

104. By virtue of how Samba TV's ACR technology and Identity Graph work, Samba TV is identifying every individual member of a household—including children under the age of 13. Samba TV uniquely identifies these children (and other individuals) through its SambaID and other identifiers found in each consumer's respective identity graph (e.g., device identifiers, like GUID, and other identifying information, like email addresses), which it shares with advertisers and publishers alongside their private video-viewing data. Thus, Samba TV's representation that it is not able to "identify [consumers'] children" is plainly false—it identifies and sells access to this information.

105. COPPA contains other requirements that Samba TV also does not comply with. COPPA requires companies falling within its purview to, among other things: (1) obtain parental consent before collecting or using personal information from children under the age of 13; (2) prominently provide disclosures on its website or online service about the information it collects from children under the age of 13, how it obtains and uses such information, and its disclosure practices; and (3) provide direct notice to parents about the information it collects from children under 13, how it obtains and uses such information, and its disclosure practices. *See* 16 C.F.R. § 312.4(b), (d). "Personal Information" is expressly defined by COPPA to include IP addresses and unique device identifiers, like those collected by Samba TV. *See* 16 C.F.R. § 312.2. Samba TV does not comply with any of these requirements either.

106. Similar to COPPA, California's Consumer Privacy Protection Act ("CCPA") also requires businesses that sell or share personal information of children under the age of 13 years old to obtain affirmative authorization from the child's parent or guardian. *See* Cal. Civ. Code § 1798.120(c). Any business that "willfully disregards the consumer's age"—like Samba TV does here—is deemed to have actual knowledge of the consumer's age. *Id.* Samba TV did not comply with the CCPA because it sold personal information of children under the age of 13 without express parental authorization.

107. Samba TV's representations that it complies with COPPA and California law are materially deceptive and unfair, and its failure to actually comply with these requirements is unlawful.

## <u>PLAINTIFFS HAVE A REASONABLE EXPECTATION OF PRIVACY</u>

108. Internet users do not expect to be tracked across every single one of their internet-connected devices, including their TVs, tablets, computers, and phones.

109. Indeed, the advent of privacy-preserving mechanisms like Apple's "Do Not Track" feature, which can prevent companies from collecting IDFA/ADID from individuals who opt-out, and similar features described above, have confirmed this expectation.

110. One 2021 study by Flurry Analytics shows that 88% of iOS users worldwide have availed themselves of this feature, indicating consumers' intent to prevent tracking on their mobile devices.

111. Consumers do not know—and did not expect—that Samba TV would create an identity profile and a new identifier—SambaID—to continue tracking consumers at an individual level. Plaintiffs and Class Members reasonably expected that they would not be tracked by an unknown company, let alone that it would use a unique identifier to profile them and facilitate targeted advertising across each of their devices for profit.

112. Likewise, consumers do not expect that technology in their TVs is secretly intercepting their identifiable video-viewing data or that this data will be incorporated into identifiable user profiles to be used and shared for targeted advertising.

113. Indeed, in recognition of this privacy expectation in one's own video-viewing habits, Congress passed the Video Privacy Protection Act ("VPPA"), which prevents video service providers from sharing personally identifiable video-viewing information without consent. The VPPA was passed following a newspaper article that had published a profile about Judge Robert H. Bork, including 146 films that his family had rented from a video store.[21]

114. When the matter was brought to the attention of the Senate Judiciary Committee, who was considering Judge Bork's nomination to the Supreme Court, Senator Simpson stated:

> ***It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home*** . . . [I]n an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to ***give a profile of a person . . .*** and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone . . . ***I think that is wrong. I think that really is Big Brother, and I think it is something that we have to guard against . . . [Privacy] is not a conservative or a liberal or moderate issue. It is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone.***[22]

[21] *See* S. REP. 599, 6, 1988 U.S.C.C.A.N. 4342-1, 4342-5–6.
[22] *Id.*

115. This incident prompted the introduction of the VPPA, designed specifically to protect video-viewing information. Senator Grassley noted when the bill was introduced:

> ***Privacy is something we all value.*** The right of privacy is not, however, a generalized undefined right: ***It is a specific right,*** one which individuals should understand. And it is the role of the legislature to define, expand, and give meaning to the concept of privacy. This bill will give specific meaning to the right of privacy, as it affects individuals in their daily lives.[23]

116. Representative Al McCandless, who was one of the first sponsors of the bill, echoed this privacy expectation, stating:

> ***There's a gut feeling that people ought to be able to read books and watch films without the whole world knowing***. Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. ***This intimate process should be protected from the disruptive intrusion of a roving eye.***[24]

117. The legislative history of the VPPA and its passage confirm that Plaintiffs and Class Members have a concrete expectation of privacy not to have a third-party interloper monitor and intercept their video viewing data from the privacy of their own home.

