Robert C. Schubert S.B.N. 62684
Willem F. Jonckheer S.B.N. 178748
Amber L. Schubert S.B.N. 278696
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel.: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law

Christian Levis (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
Rachel Kesten (*pro hac vice*)
Yuanchen Lu (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com
ylu@lowey.com

*Attorneys for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE DELLASALA, BOB WARDEN, VINCE TOPHONEY, DAVID GOODRICH, KENNETH HARRIS, DUANE LEDWARD, DEREK SCHUETTE, and DEREK SCHUETTE, as guardian of K.S., a minor, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>SAMBA TV, INC.<br><br>     Defendant. | Case No. 3:25-cv-03470<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Steve DellaSala, Bob Warden, Vince Tophoney, David Goodrich, Kenneth Harris, Duane Ledward, Derek Schuette, and Derek Schuette as guardian of K.S. (collectively, "Plaintiffs") individually and on behalf of all other similarly situated individuals, assert the following against Defendant Samba TV, Inc. ("Samba TV") based upon personal knowledge, information and belief (where applicable), and the investigation of counsel.

## SUMMARY OF ALLEGATIONS

1.      Nearly 80% of U.S. households own a Smart TV, which enables them to access traditional cable television, as well as streaming services, like Hulu and Amazon Prime.

2.      What they don't know is one company—Samba TV—has been embedding its chip set in popular Smart TVs since 2011. This chip set enables (among other things) Samba TV's patented Automatic Content Recognition ("ACR") technology, which uses video fingerprinting and machine learning to accurately identify what the viewer is watching on their Smart TV.

3.      This business practice isn't just creepy, it's extremely lucrative. Samba TV has a stronghold on video-viewing data, and it sells access to this data to advertisers and other companies.

4.      Samba TV's ACR data is particularly valuable because of its ability to uniquely identify *individual consumers and each of their devices*.

5.      Samba TV can identify and target people at the individual-level because of the Samba TV Identity Graph and its closely related SambaID—its proprietary universal identifier.

6.      Samba TV uses probabilistic and deterministic algorithms that match signals (IP address, operating system, etc.) from Plaintiffs' and Class Members' Smart TVs to their other devices, such as smart phones and tablets. Through this process, Samba TV can identify which devices belong to which specific individuals. It assigns a SambaID to each individual and each of their respective devices, which it uses to enable cross-device tracking and advertising.

7.      This type of targeting is particularly sought out by advertisers today, as many companies have begun to move away from traditional user-based online tracking in recognition that it is privacy-invasive. This began in the early 2010s when Apple Inc. announced it would no longer allow companies to collect UDID, which is a permanent device identifier that was used for online advertising. Similar changes followed in the next decade, with the roll out of additional privacy-preserving features like Apple

Inc.'s "Do Not Track" setting, which sought to  prevent the collection of advertising IDs from mobile device users, as well as  updates by several browsers to block "third-party" cookies (i.e., text files placed on a user's device from domains they are not visiting), which are used to track users across multiple websites.

8.      Through Samba TV's identity solution—and complimentary ACR product—Samba TV has been secretly harvesting and monetizing identifiable video-viewing data from tens of millions of U.S. residents without their knowledge and consent.

9.      Individuals have a baseline expectation of privacy, in which they do not expect any company to engage in wide-spread surveillance of all their video-viewing habits or to market their identifiable video-viewing data to third parties for profit.

10.      Plaintiffs and Class Members had no knowledge that Samba TV was using a unique, persistent identifier to track them across their devices, or that it was using this identifier and their private video-viewing history to facilitate highly specific targeted advertising.

11.      Samba TV's interception of the contents of Plaintiffs' and Class Members' video-viewing history violates (at least) the Electronic Communications Privacy Act of 1986 ("ECPA"), and its installation of a tracking device on Plaintiffs' and Class Members' televisions violates Cal. Penal Code § 638.51(a), as well as other laws.

<u>**PARTIES**</u>

**A.  Plaintiff DellaSala**

12.      Plaintiff Steve DellaSala is a resident of Burke County, North Carolina.

13.      Plaintiff DellaSala has owned a Sony XDR-65A8H television and a Sony XR-55A80J television for less than four years. Plaintiff DellaSala watches video-viewing content on his Sony televisions, including content on streaming services. The video-viewing content Plaintiff DellaSala selected and watched in the privacy of his own home is inherently private.

14.      Unbeknownst to Plaintiff DellaSala, Samba TV used its chip set embedded in Plaintiff DellaSala's televisions to intercept unique identifiers associated with his device, including his IP address, GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID.[1] Upon information and belief, Samba TV

---

[1] These identifiers are described in ¶¶ 112-118.

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-CV-03470

1    supplemented the identifiers it collected from Plaintiff DellaSala with other identifying information it

2    receives from advertisers and partners, including SHA256 hashed email addresses, mobile advertising

3    IDs, and any additional IP addresses and CTV device IDs.

4         15.   Samba TV used Plaintiff DellaSala's IP address and the other identifiers it collected

5    directly, as well as information from other partners and advertisers, to identify his televisions, as well as

6    his other devices, including his iPhone, tablets, and computers.

7         16.   Samba TV used each of these identifiers to create an identity graph for Plaintiff DellaSala

8    that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

9         17.   Samba TV also intercepted Plaintiff DellaSala's private video-viewing data in real time,

10    including what he watched on cable television and streaming services. This information was tied to each

11    of the identifiers—including the SambaID—associated with Plaintiff DellaSala.

12         18.   Samba TV used this data to facilitate targeted advertising. Samba TV made this data

13    available to advertisers and publishers so they could serve Plaintiff DellaSala ads across his TV, phones,

14    computers, and tablets. Samba TV also used this data to place Plaintiff DellaSala in custom audiences and

15    its lucrative panel product.

16         19.   Plaintiff DellaSala did not consent to Samba TV intercepting his unique identifiers and

17    other personal data, assigning and using unique identifiers to track him across internet-enabled services

18    and devices, or intercepting and using the contents of his private communications for profit.

19    **B.  Plaintiff Warden**

20         20.   Plaintiff Bob Warden is a resident of Tulsa County, Oklahoma.

21         21.   Plaintiff Warden has owned a Sony XBR-55X850C television since approximately 2015.

22    Plaintiff Warden watches video-viewing content on his Sony television, including content on cable

23    television and through streaming services. The video-viewing content Plaintiff Warden selected and

24    watched in the privacy of his own home is inherently private.

25         22.   Unbeknownst to Plaintiff Warden, Samba TV used its chip set embedded in Plaintiff

26    Warden's television to intercept unique identifiers associated with his device, including his IP address,

27    GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID. Upon information and belief, Samba TV

28    supplemented the identifiers it collected from Plaintiff Warden with other identifying information it

receives from advertisers and partners, including SHA256 hashed email addresses, mobile advertising IDs, and any additional IP addresses and CTV device IDs.

23.     Samba TV used Plaintiff Warden's IP address and the other identifiers it collected directly, as well as information from other partners and advertisers, to identify his television, as well as his other devices, including his Android mobile phone and computers.

24.     Samba TV used each of these identifiers to create an identity graph for Plaintiff Warden that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

25.     Samba TV intercepted Plaintiff Warden's private video-viewing data in real time, including what he watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff Warden.

26.     Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff Warden ads across his TV, phones, and tablets. Samba TV also used this data to place Plaintiff Warden in custom audiences and its lucrative panel product.

27.     Plaintiff Warden did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

**C.  Plaintiff Tophoney**

28.     Plaintiff Vince Tophoney is a resident of Wake County, North Carolina.

29.     Plaintiff Tophoney has owned a Sony XBR-75X800H television for approximately four years. Plaintiff Tophoney watches video-viewing content on his Sony television, including content on cable television and through streaming services. The video-viewing content Plaintiff Tophoney selected and watched in the privacy of his own home is inherently private.

30.     Unbeknownst to Plaintiff Tophoney, Samba TV used its chip set embedded in Plaintiff Tophoney's television to intercept unique identifiers associated with his device, including his IP address, GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID.  Upon information and belief, Samba TV supplemented the identifiers it collected from Plaintiff Tophoney with other identifying information it receives from advertisers and partners, including SHA256 hashed email addresses, mobile advertising

IDs, and any additional IP addresses and CTV device IDs.

31.    Samba TV used Plaintiff Tophoney's IP address and the other identifiers it collected directly, as well as information from other partners and advertisers, to identify his television, as well as his other devices, including his iPhone and computer.

32.    Samba TV used each of these identifiers to create an identity graph for Plaintiff Tophoney that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

33.    Samba TV intercepted Plaintiff Tophoney's private video-viewing data in real time, including what he watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff Tophoney.

34.    Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff Tophoney ads across his TV, phone, and computer. Samba TV also used this data to place Plaintiff Tophoney in custom audiences and its lucrative panel product.

35.    Plaintiff Tophoney did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

**D. Plaintiff Harris**

36.    Plaintiff Kenneth Harris is a resident of Fresno County, California.

37.    Plaintiff Harris has owned a Sony XBR65X900E television for approximately seven years and a Sony K-65XR80 television for approximately six months. Plaintiff Harris watches video-viewing content on his Sony television, including content on cable television and through streaming services. The video-viewing content Plaintiff Harris selected and watched in the privacy of his own home is inherently private.

38.    Unbeknownst to Plaintiff Harris, Samba TV used its chip set embedded in Plaintiff Harris's televisions to intercept unique identifiers associated with his device, including his IP address, GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID. Upon information and belief, Samba TV supplemented the identifiers it collected from Plaintiff Harris with other identifying information it receives from advertisers and partners, including SHA256 hashed email addresses, mobile advertising IDs, and

any additional IP addresses and CTV device IDs.

39.    Samba TV used Plaintiff Harris's IP address and the other identifiers it collected directly, as well as information from other partners and advertisers, to identify his televisions, as well as his other devices, including his laptop and phone.