118. This expectation is especially heightened for children, who are entitled to additional protections pursuant to COPPA and the CCPA. Several state attorney generals have filed complaints against companies who, like Samba TV, collect and disclose identifiable video-viewing data from children without obtaining parental consent and without providing clear disclosures.

119. For instance, Michigan Attorney General, Dana Nessel, filed an action against Roku for collecting and disclosing the video content viewed by children on Roku alongside persistent identifiers.[25] According to the complaint, Roku claimed that it would only collect "non-user level data" from viewers, similar to how Samba TV promised that "***neither Samba TV nor its third-party business partners are able to individually identify your child with any data that we collect***."

120. Similarly, New York Attorney General, Letitia James, alongside the Federal Trade Commission, filed a complaint against YouTube—a video-streaming provider—for collecting children's data from its platform without complying with COPPA.[26]

121. Finally, California Attorney General, Rob Bonta, filed a complaint against Sling TV LLC

---

[23] *Id.*

[24] *Id.*, 4342-7.

[25] *See Nessel v. Roku, Inc.*, Case No. 2:25-cv-11221-SJM-CI, ECF No. 1 (E.D. Mich.).

[26] *See FTC v. Google, LLC*, Case No. 1:19-cv-02642, ECF No. 1 (D.D.C.).

and Dish Media Sales LLC ("Sling") for failing to provide easy-to-use opt-out methods to prevent its collection of video-viewing data and failing to provide "sufficient privacy protections for children."[27] In a press release from October 30, 2025 announcing a settlement with Sling, Mr. Bonta confirmed:

> ***Californians have critical privacy rights . . . every Californian has the right to their online privacy, especially in the comfort of their living room.***

122. Each of these enforcement actions further confirm that consumers—and especially children—have a reasonable expectation of privacy not to have their identifiable video-viewing data intercepted and collected from the privacy of their home and not to have this information used to create user profiles used for targeted advertising.

**SAMBA TV DOES NOT OBTAIN CONSENT**

123. Samba TV claims to have a direct relationship with consumers that "always starts with providing a clear-cut choice to opt-in or opt-out of using our services and providing equally clear-cut controls to change or tailor this choice at any time."

**FIGURE 14[28]**




124. This is false. At the outset, Samba TV tracks each individual within a household at the individual level. This includes individuals who never agreed to ***anything*** with Samba TV because they did not set up or enable any settings on the Smart TV, including children present in the household.

125. Separately, Samba TV does not obtain consent from any individual—including those who set up or change settings on their Smart TVs—to perform the kind of omni-present tracking across all of their devices through its Identity Graph or to package and share this data with hundreds of advertisers.

126. For instance, according to Sony's website—which purports to show one ***recent*** version of

---

[27] *Attorney General Bonta Secures $530,000 Settlement with Sling TV, First Enforcement Action from DOJ's Sweep of Streaming Services*, CALIFORNIA ATTORNEY GENERAL, https://oag.ca.gov/news/press-releases/attorney-general-bonta-secures-530000-settlement-sling-tv-first-enforcement (last visited December 4, 2025).

[28] *Making your smart TV smarter*, SAMBA TV, https://www.samba.tv/users (last visited December 4, 2025).

the Samba TV interface[29]—users who wish to enable or disable Samba Interactive TV on their Sony Smart TVs are only told that doing so will allow them to "[i]nteract with [their] favorite shows. Get recommendations based on the content [they] love. Connect [their] devices for exclusive content and special offers." In reality, Samba TV does not provide "exclusive content," "special offers," or anything of that nature. And as Samba TV itself acknowledges, a technology embedded in a TV that does not provide "some product that consumers want to have" is—by their own admission—"***acting as a spyware company***."[30]

**FIGURE 15[31]**




127. Moreover, there is no mention that Samba TV will also: (1) intercept all their video-viewing data in real-time, alongside unique and persistent device identifiers like IP address, GUID, Android ID, and AAID; (2) locate and identify each of their individual devices—phones, tablets, computers, etc.; (3) profile each individual and all their devices through its Identity Graph and Samba ID; (4) market and sell

[29] The actual Samba TV interface available at the time each respective Plaintiff set up each of their TVs is information exclusively in the possession of Samba TV and, possibly, TV manufacturers like Sony.