40.    Samba TV used each of these identifiers to create an identity graph for Plaintiff Harris that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

41.    Samba TV intercepted Plaintiff Harris's private video-viewing data in real time, including what he watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff Harris.

42.    Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff Harris ads across his TV, phone, and computer. Samba TV also used this data to place Plaintiff Harris in custom audiences and its lucrative panel product.

43.    Plaintiff Harris did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

**E.  Plaintiff Ledward**

44.    Plaintiff Duane Ledward is a resident of Sonoma County, California.

45.    Plaintiff Ledward has owned a Sony television for approximately three years. Plaintiff Ledward watches video-viewing content on his Sony television, including content on streaming services and YouTube, as well as content he streamed to his television through his computer. The video-viewing content Plaintiff Ledward selected and watched in the privacy of his own home is inherently private.

46.    Unbeknownst to Plaintiff Ledward, Samba TV used its chip set embedded in Plaintiff Ledward's television to intercept unique identifiers associated with his device, including his IP address, GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID. Upon information and belief, Samba TV supplemented the identifiers it collected from Plaintiff Ledward with other identifying information it receives from advertisers and partners, including SHA256 hashed email addresses, mobile advertising IDs, and additional IP addresses and CTV device IDs.

47.     Samba TV used Plaintiff Ledward's IP address and the other identifiers it collected directly, as well as information from other partners and advertisers, to identify his television, as well as his other devices, including his Google Pixel, Samsung Galaxy Z Flip6 phone, Samsung tablets, and computer.

48.     Samba TV used each of these identifiers to create an identity graph for Plaintiff Ledward that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

49.     Samba TV intercepted Plaintiff Ledward's private video-viewing data in real time, including what he watched on streaming services, and on laptop streamed to his television. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff Ledward.

50.     Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff Ledward ads across his TV, phone, tablet, and computer. Samba TV also used this data to place Plaintiff Ledward in custom audiences and its lucrative panel product.

51.     Plaintiff Ledward did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

**F.  Plaintiff Goodrich**

52.     Plaintiff David Goodrich is a resident of San Diego County, California.

53.     Plaintiff Goodrich has owned a Sony KD 65X85J television for approximately four years. Plaintiff Goodrich watches video-viewing content on his Sony television, including content on satellite television and through streaming services. The video-viewing content Plaintiff Goodrich selected and watched in the privacy of his own home is inherently private.

54.     Unbeknownst to Plaintiff Goodrich, Samba TV used its chip set embedded in Plaintiff Goodrich's televisions to intercept unique identifiers associated with his device, including his IP address, GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID.  Upon information and belief, Samba TV supplemented the identifiers it collected from Plaintiff Goodrich with other identifying information it receives from advertisers and partners, including SHA256 hashed email addresses, mobile advertising IDs, and additional IP addresses and CTV device IDs.

55.     Samba TV used Plaintiff Goodrich's IP address and the other identifiers it collected directly, as well as information from other partners and advertisers, to identify his television, as well as his other devices, including his iPhone and iPad.

56.     Samba TV used each of these identifiers to create an identity graph for Plaintiff Goodrich that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

57.     Samba TV intercepted Plaintiff Goodrich's private video-viewing data in real time, including what he watched on satellite television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff Goodrich.

58.     Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff Goodrich ads across his TV, phone, and iPad. Samba TV also used this data to place Plaintiff Goodrich in custom audiences and its lucrative panel product.

59.     Plaintiff Goodrich did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

**G.  Plaintiff Schuette**

60.     Plaintiff Derek Schuette is a resident of Santa Clara County, California.

61.     Plaintiff Schuette has owned a Sony XR 85X05J television for approximately three years. Plaintiff Schuette watches video-viewing content on his Sony television, including content on cable television, through streaming services, and video game consoles. The video-viewing content Plaintiff Schuette selected and watched in the privacy of his own home is inherently private.

62.     Unbeknownst to Plaintiff Schuette, Samba TV used its chip set embedded in Plaintiff Schuette's televisions to intercept unique identifiers associated with his device, including his IP address, GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID.  Upon information and belief, Samba TV supplemented the identifiers it collected from Plaintiff Schuette with other identifying information it receives from advertisers and partners, including SHA256 hashed email addresses, mobile advertising IDs, and additional IP addresses and CTV device IDs.

63.     Samba TV used Plaintiff Schuette's IP address and the other identifiers it collected directly,

as well as information from other partners and advertisers, to identify his television, as well as his other devices, including his iPhones, iPad, and laptop.

64.     Samba TV used each of these identifiers to create an identity graph for Plaintiff Schuette that contained each of his identifiers and devices—which Samba TV tied to a universal SambaID.

65.     Samba TV intercepted Plaintiff Schuette's private video-viewing data in real time, including what he watched on cable television and streaming services, and which video games he played. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff Schuette.

66.     Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff Schuette ads across his TV, phones, computer, and tablets. Samba TV also used this data to place Plaintiff Schuette in custom audiences and its lucrative panel product.

67.     Plaintiff Schuette did not consent to Samba TV intercepting his unique identifiers and other personal data, assigning and using unique identifiers to track him across internet-enabled services and devices, or intercepting and using the contents of his private communications for profit.

**H. Plaintiff K.S.**

68.     Plaintiff K.S. is a resident of Santa Clara County, California.

69.     Plaintiff K.S. is a minor child who resides in Plaintiff Schuette's household with a Sony XR 85X05J television. Plaintiff K.S. watches video-viewing content on this Sony television, including content on cable television and through streaming services. The video-viewing content Plaintiff K.S. selected and watched in the privacy of her own home is inherently private.

70.     Unbeknownst to Plaintiff K.S., Samba TV used its chip set embedded in the Sony televisions to intercept unique identifiers associated with her device, including her IP address, GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID.   Upon information and belief, Samba TV supplemented the identifiers it collected from Plaintiff K.S. with other identifying information it receives from advertisers and partners, including SHA256 hashed email addresses, mobile advertising IDs, and additional IP addresses and CTV device IDs.

71.     Samba TV used Plaintiff K.S.'s IP address and the other identifiers it collected directly, as

well as information from other partners and advertisers, to identify her television, as well as her other devices, including her iPhone, iPad, and laptop.

72.    Samba TV used each of these identifiers to create an identity graph for Plaintiff K.S. that contained each of her identifiers and devices—which Samba TV tied to a universal SambaID.

73.    Samba TV intercepted Plaintiff K.S.'s private video-viewing data in real time, including what she watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID—associated with Plaintiff K.S.

74.    Samba TV used this data to facilitate targeted advertising. Samba TV made this data available to advertisers and publishers so they could serve Plaintiff K.S. ads across her TV, phone, computer, and tablet. Samba TV also used this data to place Plaintiff K.S. in custom audiences and its lucrative panel product.

75.    Plaintiff K.S. did not consent to Samba TV intercepting her unique identifiers and other personal data, assigning and using unique identifiers to track her across internet-enabled services and devices, or intercepting and using the contents of her private communications for profit.

**I.    Defendant**

76.    Samba TV is a Delaware corporation with its principal place of business located in San Francisco, California.

77.    Samba TV knowingly and intentionally incorporated its chip set into televisions to track Plaintiffs' and Class Members' video-viewing history and other activity.

78.    Samba TV knowingly and intentionally developed a persistent, unique identifier designed to accurately link Plaintiffs' and Class Members' video-viewing history and online activity to their individual identities.

79.    Samba TV knew that its unique identifier and identity graph solution were inconsistent with expectations of privacy because it had publicly stated that tracking individuals in such a manner raised privacy concerns.

80.    Samba TV knowingly and intentionally used its identifiers, and video-viewing data associated with it, to facilitate targeted advertisements for profit.

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-CV-03470

**JURISDICTION AND VENUE**

81.    Jurisdiction is proper under 28 U.S.C. § 1331 because Plaintiffs bring claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* The Court may exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' and Class Members' state law claims because these claims arise from a common nucleus of operative facts relating to Samba TV's interception and use of Plaintiffs' and Class Members' unique identifiers and other personal data.

82.    Jurisdiction is also proper under 28 U.S.C § 1332(d) because: (1) the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, (2) there are more than 100 putative members of the Class, and (3) a significant portion of Class Members are citizens of a state different from Samba TV.

83.    This Court has personal jurisdiction over Samba TV because its principal place of business is in California. Additionally, this Court has personal jurisdiction over Samba TV because a substantial part of the events and conduct giving rise to Plaintiffs' claims occurred in California, including Samba TV's interception and use of Plaintiffs' unique identifiers and other personal data.

84.    Venue is proper under 28 U.S.C. §1391(b), (c), and (d) because a substantial portion of the conduct described in this Class Action Complaint was carried out in this District. Furthermore, Samba TV is headquartered in this District and subject to personal jurisdiction in this District.

85.    This action arises in San Francisco County, in that a substantial part of the events which gave rise to the claims asserted herein occurred in San Francisco County. Pursuant to L.R. 3-2(e), all actions that arise in San Francisco County shall be assigned to the San Francisco or Oakland Division.

**BACKGROUND OF USER TRACKING**

86.    Over a decade ago, Apple announced it would no longer allow app developers to intercept "UDIDs" which are unique, device-specific identifiers. These persistent identifiers were deprecated because they are seen as privacy intrusive—they cannot be reset and were used to facilitate device-specific targeted advertising.

87.    This trend only continued. Starting in 2020, Apple and Google announced the eventual deprecation of advertising identifiers (IDFA and ADID) and third-party cookies in favor of more privacy-preserving mechanisms.

88.     The loss of some of the most common unique identifiers raised serious concerns within the multi-billion-dollar digital advertising industry. Digital advertisers relied on these identifiers and cookies to uniquely identify individuals who use their products and services—and other entities' products and services—to serve targeted advertisements to individuals based on profiles of information reflecting web and app activity indexed to unique identifiers present in third-party cookies.