[30] Ryan Joe, *Samba TV CEO: 'Our Legal Basis For Having Data is A Direct-To-Consumer Relationship'*, AD EXCHANGER, https://www.adexchanger.com/on-tv-and-video/samba-tv-ceo-our-legal-basis-for-having-data-is-a-direct-to-consumer-relationship/ (last visited December 4, 2025).

[31] Sony Support, SONY, *Information about Samba TV*, https://www.sony.com/electronics/support/articles/00182856 (last visited December 2, 2025).

their identifiable video-viewing data through its data panel and other advertising solutions; or (5) use and share their private identifiable data with hundreds of other companies to facilitate cross-device targeted advertising.

128. Moreover, Samba TV begins intercepting data from Smart TV devices ***before*** it ever prompts the user to "enable" its service (if it does so at all). Samba TV does this through TLS handshakes, which is a process through which Samba TV creates a secure connection with the Smart TV. Through testing, we observed that Samba TV triggered multiple TLS handshakes with a Smart TV before Samba TV was ever enabled. Through this process, Samba TV receives, at least, data including (1) the Samba TV domain being contacted (e.g., events.cid.samba.tv, manager.tvp.samba.tv, etc.); (2) the IP address of both the sender and receiver; and (3) the time the connection was made.

129. That Samba TV does not obtain actual consent is also clear from its own statistics. Samba TV itself advertises that only ***40% of consumers would share data if they have full knowledge*** of a company's data collection and use practices. That means 60% of users would ***<u>not</u>*** share data even if there are extremely clear disclosures.[32]

**<u>FIGURE 16</u>**




[32] Samba TV, Three Ways Samba TV Data is Creating a Better Viewing Experience for Everyone, https://www.samba.tv/resources/three-ways-samba-tv-data-is-creating-a-better-viewing-experience-for-everyone.

130. According to Samba TV, its ACR technology reaches 111 million households and 517 million devices.[33] In 2023, it claimed to have received only ***66 opt-out requests***.[34]

131. Thus, per Samba TV's own statistics, only 1 in approximately every 1.68 million households are opting out of its data collection. Stated differently, only .00000059%—a rate so vanishingly small that it is statistically indistinguishable from zero.

**FIGURE 17**




132. Samba TV's apparent "opt-out" rate is nowhere close to the 60% opt-out rate Samba TV represents will occur when there are accurate disclosures and an opt-in process.

133. The staggering discrepancy between Figure 16 and Figure 17 confirms that Samba TV's so-called "opt-in" process is deceptive, misleading, and otherwise fails to provide users with meaningful consent.

**IDENTIFIABLE VIEWING DATA HAS OBJECTIVE VALUE**

134. The private data collected by Samba TV is extremely lucrative, which is why Samba TV was able to make an entire business model centered around selling access to this data to publishers and advertisers.

[33] Samba TV, Target TV Viewers on Any Device, https://www.samba.tv/business/audience.

[34] Samba TV, Privacy Policy, https://www.samba.tv/users/privacy-policy?lang=en.

135. Advertisers spent over $18.6 billion on Smart TV ads in 2022 alone. And video-viewing data accompanied by IP addresses—like the data here—is actively bought and sold every day.

136. For instance, advertisers and publishers can buy U.S. residents' CTV viewership data listing their IP address, location, and title of the video they viewed for $14,850 a month or $148,500 a year.

**FIGURE 18[35]**

## Data Dictionary

**[Sample] 27_New_CTV_MAID.csv**

| Attribute | Type | Example | Mapping |
|---|---|---|---|
| New CTV MAID | String | ip_address | |

**Product Attributes**

| Attribute | Type | Example | Mapping |
|---|---|---|---|
| IP | String | [redacted] | IPv4 Address |
| Date | | 8/5/2020 | |
| Title | | Terminator 2 | |
| imdb_id | | tt6510950 | |
| country_code | String | US | Country Code Alpha-2 |
| country | String | United States of America | Country Name |
| region | | Massachusetts | |
| city | String | Quincy | City Name |

137. The existence of a supply-side and sell-side for this type of data shows that there is an active market for this type of private information and that it has objective, monetary value.

**TOLLING AND CONCEALMENT**

138. The earliest Plaintiffs and Class Members could have discovered Samba TV's conduct was shortly before the filing of this Complaint. Plaintiffs became aware of Samba TV's conduct through communications with counsel that are protected from disclosure.