89.     For instance, a mobile app developer would use identifiers like the IDFA and ADID created by iOS and Android phones to track user activity across their mobile application, understand what actions users took and their preferences, interests, and other information. The company would then send that information to an advertising company, such as Google, to serve targeted advertisements to that customer using this unique identifier.

90.     Proposed solutions to make up for these unique identifiers and third-party cookies were not nearly as effective. For instance, some companies sought to track user "sessions" (i.e., one interaction with the webpage until the user closes out) in lieu of other unique identifiers. However, this alternative was not nearly as powerful as directly tracking an individual at the user or device-level.

## SAMBA TV'S IDENTITY GRAPH & SAMBA ID

91.     Samba TV was well aware of the privacy implications associated with tracking users at an individual level, as well as Google's plan to deprecate these types of identifiers on its own platform.

92.     Its SVP & Head of Data Products, Chris Squire, authored an article on May 25, 2021, confirming this:

> The loss of some identifiers will inhibit the ability to deliver one-to-one targeted advertising compared to the ways of old. ***Truth be told, this may actually be good for advertisers in the long run. Reaching individuals is fraught with privacy implications.***

93.     Samba TV's co-founder and CEO echoed these concerns about the lack of first-party cookies and mobile IDs:

> Cookie and mobile ID deprecation is coming faster than advertisers would like to believe, and many simply aren't prepared for a world where they'll lose the identifier they've relied on thus far . . . . ***Without these IDs*** to deliver and measure campaigns, ***advertiser's budgets will be wasted*** on campaigns that fail to coordinate messaging for target audiences across devices. This gets even more complicated as TV consumption shifts towards OTT. ***There is plenty of opportunity for advertisers to target and message their desired consumers, but they need an identifier that will survive the death of cookies and help them understand omniscreen performance.***

94.     Despite that Samba TV's own executive recognized that tracking users at the individual-level raises "privacy implications[,]" Samba TV sought to fill the hole left by Google and others by creating a unique, user-level identifier of its own: SambaID—which is powered by Samba TV's Identity Graph.

95.     Samba TV markets its Identity Graph and SambaID precisely as a solution for the "changes with identity" currently taking place in the advertising industry. It calls its solutions "[f]uture proof" and adaptable to "ever-changing privacy regulations."[2]

**FIGURE 1**[3]

IDENTITY TODAY

**Unprepared for the changes with identity?**

As policies for mobile IDs and cookies evolve, advanced solutions are required for targeting and measurement.

- Lack of omniscreen identity in media hinders campaign performance
- Shift towards cord-cutting is making modern TV measurement more challenging
- Firms struggle to match IDs across multiple datasets

IDENTITY TODAY

**Have confidence in your identity solution**

For years, Samba TV has leveraged a multi-identifier approach, using various types of digital identifiers as well as first party TV data. As a result, we can identify at 90%+ accuracy which phones, tablets, PCs, and TVs belong to an individual by using the SambaID identifier produced by our own proprietary identity platform.
Read more on Forbes >

96.     SambaID and its Identity Graph are built on top of proprietary technology from Screen6, which Samba acquired in 2019.

97.     The technology enables cross-device tracking through highly accurate deterministic and probabilistic algorithms. It processes over a dozen signals from a device (e.g., IP address, device ID, time stamp, operating system, hardware, etc.) and matches them with other devices that share the same signals and identifiers (e.g., tablets, smartphones, TVs, and laptops) to uncover which specific devices are owned and used by the same individual.

98.     The "anchor" for the SambaID and Samba's Identity Graph is its ACR technology (discussed further below), incorporated in the chip set of Smart TVs. Through this "anchor" (i.e., Smart TVs) Samba intercepts IP addresses, unique device identifiers, and other device and signaling information directly from consumers' Smart TVs, which is how its proprietary technology can begin identifying which specific users are interacting with the Smart TV and their separate individual devices.

---

[2] Samba TV, Bridge datasets in the evolving identity world, https://www.samba.tv/business/identity.
[3] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-CV-03470

**FIGURE 2**[4]



99.     Samba TV obtains additional data from advertisers and other Samba TV "partners." This "bridge" between datasets allows advertisers and Samba TV—who already have extensive data on individuals—to combine data for even more advanced targeting, measurement, and optimization across devices through their existing ad solutions. The types of additional identifying information Samba TV receives from advertisers and partners—and adds to its existing user profiles—include SHA256 hashed email addresses[5], mobile advertising IDs (i.e., Android Advertising ID (AAID) and Apple Advertising ID (IDFA), mobile device IDs (i.e., IDFV and Android ID), and additional IP addresses and CTV device IDs.[6]

100.     For example, one way Samba TV gets its hands on additional data from "partners" that it adds to its identity profiles is through its application programming interfaces ("APIs"), which are available for use on Android, iOS, tvOS, and websites. Any third parties can incorporate Samba TV's API, so long as they receive an API Key from Samba TV. Using these APIs, Samba TV receives identifiers associated with consumers' other devices, such as their mobile phones and tablets.

101.     Using all this data Samba TV gets its hands on, Samba TV's "multi-identifier pattern

---

[4] Samba TV, Bridge datasets in the evolving identity world, https://www.samba.tv/business/identity.

[5] SHA256 hashing does nothing to protect or obscure the underlying information. *See* Staff in the Office of Technology, *No, hashing still doesn't make your data anonymous*, Federal Trade Commission, https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous (July 24, 2024).

[6]     *Samba Identity Resolution*, Samba TV, https://marketplace.databricks.com/details/ad4ff8fa-fc08-4e30-8ae7-914b9fad61a2/Samba-TV_Samba-Identity-Resolution?utm_source=chatgpt.com (last visited December 1, 2025); *Event*, mParticle, https://docs.mparticle.com/integrations/samba-tv/event/ (last visited December 1, 2025).

recognition model[7] creates a "robust and accurate Identity Graph, ensuring that advertisers get a view into ***all of the devices in a household***." Samba TV refers to this as its "[f]irst-party data advantage." Combining its ACR technology and data it gets from partners and advertisers, Samba TV's Identity Graph "can identify at the household, person [and] device level (including all digital devices – phones, tablets, PCs, etc."[8] All of this information, alongside video-viewing data, is stored in individual user profiles.

102.    Samba TV offers advertisers and publishers access to its "[a]ccurate real-time private identity graph[s] across devices and all properties." Through this technology, "advertisers can identify any type of TV viewer, target them based on how and when they consume TV, and then engage them on their phone, tablet, PC, or TV."

**FIGURE 3[9]**



103.    Samba TV's identity solution gives it a significant advantage over competing ad tech companies—which is precisely how it markets this technology to advertisers.

[7] Samba TV's patents—including Patent No. 10,880,340—confirm the same. This patent describes how Samba TV's technology matches identification data from the Smart TV to identification data from other devices on the network to identify and associate the information with a specific user. The purpose of this technology is because there is a "revenue opportunity" whereby an "interested party (e.g., a content creator, a retailer, a manufacturer, an advertiser)" can show the individual relevant content, i.e., advertisements.
[8] Amanda Festa,
*Ask a Samba TV Expert: A deep dive into Samba TV viewership insights*, SAMBATV, https://www.samba.tv/resources/a-deep-dive-into-samba-tv-viewership-insights (last visited December 4, 2025).
[9] *True Reach & Frequency*, SAMBA TV, https://www.samba.tv/business/measurement-truereachandfrequency. (last visited December 4, 2025).

1

## FIGURE 4[10]



**Campaign Inefficiencies**
Spending on ads that reach people
outside your target audiences, or
oversaturate audiences with the same
ad

• 90%+ identity accuracy on which digital devices belong to an
individual
• Accurate data ensures fidelity with reach & frequency reporting
• Actionable insights allow for campaign optimization

## SAMBA TV'S ACR TECHNOLOGY

104.    As described above, the "anchor" for Samba TV's identity solution is its ACR technology embedded in Smart TVs.

105.    Samba TV's ACR technology works by listening and recognizing content being viewed on the Smart TV—a process called video fingerprinting. Samba TV intercepts the frames (i.e., images from the video content shown on the TV) directly from the TV, as well as over two dozen metadata fields, including certain geolocation information, channel, subchannel, volume percentage, whether the TV is muted, width, height, and more.

106.    Using this data, Samba TV can tell exactly what movie, show, episode, video game, or ad is being viewed, regardless of whether it is from a cable network, streaming service, or even a video game console. Samba TV intercepts and processes the content in real time, often in just a few seconds.

107.    Samba TV bills itself as the "Heartbeat of Television" precisely because of the insights it gains through its ACR technology. It boasts that it "capture[s] second-by-second viewership data" from over 13 million households, which it "feeds into the largest TV data capture footprint in the industry"–all "owned and controlled by Samba TV."

---

[10] *Id.*

**FIGURE 5[11]**





108.    As shown in Figure 5—which comes from Samba TV marketing materials—it can identify the exact show, season, and episode viewed by the user, as well as their household ID, location, the devices "mapped" in the household, and the time and date the material was viewed.

109.    Using AI, Samba TV can now tell even more information about what specific viewers are watching. Samba TV advertises that the "second-by-second on-screen metadata" it captures can depict "actors, music, visual descriptions, and objects" all so it can have a "deeper understanding" of what the consumer is viewing.

110.    Samba TV also supplements its actual data collection efforts with data it licenses from set-top box providers. Together, it claims to have access to 46 million TV households globally and 28 million in the United States.

111.    Samba TV processes and stores this data on its own systems—which it uses to create audiences, panels, and otherwise service advertising needs—all of which is tied back to the universal SambaID and user profiles it creates for specific individuals through its Identity Graph.

---

[11] Sapna Maheshwari, *How Smart TVs in Millions of U.S. Homes Track More Than What's On Tonight*, NY Times (July 5, 2018), available at, https://www.nytimes.com/2018/07/05/business/media/tv-viewer-tracking.html.