[35] Datarade, TV Viewership Data - CTV Analytics, https://datarade.ai/data-products/datastream-ctv-viewership-data-datasys.

139. Plaintiffs and Class Members, despite their due diligence, could not have discovered Samba TV's conduct by virtue of how its technology works and its lack of disclosures.

140. Samba TV does not publicly disclose which Smart TV models use its technology. Its interception and use of Plaintiffs' and Class Members' identifying information, including IP addresses, and assignment of a SambaID happen inconspicuously in the background. This process is undetectable to an ordinary person, highly technical, and thus, prevented Plaintiffs and any Class Member from uncovering it.

141. Samba TV had exclusive knowledge that SambaID was tracking Plaintiffs and Class Members across their internet-connection devices. Similarly, Samba TV had exclusive knowledge that it was using this information to propagate one of the largest targeted advertising systems.

142. Samba TV's fraudulent conduct prevented Plaintiffs and Class Members from discovering its conduct. Samba TV publicly held out its identifier and technology as privacy-preserving mechanisms, even though they were not.

143. Samba TV was under a duty to disclose the nature and significance of its data interception and use practices—especially in light of its public statements—but did not do so. Samba TV is therefore estopped from relying on any statute of limitations by virtue of the discovery rule and doctrine of fraudulent concealment.

## CLASS ACTION ALLEGATIONS

144. Plaintiffs bring this action under Fed. R. Civ. P. 23 individually and on behalf of the following Classes:

> **Identifier Class:** All natural persons in the United States for whom Samba TV intercepted their identifying information, or for whom Samba TV created a SambaID and/or Identity Graph.
>
> **ACR Class:** All natural persons in the United States who had their video-viewing data intercepted, used, or disclosed by Samba TV without their consent.

145. The Classes exclude: (1) any judge presiding over this action or their immediate families; (2) Samba TV, its subsidiaries, affiliates, parents, successors, predecessors, and any other entity in which Samba TV has a controlling interest; (3) Samba TV's current and former employees, officers, and

directors; and (4) Plaintiffs' and Samba TV's counsel.

146. ***Numerosity.*** While the precise size of the Classes is currently unknown to Plaintiffs, each of the Classes consists of well over a million individuals and members of each of the Classes can be identified through Samba TV's records.

147. ***Predominant Common Questions.*** The Classes' claims present several common questions of law and fact that predominant over questions (if any) that affect individual class members. This includes:

a. Whether Samba TV violated Plaintiffs' and the Classes' privacy rights;

b. Whether Plaintiffs and Class Members are entitled to damages and/or equitable relief, including injunctive relief, restitution, and disgorgement; and

c. Whether Samba TV was unjustly enriched.

148. ***Typicality.*** Plaintiffs' claims are typical of all Class Members because they arise from the same conduct and are based on the same legal theories.

149. ***Adequate Representation.*** Plaintiffs will (and have) fairly and adequately represented the Classes and protected the interest of all Class Members. Plaintiffs have retained competent counsel with significant experience in class action and data privacy litigation. Plaintiffs and counsel have no interest that conflicts with the interests of the Classes and are not subject to any unique defenses. Plaintiffs and their counsel will vigorously prosecute this action to advance the interest of the Classes and have the resources necessary to do so.

150. ***Substantial Benefits.*** A class action is superior to all other possible methods to fairly and efficiently adjudicate this case and controversy, and joinder of all Class Members is impracticable. Proceeding as a class case has significant advantages to individual litigation, including: (1) comprehensive oversight by a single court, which avoids inconsistent outcomes; and (2) saving time and expense by litigating the same claims arising from the same conduct all in one action.

151. Plaintiffs reserve all rights to revise or modify the class allegations based on facts and legal developments following additional investigation or discovery.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Violation of Common Law Invasion of Privacy (Intrusion Upon Seclusion)**
**On Behalf of the Plaintiffs and Classes**

152. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

153. Intrusion upon seclusion requires pleading: (1) that the defendant intruded on a place, conversation, or matter in which Plaintiffs have a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

154. Samba TV's collection, interception, and use of Plaintiffs' and Class Members' personally identifiable information, including IP address and device identifiers, constitutes an intentional intrusion. As does its use of this information—as well as other personally identifiable information like email addresses—to create "identity graphs" and user profiles to track Plaintiffs and Class Members across all of their personal devices based on their online activity.