**SAMBA TV'S COLLECTION OF IDENTIFIERS THROUGH ITS ACR TECHNOLOGY**

112.    None of the data Samba TV intercepts through its ACR technology is deidentified, anonymized, or aggregated. As soon as Plaintiffs and Class Members set up their device, Samba TV assigns a GUID, which is a unique long-term identifier for that specific TV. Samba TV first tries to set the GUID by checking for a specific ID set by the TV manufacturer (e.g., Sony) and, if none is available, sets the GUID as a hashed Android ID (intercepted as "UUID"). The Android ID/UUID is yet another unique device identifier set by Android that Samba TV also intercepts and uses. Both the GUID and Android ID/UUID persist across reboots and app updates, as does the IP address that Samba TV also intercepts.

113.    Samba TV also assigns and intercepts a number of additional identifiers used to track the TV, specific users, and each of their video-viewing sessions. For instance, Samba TV intercepts the device's Android Advertising ID ("AAID"), which is an additional unique identifier for the TV that is set by Android specifically for advertising. Samba TV also sets and intercepts two of its own additional identifiers, the Samba Advertising ID (SDADID) and Samba Measurement ID (SMID).

114.    Samba TV also tracks specific TV "sessions." In each session, Samba TV intercepts information about that specific video-viewing instance, including the unique GUID, Android ID/UUID, AAID, and timestamps, as well as the "tvSessionId" and "lastTVSessionId." These SessionIDs are derived by hashing the Android ID/UUID with a timestamp. Because the SessionID and Android ID/UUID are transmitted together, Samba TV can always associate a particular SessionID with the Android ID/UUID. These sessions further enable long-term tracking of Plaintiffs and Class Members' specific video-viewing activities.

115.    In addition to these identifiers, Samba TV constructs fingerprint maps and uses metadata enrichment to uncover even more information about the specific device. This includes platform information, make, model_id, firmware_version, device_name, device_language, brand, and model_year.

116.    Further ensuring Samba TV can track Plaintiffs' and Class Members' specific video-viewing habits, Samba TV sends data directly from the TV to Mixpanel, a separate third party. Mixpanel receives its own device_id set by Mixpanel, as well as the GUID.

117.    By using multiple identifiers, Samba TV makes it virtually impossible for Plaintiffs and Class Members to disable Samba TV's tracking. Even if Plaintiffs and Class Members were able to

uncover this conduct (and they were not) and tried to reset the "device advertising ID" on their TVs, this would be a futile act. While this feature is represented by Samba TV as allowing consumers to "clear the data associated with your advertising profile," this functionality can only reset the AAID and SDADID—it would have no impact on the GUID or Android ID/UUID. And since these identifiers are all sent together, Samba TV can simply associate the new AAID and SDADID with the existing GUID and Android ID/UUID. Thus, Samba TV can continue consistently tracking each consumer regardless of this reset even if consumers tried to use this functionality.

118.    As described above, each of these identifiers is used as the "anchor" for Samba TV's Identity Graph, which enables Samba TV to identify and profile not only Plaintiffs' and Class Members' specific TVs, but each of their other personal devices, including their individual phones, tablets, and PCs through deterministic and probabilistic matching.

## SAMBA TV SHARES AND SELLS ACCESS TO IDENTIFIABLE DATA FOR PROFIT

119.    Samba TV packages and shares this identifiable data in a number of ways, including through its panel product and audience segments, as well as directly with advertisers and publishers.

120.    ***The Samba Panel.*** Samba TV packages and normalizes all the data it obtains about individuals—tied to the SambaID—into a data panel, which it sells for profit. This panel is so extensive that Samba TV actively markets it as comparable to U.S. census data. It claims the millions of individuals represented in its panel have "between a .00003% and .01% delta compared to U.S. census for gender, ethnicity, age & income."

121.    ***Custom Audience Solution.*** Samba TV places individual consumers into custom audiences based on their unique video-viewing habits and other data Samba TV compiles about them. Samba TV provides this information to advertisers and publishers so they can target the individuals contained within these audiences with advertisements.

122.    These audiences provide unique insights about Plaintiffs and Class Members, including their demographics, hobbies, political beliefs, and more.

123.    For instance, Samba TV can determine an individual's political leanings based on their TV viewing habits. Samba TV packages individuals with similar political leanings into the same audience.

**FIGURE 6**[12]



124.    As shown in Figure 6, Samba TV uses video-viewing habits to see who has an "affinity" for conservative or liberal news, as well as who it considers to be a "[h]eavy [v]iewers" of such content.

125.    Samba TV also created custom audiences indicating who watched content in foreign languages, including Chinese-Mandarin, Japanese, and Korean TV.

**FIGURE 7**[13]



126.    It created even more specific audiences geared to niche content, like individuals who watched content associated with Pride Month, Mother's Day, and Black History Month.

---

[12] Samba TV, Audiences, https://www.samba.tv/business/audience/ui.
[13] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-CV-03470

**FIGURE 8[14]**



127.    Samba TV also creates audiences beyond video-viewing data, including audiences reflecting what video games users play, like Skyrim, God of War, and the FIFA series.

**FIGURE 9[15]**



128.    These audiences can be immediately incorporated into existing advertiser and data broker accounts, including Free Wheel, Google Ads, LiveRamp, the Trade Desk, and Yahoo. All an advertiser needs to do is copy the "Deal ID" into their platform of choice to start targeting these individuals in an advertising campaign. Samba TV routinely refreshes this data so these advertisers "have access to the latest audiences available."

---

[14] *Id.*
[15] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-CV-03470

129.    Samba TV also helps its advertising partners create audiences that suit their own specific business needs. For instance, Samba TV helped one client create audiences based on characteristics like "25 to 40 year-old fitness enthusiasts."

130.    ***Audience Amplification Solution***. Advertisers can also integrate Samba TV's user "attributes" with their "DSP of choice." A "DSP" is an entity that sits on the demand-side of real-time bidding and places bid requests on advertising space on behalf of the advertiser. Similar to its custom audiences, advertisers can "[l]everage more than 2,800 attributes" about consumers in Samba TV's database to ensure they target the right individuals at the right time through their DSP.

131.    ***Sync & Retarget Solution***. Samba TV's Sync & Retarget solution is used by advertisers to connect with what Samba TV deems "[u]nreachables" i.e., users who the advertisers previously did not have access to. More than 400 advertisers use this solution, which enables them to link their own data to Samba TV's extensive database to identify and then target individual consumers with advertisements across devices.

132.    ***Data Sharing Partnerships***. Samba TV enters partnerships with other companies in the advertising space to super-charge the data it already has on Plaintiffs and Class Members. For instance, it recently announced a partnership with HyphaMetrics, through which the two companies will create a "commingled multi-million device dataset" that they will make available to "brands, agencies, publishers, and currency providers[.]" Thus, Plaintiffs' and Class Members' extensive data will end up in the hands of even ***more advertisers***.

### SAMBA TV MARKETS ITS PRODUCTS AS PRIVACY-PRESERVING

133.    Despite the above, Samba TV markets its identity solution and ACR technology as ***privacy-preserving***. It claims:

> Since its inception, Samba TV has been ***a proponent of the right to privacy*** and pioneered Smart TV opt-in and data protection policies in advance of General Data Protection Regulation (GDPR), California Consumer Privacy Act (CCPA), and the California Privacy Rights Act (CPRA).

134.    Samba TV boldly asserts that "[p]rivacy" is "central" to its mission. Consistent with this claim, it publicly asserts that its data sets are "***anonymized***" and only measure online activity at the "household level."

**FIGURE 10**[16]

**Our data sets are anonymized.** Privacy is central to all we do. All of our data sets are anonymized, and we do not have contact with any opted-in users. We measure at a household level, not individual users, and household information is measured without directly identifiable information (such as names or email addresses) for maximum privacy.

135.    These statements are patently false. Samba TV's data is not anonymized by any definition of the word. This is because Samba TV collects and shares IP addresses and persistent device identifiers that—under both the California Consumer Privacy Act and the GDPR—are classified as ***identifiable data***.

136.    The California Consumer Privacy Act defines "personal information" as "information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." It expressly includes "Internet Protocol address[es]" and other "unique personal identifier[s]" as falling within this definition.

137.    Under the General Data Protection Regulation GDPR, Article 4(1), "any information relating to an identified or identifiable natural person" is personal information. This too expressly includes "[o]nline identifiers" including IP addresses.

138.    The data Samba TV collects, processes, and shares is ***especially*** identifiable because Samba TV goes out of its way—through its identity solution—to identify individuals, ***not*** households, and tracks them through its global SambaID.

139.    Despite this, Samba TV publicly represents that it is "GDPR and CCPA compliant" "100% privacy compliant" and that "PII [is] never shared."

**FIGURE 11**[17]

**Privacy Focus**

GDPR and CCPA compliant, PII never shared, 100% consumer opt-in data

140.    Samba TV goes so far as to include graphics representing its purported compliance with both the GDPR and California law.

---

[16] Justin Lundvall, What's the difference between your data and other data providers?, Samba TV, https://help.samba.tv/hc/en-us/articles/4405728421659-What-s-the-difference-between-your-data-and-other-data-providers.

[17] Samba TV, Engage and Measure TV Audiences, https://web.archive.org/web/20200618175206/https://samba.tv/business/.

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-CV-03470

**FIGURE 12[18]**



141.    Samba TV also claims it complies with Children's Online Privacy Protection Act ("COPPA")—a federal law designed to protect children online—and uses a COPPA Safe Harbor Certification provided by PRIVO.

**FIGURE 13[19]**



142.    Samba TV states "The PRIVO COPPA certification Seal posted on this page indicates Samba TV has established COPPA compliant privacy practices and has agreed to submit to PRIVO's oversight and consumer dispute resolution process."