155. Samba TV's interception and use of Plaintiffs' and Class Members' private video-viewing history, associated with their assigned SambaID and Samba-created user profiles, is likewise an intentional intrusion upon Plaintiffs' and Class Members' solitude.

156. Plaintiffs and Class Members reasonably expected their unique identifiers and other personal data, alongside their video-viewing activity, would not be intercepted or used by an unknown third-party.

157. The types of identifying information Samba TV stored in "identity graphs" are particularly private because they are often directly identifiable, permanent identifiers (e.g., IP address, email addresses, etc.). Plaintiffs and Class Members reasonably expected this information, alongside the other identifiers it intercepted and used (e.g., GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID) would remain private and confidential and would not be intercepted or used by third parties without their consent.

158. Plaintiffs and Class Members did not consent to, authorize, or understand Samba TV's interception, collection, and use of their private data or its profiling of Plaintiffs and Class Members so that advertisers could target them across their internet-connected devices.

159. Samba TV's conduct is highly offensive because it violates established social norms.

Consumers do not expect to be surveilled whenever they use the internet, especially in light of state laws requiring companies to make adequate disclosures regarding their collection and use of data.

160. Samba TV's conduct is particularly offensive in light of the secretive nature in which it takes place. Plaintiffs and Class Members had no way of knowing that Samba TV collected their unique identifiers or assigned them a global SambaID to be tracked across their devices.

161. Samba TV's conduct caused Plaintiffs and Class Members harm and injury, including a violation of their privacy interests.

162. Plaintiffs and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Samba TV as a result of its intrusion upon seclusion.

163. Defendant's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' and Class Members' rights. Thus, Plaintiffs and Class Members are entitled to punitive and exemplary damages.

164. Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

**SECOND CAUSE OF ACTION**
**Unjust Enrichment**
**On Behalf of the Plaintiffs and the Classes**

165. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

166. Samba TV receives benefits from Plaintiffs and Class Members in the form of their unique identifiers and other personal data and private online communications. Samba TV acquired this information without Plaintiffs' and Class Members' authorization and without providing corresponding compensation.

167. Samba TV acquired and used this private data for its own benefit, including tangible economic benefits from companies that used Samba TV for targeted advertising.

168. Had Plaintiffs and Class Members known of Samba TV's misconduct, they would not have agreed Samba TV could acquire and use their private data.

169. Samba TV unjustly retained these benefits at the expense of Plaintiffs and Class Members. Plaintiffs and Class Members were harmed by this conduct and were not provided any commensurate

compensation.

170. The benefits Samba TV received and derived benefit from Plaintiffs' and Class Members' private data rightly belonging to Plaintiffs and Class Members. It is inequitable under unjust enrichment principles for Samba TV to retain the profits and other intangible benefits they derived through its wrongful conduct.

171. Samba TV should be compelled to disgorge these profits and other inequitable proceeds in a common fund for the benefit of Plaintiffs and Class Members.

## THIRD CAUSE OF ACTION
**Injunctive Relief**
**On Behalf of the Plaintiffs and the Classes**

172. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

173. Samba TV's conduct has and continues to cause harm to Plaintiffs' and Class Members' privacy and autonomy, as it continues to store unique persistent identifiers, as well as the private contents of their communications, on its own systems. Samba TV routinely uses this information for targeted advertising.

174. Accordingly, Plaintiffs and Class Members seek injunctive relief, including an order permanently restraining Samba TV from continuing to use and store this information without consent and/or a court order, and requiring Samba TV to delete this information from its systems.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the putative Classes request the Court enter an Order:

a. Certifying the Classes and appointing Plaintiffs as Class Representatives;
b. Finding Samba TV's conduct unlawful;
c. Awarding injunctive and other equitable relief as is just and proper;
d. Awarding Plaintiffs and the Classes statutory, actual, compensatory, punitive, nominal, and other damages, as well as restitution and/or disgorgement of unjust and unlawful profits;
e. Awarding pre-judgment and post-judgment interest;

f. Awarding reasonable attorneys' fees, costs, and expenses; and

g. Granting any other relief as the Court sees just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: December 4, 2025

/s/ *Christian Levis*
Christian Levis (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
Rachel Kesten (*pro hac vice*)
Yuanchen Lu (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com
ylu@lowey.com

Robert C. Schubert S.B.N. 62684
Willem F. Jonckheer S.B.N. 178748
Amber L. Schubert S.B.N. 278696
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel.: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law

*Attorneys for Plaintiff and the Proposed Class*