143.    Consistent with its COPPA claims, Samba TV states that "***neither Samba TV nor its third-party business partners are able to individually identify your child with any data that we collect***."

144.    This too is a lie. COPPA requires companies falling within its purview to meet certain requirements prior to collecting, using, or disclosing personal information about children, who are defined

[18] *See supra* n.3.
[19] Samba TV, Your Privacy Handbook, https://www.samba.tv/users/your-privacy-handbook.

as individuals under the age of 13.

145.    By virtue of how Samba TV's ACR technology and Identity Graph work, Samba TV is identifying every individual member of a household—including children under the age of 13, like Plaintiff K.S. at the time her household first purchased a Samba TV-enabled television. Samba TV uniquely identifies these children (and other individuals) through its SambaID and other identifiers found in each consumer's respective identity graph (e.g., device identifiers, like GUID, and other identifying information, like email addresses), which it shares with advertisers and publishers alongside their private video-viewing data. Thus, Samba TV's representation that it is not able to "identify [consumers'] children" is plainly false—it identifies and sells access to this information.

146.    COPPA contains other requirements that Samba TV also does not comply with. COPPA requires companies falling within its purview to, among other things: (1) obtain parental consent before collecting or using personal information from children under the age of 13; (2) prominently provide disclosures on its website or online service about the information it collects from children under the age of 13, how it obtains and uses such information, and its disclosure practices; and (3) provide direct notice to parents about the information it collects from children under 13, how it obtains and uses such information, and its disclosure practices. *See* 16 C.F.R. § 312.4(b), (d). "Personal Information" is expressly defined by COPPA to include IP addresses and unique device identifiers, like those collected by Samba TV. *See* 16 C.F.R. § 312.2. Samba TV does not comply with any of these requirements either.

147.    Similar to COPPA, California's Consumer Privacy Protection Act ("CCPA") also requires businesses that sell or share personal information of children under the age of 13 years old to obtain affirmative authorization from the child's parent or guardian. *See* Cal. Civ. Code § 1798.120(c). Any business that "willfully disregards the consumer's age"—like Samba TV does here—is deemed to have actual knowledge of the consumer's age. *Id.* Samba TV did not comply with the CCPA because it sold personal information of children under the age of 13 without express parental authorization.

148.    Samba TV's representations that it complies with COPPA and California law are materially deceptive and unfair, and its failure to actually comply with these requirements is unlawful.

## **PLAINTIFFS HAVE A REASONABLE EXPECTATION OF PRIVACY**

149.    Internet users do not expect to be tracked across every single one of their internet-connected

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-CV-03470

devices, including their TVs, tablets, computers, and phones.

150.    Indeed, the advent of privacy-preserving mechanisms like Apple's "Do Not Track" feature, which can prevent companies from collecting IDFA/ADID from individuals who opt-out, and similar features described above, have confirmed this expectation.

151.    One 2021 study by Flurry Analytics shows that 88% of iOS users worldwide have availed themselves of this feature, indicating consumers' intent to prevent tracking on their mobile devices.

152.    Consumers do not know—and did not expect—that Samba TV would create an identity profile and a new identifier—SambaID—to continue tracking consumers at an individual level. Plaintiffs and Class Members reasonably expected that they would not be tracked by an unknown company, let alone that it would use a unique identifier to profile them and facilitate targeted advertising across each of their devices for profit.

153.    Likewise, consumers do not expect that technology in their TVs is secretly intercepting their identifiable video-viewing data or that this data will be incorporated into identifiable user profiles to be used and shared for targeted advertising.

154.    Indeed, in recognition of this privacy expectation in one's own video-viewing habits, Congress passed the Video Privacy Protection Act ("VPPA"), which prevents video service providers from sharing personally identifiable video-viewing information without consent. The VPPA was passed following a newspaper article that had published a profile about Judge Robert H. Bork, including 146 films that his family had rented from a video store.[20]

155.    When the matter was brought to the attention of the Senate Judiciary Committee, who was considering Judge Bork's nomination to the Supreme Court, Senator Simpson stated:

> ***It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home*** . . . [I]n an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to ***give a profile of a person . . .*** and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone . . . ***I think that is wrong. I think that really is Big Brother, and I think it is something that we have to guard against . . . [Privacy] is not a conservative or a liberal or moderate issue. It is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We***

---

[20] *See* S. REP. 599, 6, 1988 U.S.C.C.A.N. 4342-1, 4342-5–6.

*want to be left alone.*[21]

156.    This incident prompted the introduction of the VPPA, designed specifically to protect video-viewing information. Senator Grassley noted when the bill was introduced:

> ***Privacy is something we all value.*** The right of privacy is not, however, a generalized undefined right: ***It is a specific right,*** one which individuals should understand. And it is the role of the legislature to define, expand, and give meaning to the concept of privacy. This bill will give specific meaning to the right of privacy, as it affects individuals in their daily lives.[22]

157.    Representative Al McCandless, who was one of the first sponsors of the bill, echoed this privacy expectation, stating:

> ***There's a gut feeling that people ought to be able to read books and watch films without the whole world knowing.*** Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. ***This intimate process should be protected from the disruptive intrusion of a roving eye.***[23]

158.    The legislative history of the VPPA and its passage confirm that Plaintiffs and Class Members have a concrete expectation of privacy not to have a third-party interloper monitor and intercept their video viewing data from the privacy of their own home.

159.    This expectation is especially heightened for children, like K.S., who are entitled to additional protections pursuant to COPPA and the CCPA. Several state attorney generals have filed complaints against companies who, like Samba TV, collect and disclose identifiable video-viewing data from children without obtaining parental consent and without providing clear disclosures.

160.    For instance, Michigan Attorney General, Dana Nessel, filed an action against Roku for collecting and disclosing the video content viewed by children on Roku alongside persistent identifiers.[24] According to the complaint, Roku claimed that it would only collect "non-user level data" from viewers, similar to how Samba TV promised that "***neither Samba TV nor its third-party business partners are able to individually identify your child with any data that we collect***."

161.    Similarly, New York Attorney General, Letitia James, alongside the Federal Trade Commission, filed a complaint against YouTube—a video-streaming provider—for collecting children's

---

[21] *Id.*
[22] *Id.*
[23] *Id.*, 4342-7.
[24] *See Nessel v. Roku, Inc.*, Case No. 2:25-cv-11221-SJM-CI, ECF No. 1 (E.D. Mich.).

data from its platform without complying with COPPA.[25]

162.    Finally, California Attorney General, Rob Bonta, filed a complaint against Sling TV LLC and Dish Media Sales LLC ("Sling") for failing to provide easy-to-use opt-out methods to prevent its collection of video-viewing data and failing to provide "sufficient privacy protections for children."[26] In a press release from October 30, 2025 announcing a settlement with Sling, Mr. Bonta confirmed:

> ***Californians have critical privacy rights . . . every Californian has the right to their online privacy, especially in the comfort of their living room.***

163.    Each of these enforcement actions further confirm that consumers—and especially children—have a reasonable expectation of privacy not to have their identifiable video-viewing data intercepted and collected from the privacy of their home and not to have this information used to create user profiles used for targeted advertising.

## SAMBA TV DOES NOT OBTAIN CONSENT

164.    Samba TV claims to have a direct relationship with consumers that "always starts with providing a clear-cut choice to opt-in or opt-out of using our services and providing equally clear-cut controls to change or tailor this choice at any time."

## FIGURE 14[27]



165.    This is false. At the outset, Samba TV tracks each individual within a household at the individual level. This includes individuals who never agreed to ***anything*** with Samba TV because they did not set up or enable any settings on the Smart TV, including children present in the household.

166.    Separately, Samba TV does not obtain consent from any individual—including those who set up or change settings on their Smart TVs—to perform the kind of omni-present tracking across all of

---

[25] *See FTC v. Google, LLC*, Case No. 1:19-cv-02642, ECF No. 1 (D.D.C.).
[26] *Attorney General Bonta Secures $530,000 Settlement with Sling TV, First Enforcement Action from DOJ's Sweep of Streaming Services*, CALIFORNIA ATTORNEY GENERAL, https://oag.ca.gov/news/press-releases/attorney-general-bonta-secures-530000-settlement-sling-tv-first-enforcement (last visited December 4, 2025).
[27] *Making your smart TV smarter*, SAMBA TV, https://www.samba.tv/users (last visited December 4, 2025).

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-CV-03470

their devices through its Identity Graph or to package and share this data with hundreds of advertisers.

167.    For instance, according to Sony's website—which purports to show one **recent** version of the Samba TV interface[28]—users who wish to enable or disable Samba Interactive TV on their Sony Smart TVs are only told that doing so will allow them to "[i]nteract with [their] favorite shows. Get recommendations based on the content [they] love. Connect [their] devices for exclusive content and special offers." In reality, Samba TV does not provide "exclusive content," "special offers," or anything of that nature. And as Samba TV itself acknowledges, a technology embedded in a TV that does not provide "some product that consumers want to have" is—by their own admission—"***acting as a spyware company***."[29]

**FIGURE 15[30]**



168.    Moreover, there is no mention that Samba TV will also: (1) intercept all their video-viewing data in real time, alongside unique and persistent device identifiers like IP address, GUID, Android ID,

---

[28] The actual Samba TV interface available at the time each respective Plaintiff set up each of their TVs is information exclusively in the possession of Samba TV and, possibly, TV manufacturers like Sony.
[29] Ryan Joe, *Samba TV CEO: 'Our Legal Basis For Having Data is A Direct-To-Consumer Relationship'*, AD EXCHANGER, https://www.adexchanger.com/on-tv-and-video/samba-tv-ceo-our-legal-basis-for-having-data-is-a-direct-to-consumer-relationship/ (last visited December 4, 2025).
[30] Sony Support, SONY, *Information about Samba TV*, https://www.sony.com/electronics/support/articles/00182856 (last visited December 2, 2025).

and AAID; (2) locate and identify each of their individual devices—phones, tablets, computers, etc.; (3) profile each individual and all their devices through its Identity Graph and Samba ID; (4) market and sell their identifiable video-viewing data through its data panel and other advertising solutions; or (5) use and share their private identifiable data with hundreds of other companies to facilitate cross-device targeted advertising.

169.    Moreover, Samba TV begins intercepting data from Smart TV devices *before* it ever prompts the user to "enable" its service (if it does so at all). Samba TV does this through TLS handshakes, which is a process through which Samba TV creates a secure connection with the Smart TV. Through testing, we observed that Samba TV triggered multiple TLS handshakes with a Smart TV before Samba TV was ever enabled. Through this process, Samba TV receives, at least, data including (1) the Samba TV domain being contacted (e.g., events.cid.samba.tv, manager.tvp.samba.tv, etc.); (2) the IP address of both the sender and receiver; and (3) the time the connection was made.

170.    That Samba TV does not obtain actual consent is also clear from its own statistics. Samba TV itself advertises that only ***40% of consumers would share data if they have full knowledge*** of a company's data collection and use practices. That means 60% of users would ***not*** share data even if there are extremely clear disclosures.[31]

### <u>FIGURE 16</u>

User Preferences If Fully Informed (According to SambaTV)



[31] Samba TV, Three Ways Samba TV Data is Creating a Better Viewing Experience for Everyone,
https://www.samba.tv/resources/three-ways-samba-tv-data-is-creating-a-better-viewing-experience-for-everyone.

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-CV-03470

171.    According to Samba TV, its ACR technology reaches 111 million households and 517 million devices.[32] In 2023, it claimed to have received only ***66 opt-out requests***.[33]

172.    Thus, per Samba TV's own statistics, only 1 in approximately every 1.68 million households are opting out of its data collection. Stated differently, only .00000059%—a rate so vanishingly small that it is statistically indistinguishable from zero.

**FIGURE 17**



SambaTV's Actual "Opt-Out" Rates in 2023

173.    Samba TV's apparent "opt-out" rate is nowhere close to the 60% opt-out rate Samba TV represents will occur when there are accurate disclosures and an opt-in process.

174.    The staggering discrepancy between Figure 16 and Figure 17 confirms that Samba TV's so-called "opt-in" process is deceptive, misleading, and otherwise fails to provide users with meaningful consent.

**IDENTIFIABLE VIEWING DATA HAS OBJECTIVE VALUE**

175.    The private data collected by Samba TV is extremely lucrative, which is why Samba TV was able to make an entire business model centered around selling access to this data to publishers and advertisers.

176.    Advertisers spent over $18.6 billion on Smart TV ads in 2022 alone. And video-viewing data accompanied by IP addresses—like the data here—is actively bought and sold every day.

---

[32] Samba TV, Target TV Viewers on Any Device, https://www.samba.tv/business/audience.
[33] Samba TV, Privacy Policy, https://www.samba.tv/users/privacy-policy?lang=en.

177.    For instance, advertisers and publishers can buy U.S. residents' CTV viewership data listing their IP address, location, and title of the video they viewed for $14,850 a month or $148,500 a year.

**FIGURE 18[34]**



178.    The existence of a supply-side and sell-side for this type of data shows that there is an active market for this type of private information and that it has objective, monetary value.

**TOLLING AND CONCEALMENT**

179.    The earliest Plaintiffs and Class Members could have discovered Samba TV's conduct was shortly before the filing of this Complaint. Plaintiffs became aware of Samba TV's conduct through communications with counsel that are protected from disclosure.

180.    Plaintiffs and Class Members, despite their due diligence, could not have discovered Samba TV's conduct by virtue of how its technology works and its lack of disclosures.

---

[34] Datarade, TV Viewership Data - CTV Analytics, https://datarade.ai/data-products/datastream-ctv-viewership-data-datasys.

SECOND AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:23-CV-03470

181.    Samba TV does not publicly disclose which Smart TV models use its technology. Its interception and use of Plaintiffs' and Class Members' identifying information, including IP addresses, and assignment of a SambaID happen inconspicuously in the background. This process is undetectable to an ordinary person, highly technical, and thus, prevented Plaintiffs and any Class Member from uncovering it.

182.    Samba TV had exclusive knowledge that SambaID was tracking Plaintiffs and Class Members across their internet-connection devices. Similarly, Samba TV had exclusive knowledge that it was using this information to propagate one of the largest targeted advertising systems.

183.    Samba TV's fraudulent conduct prevented Plaintiffs and Class Members from discovering its conduct. Samba TV publicly held out its identifier and technology as privacy-preserving mechanisms, even though they were not.

184.    Samba TV was under a duty to disclose the nature and significance of its data interception and use practices—especially in light of its public statements—but did not do so. Samba TV is therefore estopped from relying on any statute of limitations by virtue of the discovery rule and doctrine of fraudulent concealment.

## **CLASS ACTION ALLEGATIONS**

185.    Plaintiffs bring this action under Fed. R. Civ. P. 23 individually and on behalf of the following Classes:

> **Identifier Class:** All natural persons in the United States for whom Samba TV intercepted their identifying information, or for whom Samba TV created a SambaID and/or Identity Graph.

> **ACR Class:** All natural persons in the United States who had their video-viewing data intercepted, used, or disclosed by Samba TV without their consent.

> **California Identifier Subclass**: All natural persons in California for whom Samba TV intercepted their identifying information, or for whom Samba TV created a SambaID and/or Identity Graph.

> **California ACR Subclass:** All natural persons in California who had their video-viewing data intercepted, used, or disclosed by Samba TV without their consent.

186.    The Classes exclude: (1) any judge presiding over this action or their immediate families; (2) Samba TV, its subsidiaries, affiliates, parents, successors, predecessors, and any other entity in which

Samba TV has a controlling interest; (3) Samba TV's current and former employees, officers, and directors; and (4) Plaintiffs' and Samba TV's counsel.

187. ***Numerosity.*** While the precise size of the Classes is currently unknown to Plaintiffs, each of the Classes consists of well over a million individuals and members of each of the Classes can be identified through Samba TV's records.

188. ***Predominant Common Questions.*** The Classes' claims present several common questions of law and fact that predominant over questions (if any) that affect individual class members. This includes:

     a.   Whether Samba TV violated Plaintiffs' and the Classes' privacy rights;

     b.   Whether Samba TV engaged in unfair and deceptive conduct;

     c.   Whether Samba TV's acts and practices violate the California Invasion of Privacy Act;

     d.   Whether Samba TV's acts and practices violate the Video Privacy Protection Act;

     e.   Whether Plaintiffs and Class Members are entitled to damages and/or equitable relief, including injunctive relief, restitution, and disgorgement; and

     f.   Whether Samba TV was unjustly enriched.

189. ***Typicality.*** Plaintiffs' claims are typical of all Class Members because they arise from the same conduct and are based on the same legal theories.

190. ***Adequate Representation.*** Plaintiffs will (and have) fairly and adequately represented the Classes and protected the interest of all Class Members. Plaintiffs have retained competent counsel with significant experience in class action and data privacy litigation. Plaintiffs and counsel have no interest that conflicts with the interests of the Classes and are not subject to any unique defenses. Plaintiffs and their counsel will vigorously prosecute this action to advance the interest of the Classes and have the resources necessary to do so.

191. ***Substantial Benefits.*** A class action is superior to all other possible methods to fairly and efficiently adjudicate this case and controversy, and joinder of all Class Members is impracticable. Proceeding as a class case has significant advantages to individual litigation, including: (1) comprehensive oversight by a single court, which avoids inconsistent outcomes; and (2) saving time and expense by litigating the same claims arising from the same conduct all in one action.

192.    Plaintiffs reserve all rights to revise or modify the class allegations based on facts and legal developments following additional investigation or discovery.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of Common Law Invasion of Privacy (Intrusion Upon Seclusion)**
**On Behalf of the Plaintiffs and Classes**

193.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

194.    Intrusion upon seclusion requires pleading: (1) that the defendant intruded on a place, conversation, or matter in which Plaintiffs have a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

195.    Samba TV's collection, interception, and use of Plaintiffs' and Class Members' personally identifiable information, including IP address and device identifiers, constitutes an intentional intrusion. As does its use of this information—as well as other personally identifiable information like email addresses—to create "identity graphs" and user profiles to track Plaintiffs and Class Members across all of their personal devices based on their online activity.

196.    Samba TV's interception and use of Plaintiffs' and Class Members' private video-viewing history, associated with their assigned SambaID and Samba-created user profiles, is likewise an intentional intrusion upon Plaintiffs' and Class Members' solitude.

197.    Plaintiffs and Class Members reasonably expected their unique identifiers and other personal data, alongside their video-viewing activity, would not be intercepted or used by an unknown third-party.

198.    The types of identifying information Samba TV stored in "identity graphs" are particularly private because they are often directly identifiable, permanent identifiers (e.g., IP address, email addresses, etc.). Plaintiffs and Class Members reasonably expected this information, alongside the other identifiers it intercepted and used (e.g., GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID) would remain private and confidential and would not be intercepted or used by third parties without their consent.

199.    Plaintiffs and Class Members did not consent to, authorize, or understand Samba TV's interception, collection, and use of their private data or its profiling of Plaintiffs and Class Members so

that advertisers could target them across their internet-connected devices.

200.    Samba TV's conduct is highly offensive because it violates established social norms. Consumers do not expect to be surveilled whenever they use the internet, especially in light of state laws requiring companies to make adequate disclosures regarding their collection and use of data.

201.    Samba TV's conduct is particularly offensive in light of the secretive nature in which it takes place. Plaintiffs and Class Members had no way of knowing that Samba TV collected their unique identifiers or assigned them a global SambaID to be tracked across their devices.

202.    Samba TV's conduct caused Plaintiffs and Class Members harm and injury, including a violation of their privacy interests.

203.    Plaintiffs and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Samba TV as a result of its intrusion upon seclusion.

204.    Defendant's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' and Class Members' rights. Thus, Plaintiffs and Class Members are entitled to punitive and exemplary damages.

205.    Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

## SECOND CAUSE OF ACTION
### Violation of Article I, Section 1 of the California Constitution (Invasion of Privacy)
### On Behalf of the California Plaintiffs and the California Subclasses

206.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

207.    Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. Art. I, § 1

208.    To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

209.    The right to privacy in California's Constitution creates a right of action against private and government entities.

210.    Plaintiffs and Class Members have and continue to have a reasonable expectation of privacy in their personal information, identities, and private data, pursuant to Article I, Section I of the California Constitution.

211.    The identifiable and private information and video-viewing data Samba TV intercepted, stored, and used without Plaintiffs' and Class Members' consent was used to profile and track them consistently, and persistently, across internet-connected services and to serve targeted advertisements.

212.    The types of identifying information Samba TV stored in "identity graphs" are particularly private because they are often directly identifiable, permanent identifiers (e.g., IP address, email addresses, etc.). Plaintiffs and Class Members reasonably expected this information, alongside the other identifiers Samba TV intercepted and used (e.g., GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID) would remain private and confidential and would not be intercepted or used by third parties without their consent.

213.    The surreptitious manner in which Samba TV intercepted and collected this information defeated established privacy mechanisms and social norms.

214.    This conduct constitutes an extremely serious invasion of privacy that would be highly offensive to a reasonable person. Reasonable individuals do not expect that there is an entity intercepting their video-viewing data and linking it to a global unique identifier, let alone using it for profit.

215.    Samba TV's conduct violated the privacy of hundreds of thousands (if not millions) of Class Members, including Plaintiff. Samba TV did not have consent to intercept this information, let alone use it.

216.    Plaintiffs and Class Members seek damages to compensate the harm to their privacy interests, among other damages, as well as disgorgement of profits made by Samba TV as a result of its intrusion upon seclusion.

217.    Defendant's conduct was willful, knowing, and carried out with a conscious disregard for Plaintiffs' or Class Members' rights. Thus, Plaintiffs and Class Members are entitled to punitive and exemplary damages.

218.    Plaintiffs and Class Members also seek any other relief the Court may deem just and proper.

### THIRD CAUSE OF ACTION
**Violation of the California Invasion of Privacy Act ("CIPA")**
**Cal. Penal Code § 631**
**On Behalf of the California Plaintiffs and the California Subclasses**

219.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

220.    CIPA § 631 prohibits any person who by means of any "machine, instrument, contrivance" or in "any other manner:" (1) intentionally taps or makes an unauthorized connection with "any telegraph or telephone wire, line, cable, or instrument;" (2) willfully and without consent of "all parties to the communication" or in "any unauthorized manner" reads or "attempts to read" or "learn[s] the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within" California; (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way" information so obtained; or (4) from aiding, agreeing, employing, or conspiring with "any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

221.    Samba TV is a person under CIPA § 631.

222.    Samba TV maintains its principal place of business in California, which is where it designed, created, conspired, and effectuated the interception and use of Plaintiffs' and Class Members' unique identifiers and other personal data and private communications.

223.    Samba TV's ACR technology and Plaintiffs' and Class Members' computers, mobile devices, and connected TVs are each a "machine, instrument, or contrivance, or . . . other manner" under CIPA § 631.

224.    At all relevant times, Samba TV used its technology to make unauthorized connections with the lines of communication and instruments used by Plaintiffs and Class Members to access online services without the consent of all parties to those communications.

225.    Samba TV willfully, and without consent, read or attempted to read, or learn the contents and meaning of, Plaintiffs' and Class Members' communications with online services while those communications were in transit or passing over a wire, line, or cable, or were being sent or received within

California through its tracking technology, as described herein. This interception happens prior to or at the same time they would be received by the intended recipient.

226.    Samba TV used, and attempted to use, these identifiable, private communications for its own benefit, including targeted advertising as described herein.

227.    Samba TV also aided, agreed with, employed, and conspired with Smart TV brands and advertising entities to intercept and use this data for profit.

228.    The interception and use of Plaintiffs' and Class Members' communications were without authorization or consent from Plaintiffs and Class Members.

229.    Plaintiffs and Class Members have been harmed as a result of Samba TV's conduct. Their private data has been intercepted, viewed, and used for targeted advertising and has not been destroyed. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

230.    Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and Class Members in an amount to be proven at trial, as well as injunctive or other equitable relief.

**FOURTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 632**
**On Behalf of the California Plaintiffs and the California Subclasses**

231.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

232.    CIPA § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication[.]"

233.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

234.    Plaintiffs' and Class Members' communications with their respective video-content

providers are confidential communications for purposes of § 632 because Plaintiffs and Class Members had an objectively reasonable expectation of privacy in this data.

235.    Plaintiffs and Class Members expected their communications would not be shared with Samba TV, as there were no adequate disclosures that Samba TV would secretly eavesdrop upon or record their information and communications.

236.    Samba TV's ACR technology and Identity Graph solution are electronic amplifying or recording devices for purposes of § 632.

237.    By contemporaneously intercepting and recording Plaintiffs' and Class Members' confidential and identifiable communications through this technology, Samba TV eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

238.    At no time did Plaintiffs or Class Members consent to Samba TV's conduct, nor could they reasonably expect that their communications with their Smart TVs would be overheard and recorded by Samba TV.

239.    Samba TV utilizes these private communications for their own benefit, including to serve targeted advertisements and develop user profiles.

240.    Plaintiffs and Class Members have been harmed as a result of Samba TV's conduct. Their private data has been intercepted, viewed, and used for targeted advertising and has not been destroyed. Plaintiffs and Class Members face an imminent threat of continued injury, as this data continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

241.    Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and Class Members in an amount to be proven at trial, as well as injunctive or other equitable relief.

### FIFTH CAUSE OF ACTION
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code § 638.50 & 638.51**
**On Behalf of the California Plaintiffs and the California Subclasses**

242.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the

1  same force and effect as if fully restated herein.

2  243.  CIPA § 638.50(b) defines a "pen register" as a "device or process" that "records or decodes

3  dialing, routing, addressing, or signaling information" that is "transmitted by an instrument or facility

4  from which a wire or electronic communication is transmitted, but not the contents of a communication."

5  244.  Separately, CIPA § 638.50(c) defines a "[t]rap and trace device" as a "device or process

6  that captures the incoming electronic or other impulses that identify the originating number or other

7  dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or

8  electronic communication, but not the contents of a communication."

9  245.  CIPA § 638.51 prohibits a person from installing either a pen register or trap and trace

10  device without a court order.

11  246.  Samba TV is a person under CIPA § 638.51.

12  247.  Samba TV implemented and installed the ACR technology and its identity solution—which

13  are pen registers and/or trap and trace devices—on Plaintiffs' and Class Members' devices, including their

14  Smart TVs.

15  248.  These processes captured "routing, addressing, or signaling information" because they

16  intercept, at least (1) the Samba TV domain being contacted (e.g., events.cid.samba.tv,

17  manager.tvp.samba.tv, etc.); (2) the IP address of both the sender and receiver; (3) the time the connection

18  was made; and (4) other identifiers, like SambaID.

19  249.  Samba TV was not authorized by any court order to use a pen register or trap and trace

20  device to record or capture Plaintiffs' and Class Members' routing, addressing, or signaling information.

21  250.  Plaintiffs and Class Members did not consent to Samba TV's installation of a pen register

22  or trap and trace device on their devices and browsers.

23  251.  Plaintiffs and Class Members have been harmed as a result of Samba TV's conduct. Samba

24  TV did not have authorization to use pen registers and/or trap and trace devices to surveille and identify

25  Plaintiffs and Class Members or to intercept other routing, addressing, and signaling information.

26  252.  Plaintiffs and Class Members face an imminent threat of continued injury, as this data

27  continues to be stored and used, such that Plaintiffs and Class Members have no adequate remedy at law.

28  253.  Plaintiffs and Class Members seek statutory damages in accordance with § 637.2(a) which

provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and Class Members in an amount to be proven at trial, as well as injunctive or other equitable relief.

**SIXTH CAUSE OF ACTION**
**Violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA")**
**Cal. Penal Code § 502**
**On Behalf of the California Plaintiffs and the California Subclasses**

254.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

255.    The California Legislature enacted CDAFA to "expand the degree of protection afforded. . . from tampering, interference, damage, and unauthorized access to ([including the extraction of data from)] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals . . ." Cal. Penal Code § 502(a).

256.    Plaintiffs' and Class Members' devices on which Samba TV's tracking technology is installed, including their computers, smart phones, and tablets, constitute "Computer system" within the meaning of the CDAFA. *Id*. § 502(b)(5).

257.    The data that Samba TV accessed and collected from Plaintiffs' and Class Members' devices constitute "Data" within the meaning of the CDAFA. *Id*. § 502(b)(8).

258.    Samba TV violated § 502(c)(1) of the CDAFA by knowingly accessing without permission Plaintiffs' and Class Members' devices in order to wrongfully obtain and use their personal data, in violation of users' reasonable expectations of privacy in their devices and data.

259.    Samba TV violated § 502(c)(2) of the CDAFA by knowingly and without permission taking, copying, and making use of Plaintiffs' and the Class Members' unique identifiers and other personal data from their devices.

260.    Samba TV's tracking technology incorporated on Plaintiffs' and the Class Members' devices constitute "computer services" within the meaning of the CDAFA. Samba TV violated § 502(c)(3)

by knowingly and without permission using those computer services, and/or causing them to be used. Samba TV violated § 502(c)(7) by knowingly and without permission accessing those devices, and/or causing them to be accessed.

261. Samba TV violated §§ 502(c)(6) and (c)(13) of the CDAFA by knowingly, and without permission from Plaintiffs the Class Members, providing and/or assisting in providing advertisers and publishers the ability to access Plaintiffs' and the Class Members' personal data via its audiences, panels, and ad integrations.

262. Under § 502(b)(12) of the CDAFA a "computer contaminant" is defined as "any set of computer instructions that are designed to . . . record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information." Samba TV violated § 502(c)(8) by knowingly and without permission introducing a computer contaminant via its tracking technology incorporated on Plaintiffs' and the Class Members' devices, which intercepted their personal data. As described *supra*, the tracking technology is deeply hidden; Plaintiffs and Class Members had no way to remove it or opt out of its functionality.

263. Plaintiffs and Class Members suffered damage and loss as a result of Samba TV's conduct. Samba TV's practices have deprived Plaintiffs and the Class Members of control over their valuable property (namely, their sensitive personal data), the ability to receive compensation for that data, and the ability to withhold their data for sale.

264. Plaintiffs and the Class Members seek compensatory damages in accordance with CDAFA § 502(e)(1), in an amount to be proven at trial, and injunctive or other equitable relief.

265. Plaintiffs and Class Members have also suffered irreparable and incalculable harm and injuries from Samba TV's violations. The harm will continue unless Samba TV is enjoined from further violations of this section. Plaintiffs and Class Members have no adequate remedy at law.

266. Plaintiffs and the Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Samba TV's violations were willful and, upon information and belief, Samba TV is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294. Plaintiffs and Class Members are also entitled to recover their reasonable attorneys' fees under § 502(e)(2).

### SEVENTH CAUSE OF ACTION
**Violation of The Federal Wiretap Act, 18 U.S.C. § 2510,** *et. seq.*
**On Behalf of the Plaintiffs and the Classes**

267.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

268.    The Federal Wiretap Act, as amended by the ECPA, prohibits the intentional interception of the contents of any wire, oral, or electronic communication through the use of a device. 18 U.S.C. § 2511.

269.    The ECPA protects both the sending and receipt of communications.

270.    The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed or intentionally used in violation of the ECPA. 18 U.S.C. § 2520(a).

271.    Samba TV intentionally intercepted Plaintiffs' and Class Members' electronic communications while they were being exchanged with their respective video-content providers, simultaneous with these communications taking place through its ACR technology.

272.    Samba TV's actions in intercepting and tracking Plaintiffs' and Class Members' identifiable video-viewing content were at all times intentional. Samba TV designed its ACR technology and Identity Graph for the exact purpose of intercepting these identifiable communications to package them in user profiles and audiences that it sells access to for profit.

273.    Samba TV's interception of these communications was contemporaneous with the sending and receiving of those communications.

274.    Samba TV intercepted the content of these communications because it revealed precisely what video content Plaintiffs and Class Members were viewing at any given moment across cable, streaming services, video game consoles, and more. Samba TV learned, or attempted to learn the contents, of these communications while they were in transit or in the process of being sent or received.

275.    Plaintiffs and Class Members were unaware of, and did not consent to, Samba TV's acquisition of their private communications. Samba TV did not obtain legal authorization to obtain Plaintiffs' and Class Members' communications with their respective video-content providers.

276.    In acquiring the contents of Plaintiffs' and Class Members' communications with their

respective video-content providers, Samba TV had a purpose that was tortious and designed to violate state constitutional and common law.

277.     Consent is not a defense where a "communication is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). Subsequent use or disclosure of the contents of the intercepted communications for the purpose of further invading Plaintiffs' and Class Members' privacy is a tortious act that satisfies this exception to consent. In addition to having the intent of profiting by selling access to Plaintiffs' and Class Members' personal information, Samba TV knowingly and intentionally invaded Plaintiffs' privacy by using the fruits of those interceptions to further invade Plaintiffs' and Class Members' privacy through the creation of its "identity graphs" and associated user profiles and audiences.

278.     Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members seek monetary damages for the greater of (i) the sum of the actual damages suffered by Plaintiffs and any profits made by Samba TV as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

## EIGHTH CAUSE OF ACTION
### Violation of California Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### On Behalf of the California Plaintiffs and the California Subclasses

279.     Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

280.     Plaintiffs plead this claim for equitable relief, including restitution and injunctive relief, in the alternative to their claims for damages.

281.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

282.     Samba TV is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

283.     Samba TV violated the UCL by engaging in unlawful and unfair business acts and practices.

284.     Samba TV's "unlawful" acts and practices include its violation of CIPA, CDAFA, COPPA, and CCPA. Samba TV's conduct violated the spirit and letter of these laws, which protect privacy interests

and prohibit the unauthorized collection, use, and sale of private communications and personal information. As outlined above, Samba TV at all times had actual knowledge of its non-compliance with COPPA and other applicable privacy-related laws.

285.    Samba TV's "unfair" acts and practices include: (1) its surreptitious collection of Plaintiffs' and Class Members' private video-viewing data, IP addresses, and unique device identifiers; (2) its creation of Samba TV user profiles, anchored by its lucrative Samba ID; (3) its supplementation of these profiles with additional personally identifiable information, including email addresses; and (4) its sale of these profiles and information to third parties for profit.

286.    Plaintiffs and Class Members were completely unaware of Samba TV's conduct and could not have anticipated Samba TV's intrusion into their privacy through its unlawful and unfair collection of their personal information and private communications. Accordingly, Plaintiffs and Class Members could not avoid the harm Samba TV caused.

287.    Samba TV's conduct was immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiffs and Class Members. Further, the gravity of the harm of Samba TV's secret interception, collection, and use of Plaintiffs' and Class Members' personal information and private communications is significant, and there is no corresponding benefit resulting from such conduct.

288.    Plaintiffs and Class Members have suffered injury, including the loss of money and/or property as a result of Samba TV's unfair and unlawful practice of intercepting Plaintiffs' and Class Members' personal information and private communications, which have economic value.

289.    Plaintiffs and Class Members have suffered harm in the form of diminution in the value of their personal information and private communications.

290.    Samba TV caused damage to and loss of Plaintiffs' and Class Members' property right to control the dissemination and use of their personal information and private communications.

291.    Samba TV has reaped unjust profits and revenues in violation of the UCL as a result of its unlawful and unfair conduct, including profits and revenues from its sale of Plaintiffs' and Class Members' data. Plaintiffs and Class Members seek restitution and disgorgement of these unjust profits and revenues.

292.    Plaintiffs and Class Members would not have purchased and/or used their Samba TV-enabled televisions had they known of its conduct.

293.    Plaintiffs and Class Members lack an adequate remedy at law because Samba TV's conduct has and continues to cause harm to Plaintiffs' and Class Members' privacy and autonomy, as it continues to store unique persistent identifiers, as well as the private contents of their communications, on its own systems. Samba TV routinely uses this information for targeted advertising. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury.

294.    Plaintiffs and Class Members seek all monetary and non-monetary relief allowed under the statute and equity, including restitution; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief permissible under the UCL.

**NINTH CAUSE OF ACTION**
**Unjust Enrichment**
**On Behalf of the Plaintiffs and the Classes**

295.    Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

296.    Samba TV receives benefits from Plaintiffs and Class Members in the form of their unique identifiers and other personal data and private online communications. Samba TV acquired this information without Plaintiffs' and Class Members' authorization and without providing corresponding compensation.

297.    Samba TV acquired and used this private data for its own benefit, including tangible economic benefits from companies that used Samba TV for targeted advertising.

298.    Had Plaintiffs and Class Members known of Samba TV's misconduct, they would not have agreed Samba TV could acquire and use their private data.

299.    Samba TV unjustly retained these benefits at the expense of Plaintiffs and Class Members. Plaintiffs and Class Members were harmed by this conduct and were not provided any commensurate compensation.

300.    The benefits Samba TV received and derived benefit from Plaintiffs' and Class Members' private data rightly belonging to Plaintiffs and Class Members. It is inequitable under unjust enrichment principles for Samba TV to retain the profits and other intangible benefits they derived through its wrongful conduct.

301. Samba TV should be compelled to disgorge these profits and other inequitable proceeds in a common fund for the benefit of Plaintiffs and Class Members.

## TENTH CAUSE OF ACTION
### Injunctive Relief
### On Behalf of the Plaintiffs and the Classes

302. Plaintiffs re-allege and incorporate the preceding allegations of this Complaint with the same force and effect as if fully restated herein.

303. Samba TV's conduct has and continues to cause harm to Plaintiffs' and Class Members' privacy and autonomy, as it continues to store unique persistent identifiers, as well as the private contents of their communications, on its own systems. Samba TV routinely uses this information for targeted advertising.

304. Accordingly, Plaintiffs and Class Members seek injunctive relief, including an order permanently restraining Samba TV from continuing to use and store this information without consent and/or a court order, and requiring Samba TV to delete this information from its systems.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves and the putative Classes request the Court enter an Order:

    a. Certifying the Classes and appointing Plaintiffs as Class Representatives;

    b. Finding Samba TV's conduct unlawful;

    c. Awarding injunctive and other equitable relief as is just and proper;

    d. Awarding Plaintiffs and the Classes statutory, actual, compensatory, punitive, nominal, and other damages, as well as restitution and/or disgorgement of unjust and unlawful profits;

    e. Awarding pre-judgment and post-judgment interest;

    f. Awarding reasonable attorneys' fees, costs, and expenses; and

    g. Granting any other relief as the Court sees just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: December 5, 2025

*/s/ Christian Levis*

Christian Levis (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
Rachel Kesten (*pro hac vice*)
Yuanchen Lu (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com
ylu@lowey.com

Robert C. Schubert S.B.N. 62684
Willem F. Jonckheer S.B.N. 178748
Amber L. Schubert S.B.N. 278696
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel.: (415) 788-4220
Fax: (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law
aschubert@sjk.law

*Attorneys for Plaintiffs and the Proposed Classes*