UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEVE DELLASALA, et al.,

               Plaintiffs,

    v.

SAMBA TV, INC.,

               Defendant.

Case No. 3:25-cv-03470-JSC

**ORDER RE: MOTION TO DISMISS SECOND AMENDED COMPLAINT; MOTION TO STRIKE**

Re: Dkt. No. 58

Plaintiffs filed this putative class action bringing claims under California privacy and consumer protection laws and the Federal Wiretap Act against Samba TV. The Court granted Samba's motion to dismiss with leave to amend and Plaintiffs amended their complaint and added plaintiffs and claims. (Dkt. Nos. 49, 54, 56.[1]) Samba again moves to dismiss and to strike portions of the Second Amended Complaint. (Dkt. Nos. 57, 58.) Having considered the parties' briefs, and having had the benefit of oral argument April 14, 2026, the Court GRANTS IN PART and DENIES IN PART the motion to dismiss, and GRANTS IN PART and DENIES IN PART the motion to strike.

## BACKGROUND

Plaintiffs, residents of North Carolina, Oklahoma, and California, allege they purchased Sony televisions to watch "video-viewing content" including on steaming services. (Dkt. No. 56 at ¶¶ 12-19 (Plaintiff Steve DellaSala); ¶¶ 20-27 (Plaintiff Bob Warden); ¶¶ 28-35 (Plaintiff Vince

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

Tophoney); ¶¶ 36-43 (Plaintiff Kenneth Harris); ¶¶ 44-51 (Plaintiff Duane Ledward); ¶¶ 52-59 (Plaintiff David Goodrich); ¶¶ 60-67 (Plaintiff Derek Schuette); ¶¶ 68-75 (Plaintiff K.S.).) "Unbeknownst" to each plaintiff "Samba TV used its chip set embedded in [Plaintiffs'] televisions to intercept unique identifiers associated with [their] device, including [their] IP address, GUID, Android ID/UUID, AAID, SessionID, SDADID, SMID." (*Id*. at ¶¶ 14, 22, 30, 38, 46, 54, 62, 70.) Samba intercepted Plaintiffs' "private video-viewing data in real time, including what [they] watched on cable television and streaming services. This information was tied to each of the identifiers—including the SambaID"—and used to facilitate targeted advertising without Plaintiffs' consent. (*Id*. at ¶¶ 17-19, 25-27, 33-35, 41-43, 49-51, 57-59, 65-67, 73-75.) "Samba TV knowingly and intentionally used its identifiers, and video-viewing data associated with it, to facilitate targeted advertisements for profit." (*Id*. at ¶ 80.)

This action was initially filed on behalf of Plaintiffs McDonald, DellaSala, Warden, and Tophoney—all non-California residents. (Dkt. No. 1.) McDonald voluntarily dismissed his claims (Dkt. No. 23), and the Court dismissed the claims as to the other Plaintiffs because the California privacy laws they sued under do not apply to conduct that occurs to non-residents outside California. Plaintiffs also failed to plausibly allege a common law intrusion upon seclusion claim or a Video Privacy Protection Act claim. (Dkt. No. 49.) Plaintiffs have since amended their complaint to plead claims on behalf of five California residents as well as DellaSala, Warden, and Tophoney. (Dkt. No. 56.) Plaintiffs bring nationwide claims for (1) violation of common law invasion of privacy (intrusion upon seclusion); (2) invasion of privacy under the California Constitution; (3) violation of the California Invasion of Privacy Act (CIPA), Cal. Pen. Code § 631; (4) violation of CIPA, § 632; (5) violation of CIPA, §§ 638.50, 638.51; (6) violation of the Comprehensive Computer Data Access and Fraud Act (CDAFA), Cal. Pen. Code § 502; (7) violation of the Federal Wiretap Act, 18 U.S.C. § 2510; (8) violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200; (9) unjust enrichment; and (10) injunctive relief. (Dkt. No. 56.)

Samba now moves to dismiss for lack of Article III standing and failure to state a claim. (Dkt. No. 58.) Samba also moves to strike Plaintiffs' nationwide class claims and allegations that

reference the Video Privacy Protection Act (VPPA).  (Dkt. No. 57.)  Both motions are fully briefed and oral argument was heard April 14, 2026.

**DISCUSSION**

## I.     MOTION TO DISMISS

### A.      Article III standing

Article III of the United States Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203, (2021). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id.* (citations omitted). To establish standing sufficient to satisfy constitutional requirements, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).

Samba insists Plaintiffs have no Article III standing because they have not alleged an actionable injury relying heavily on the Ninth Circuit's recent decision in *Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025). In *Popa*, the plaintiff alleged the defendant's session-replay technology captured her information while she browsed for pet supplies on a pet supply website. The Ninth Circuit affirmed the district court's dismissal for lack of Article III standing because the nature of the collected information was not "embarrassing, invasive, or otherwise private." *Id*. at 786-87, 791.  The court held the plaintiff had not established "how the tracking of her interactions ... caused her to experience any kind of harm that is remotely similar to the 'highly offensive' interferences or disclosures that were actionable at common law." *Id*. at 791. The court explained further "the kind of harm and not the degree" is relevant for determining whether an alleged injury-in-fact is concrete enough relative "to a specific common-law tort" and that the injury must be one "that has traditionally been actionable in our nation's legal system." *Id*.

Plaintiffs counter the harm alleged here is far more invasive than that alleged in *Popa* as they allege Samba both collects video-viewing data from consumers and discloses it to third parties for a profit. (Dkt. No. 56 at ¶¶ 112-114) (alleging as soon as Plaintiffs set up their TV,

Samba creates a series of "unique long-term identifiers" which "track the TV, specific users, and each of their video-viewing sessions") ¶¶ 116-118 (this information is sent to a third party MixPanel and used to create "Samba TV's Identity Graph, which enables Samba TV to identify and profile not only Plaintiffs' and Class Members' specific TVs, but each of their other personal devices, including their individual phones, tablets, and PCs through deterministic and probabilistic matching."); ¶¶ 119-132 (Samba packages this identifiable information into a "data-panel" and "custom audiences" which identify individuals by attributes including "demographics, hobbies, political beliefs, and more" and then Samba sells this information to advertisers and publishers).) These allegations go well beyond the session-replay technology at issue in *Popa*. *See Popa*, 153 F.4th at 791 (comparing "Popa's interactions with PSP's website… to a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales.").

The cases Samba relies on are inapposite. In *Rodriguez v. Brushfire Recs*., No. 2:25-CV-09797-CAS-PDX, 2025 WL 3692144, at *7 (C.D. Cal. Dec. 15, 2025), the court found no Article III standing because "Defendant's acquisition of plaintiff's IP address and other device identifiers from her visit to defendant's website 'does not cause the kind of harm that can be vindicated in federal court.'" *See also Rodriguez v. Culligan Int'l Co*., No. 25-CV-00225-AJB-KSC, 2025 WL 3064113, at *3 (S.D. Cal. Nov. 3, 2025) (rejecting the argument the plaintiff had Article III standing because she had a "reasonable expectation of privacy in the IP address of her devices, which is currently statutorily protected in California"). At oral argument, Samba insisted this case was analogous to *Khamooshi v. Politico LLC*, No. 24-CV-07836-SK, 2025 WL 2822879, at *3 (N.D. Cal. Oct. 2, 2025), when the court found the plaintiff's allegations that the defendant collected information such as "device type, browser type, and device fingerprints" and "browsing activity" did not give rise to a concrete privacy interest. But the plaintiff there did not identify the browsing activity that was collected and the court noted while "some types of browsing activity implicate protectable privacy interests, others do not." *Id*. at *3 (citing *Popa*, 2025 WL 2448824, at *5 (holding no protectable privacy interest in browsing activity on a pet supply website); *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 599 (9th Cir. 2020) (holding protectable

United States District Court
Northern District of California

privacy interest in "cradle-to-grave profile" of users' browsing activity across third-party websites combined with their Facebook profiles); *see also Khamooshi v. Politico LLC*, No. 24-CV-07836-SK, Dkt. No. 49, (First Amended Complaint at ¶ 17 alleging defendant collected his "browser and device/operating system data, IP addresses, geolocation information, and other personally identifying information such as his browsing activity."). *Khamooshi* stands for the unremarkable proposition that it is not enough to simply allege your browsing activity was collected; rather, to have Article III standing a plaintiff must allege browsing data that implicates *protectable privacy interests* was collected.

Plaintiffs have done so here. They allege Samba collected detailed video viewing information to package individuals into audiences based, for example, on their political leanings because they watched the State of the Union, or "liberal affinity news," or "conservative affinity news." (Dkt. No. 56 at ¶ 123.) These allegations are akin to those in *Harris v. iHeartMedia, Inc.*, No. 25-CV-06038-EKL, 2026 WL 247875, at *1 (N.D. Cal. Jan. 29, 2026), when the court concluded the plaintiff had adequately alleged injury in fact based on allegations the defendant created "comprehensive user profiles that include an assortment of information, interests, and inferences" which were synched with third party "data brokers to build the most comprehensive user profiles possible" and then "auctioned to potential advertisers." Here, as in *iHeart*, the allegations of "the violation of a privacy interest that bears a 'close relationship' to traditional harms – i.e., the loss of the ability to control information about himself and to avoid the broad dissemination of that information" are therefore sufficient to demonstrate a concrete injury in fact. *Id*. at *2 (collecting cases similarly holding).

Further supporting a protectable privacy interest, and as discussed at oral argument, an individual's privacy interest in their video viewing information is what led to the passage of the Video Privacy Protection Act. *See Osheske v. Silver Cinemas Acquisition Co.*, 132 F.4th 1110, 1114 (9th Cir. 2025) (discussing the history of the VPPA and legislators' "outrage" over "the disclosure of Judge Bork's video rental history" and the right to "privacy and intellectual freedom [in] the 'home,' the 'living room,' and other contexts in which people might expect 'quiet[ ] and reflection.'" (quoting S. Rep. No. 100-599, at 5–7); *see also Balestrieri v. SportsEdTV, Inc.*, No.

25-CV-04046-SK, 2025 WL 2776356, at *7 (N.D. Cal. Sept. 16, 2025) (concluding disclosure of video-viewing history constitutes a concrete injury under the VPPA and collecting cases re: the same).

Finally, *Popa* is further distinguishable because it did not involve any dissemination of the "session-replay" beyond the defendants' own use. *Popa*, 153 F.4th at 787 (explaining the session-replay provider "create[s] a video replay of the user's behavior on the website to provide it to [the website owner] for analysis"). Here, in contrast, Plaintiffs allege Samba collects data and creates profiles of users and then sells the profiles to third parties. *See Gilligan v. Experian Data Corp.*, No. 25-CV-02873-RFL, 2026 WL 32259, at *2-3 (N.D. Cal. Jan. 6, 2026) (finding a concrete Article III injury when the "scope of the alleged tracking ... is materially more invasive than the limited tracking at issue in [*Popa*]").

Accordingly, Plaintiffs have sufficiently alleged the violation of a privacy interest and Article III standing.

**B.      Invasion of Privacy and Intrusion Upon Seclusion Under California Law**

Courts evaluating whether plaintiffs have stated a claim for invasion of privacy or intrusion upon seclusion under California law "consider the claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *Facebook Internet Tracking*, 956 F.3d at 601 (citing *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009)). First, to determine whether a reasonable expectation of privacy exists, courts consider "the customs, practices, and circumstances surrounding the data collection, including the amount of data collected, the sensitivity of data collected, the manner of data collection, and the defendant's representations to its customers." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1088 (N.D. Cal. 2022) (citing *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 26 (1994)). A reasonable expectation of privacy may exist when a defendant gains "unwanted access to data by electronic or other covert means, in violation of the law or social norms." *Facebook Internet Tracking*, 956 F.3d at 601-02 (quotation marks and citation omitted). Second, when determining whether an invasion is "highly offensive," courts consider "the degree and setting of the intrusion," as well as "the intruder's motives and objectives." *Hernandez*, 47 Cal. 4th at 287.

6

Because both inquiries are highly factual, "[c]ourts are generally hesitant to decide claims of this nature at the pleading stage." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 799 (N.D. Cal. 2022).

Samba insists Plaintiffs' invasion of privacy and intrusion upon seclusion claims fail because they (1) have no expectation of privacy in the information collected; and (2) Samba's alleged conduct was not highly offensive. Neither argument is persuasive.

First, as discussed above, Plaintiffs do not simply allege Samba collects their IP addresses and device information. Rather, they allege Samba collects this information and detailed information over time regarding their video viewing habits and uses this information to create profiles identifying individuals based on personal attributes such as political leanings, or those who watched Pride Month or Black History Month programming. (Dkt. No. 56 at ¶¶ 123, 126.) "[V]iewing the allegations in the light most favorable to Plaintiffs, as we must at this stage, the allegations that [Samba] allegedly compiled highly personalized profiles from [video-viewing] histories and habits prevent us from concluding that the Plaintiffs have no reasonable expectation of privacy." *In re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d 589, 604 (9th Cir. 2020).

Second, it is only if the allegations "show no reasonable expectation of privacy or an insubstantial impact on privacy interests" that the "question of [a serious or highly offensive] invasion [ ] be adjudicated as a matter of law." *Hill*, 7 Cal. 4th at 40. The "ultimate question of whether ... tracking and collection practices could highly offend a reasonable individual is an issue that [often] cannot be resolved at the pleading stage." *In re Facebook*, 956 F.3d at 606. As a result, dismissal under Rule 12(b)(6) is appropriate only if the allegations "show no reasonable expectation of privacy or an insubstantial impact on privacy interests." *Hill*, 7 Cal. 4th at 40. Plaintiffs allege Samba's conduct is highly offensive because it "violates established social norms [as c]onsumers do not expect to be surveilled whenever they use the internet." (Dkt. No. 56 at ¶ 200.) Plaintiffs' allegations as to the breadth of the information Samba allegedly collects along with its dissemination are sufficient to support an inference of a serious invasion of privacy. *See Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1088 (N.D. Cal. 2025) ("Plaintiffs have alleged enough in the [S]AC such that the Court cannot at this stage conclude as a matter of

United States District Court
Northern District of California

law that the alleged aggregation, synthesis, and sale of comprehensive [] data of individuals without their knowledge is not highly offensive.").

Accordingly, Samba's motion to dismiss Plaintiffs' invasion of privacy and intrusion upon seclusion claims under California law is denied.[2]

### C.    CIPA Claims

#### 1.    Section 631

California Penal Code § 631 "prescribes criminal penalties for three distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978). These include:

1) when a person "by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection ... with any telegraph or telephone wire, line, cable, or instrument,"

2) when a person "willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit,"

3) when a person "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or

4) where a person "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above."

*Yockey v. Salesforce*, 688 F. Supp. 3d 962, 970 (N.D. Cal. 2023) (quoting Cal. Penal Code § 631). Plaintiffs allege Samba violated the second, third, and fourth prongs "by intercepting their video-viewing history and identifying information and packaging that data into uniquely identifiable user profiles for sale." (Dkt. No. 60 at 20 (citing Dkt. No. 56 at ¶¶ 94-132).)

Samba insists Plaintiffs' claims fail because (1) the information collected is "record information" not protected by the statute, and (2) even if it were protected, Plaintiffs have not alleged Samba learned the contents of the communications while in transit.

//

---

[2] At oral argument, Plaintiffs confirmed their common law claims are only brought under California law.

### a. Record information

"The analysis for a violation of CIPA is the same as that under the federal Wiretap Act." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1092 (N.D. Cal. 2022). The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510. Interpreting this provision of the Wiretap Act, the Ninth Circuit distinguished between the contents of a message—i.e., the "intended message conveyed by the communication" including "any information concerning the substance, purport, or meaning of a communication"—and "record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106–07 (9th Cir. 2014) (citing 18 U.S.C. §§ 2511(3)(a), 2702(a), 2510(8)). Whether a particular form of information involves the "contents" of a communication as opposed to mere "record information" depends on context. *See id.* Generally, information like name, address, and subscriber numbers are record information. *Zynga*, 750 F.3d at 1104, 1108. "URLs are record information when they only reveal a general webpage address and basic identification information, but when they reproduce a person's personal search engine queries, they are contents." *Hammerling*, 615 F. Supp. 3d at 1093 ("URLs are record information when they only reveal a general webpage address and basic identification information, but when they reproduce a person's personal search engine queries, they are contents.").

Samba insists Plaintiffs have only alleged record information because the only identifying information they allege was collected was their IP address, unique device identifiers, and email addresses. But this is not the only information Plaintiffs allege was collected. They also allege Samba collected their video viewing data which—when combined with their identifying information—allowed Samba to build profiles containing more than "basic identification and address information." *Doe v. Eating Recovery Ctr. LLC,* 806 F. Supp. 3d 1109, 1116 (N.D. Cal. 2025) (holding URLs were more than record information where they showed the "browsing path and how long she spent on each page" which "conveys far more than basic identification and address information"). So, Plaintiffs have alleged facts which plausibly support an inference Samba collected the contents of their communications and not mere record information.

9

### b.    Read In Transit

Next, Samba argues the allegations suggest at most that "any allegedly collected data is processed upon being stored and after transmission," and not, as required, while in transit.  (Dkt. No. 58 at 24.)  Plaintiffs repeatedly allege "real time" interception: "Samba TV also intercepted Plaintiff DellaSala's private video-viewing data in real time, including what he watched on cable television and streaming services." (Dkt. No. 56 at ¶ 17; *see also* ¶¶ 25, 33, 41, 49, 57, 65, 73) (repeating same allegations for other plaintiffs); ¶ 102 (Samba TV offers advertisers and publishers access to its "[a]ccurate real-time private identity graph[s] across devices and all properties");  ¶ 106 ("Samba TV intercepts and processes the content in real time, often in just a few seconds.".) But their allegations as to Samba *learning* the contents of their communications while in transit merely parrot the statute's language.  For example, Plaintiffs allege:

> 225. Samba TV willfully, and without consent, read or attempted to read, or learn the contents and meaning of, Plaintiffs' and Class Members' communications with online services while those communications were in transit or passing over a wire, line, or cable, or were being sent or received within California through its tracking technology, as described herein. This interception happens prior to or at the same time they would be received by the intended recipient.

> 274. Samba TV intercepted the content of these communications because it revealed precisely what video content Plaintiffs and Class Members were viewing at any given moment across cable, streaming services, video game consoles, and more. Samba TV learned, or attempted to learn the contents, of these communications while they were in transit or in the process of being sent or received.

(Dkt. No. 56 at ¶¶ 225, 274)   These conclusory allegations do not support any inference as to how the content is simultaneously read.  Further, Plaintiffs' more specific allegations regarding how Samba's technology works compels an inference Samba does not learn the contents while they are in transit: "Samba TV *processes* and stores this data on its own systems—which it uses to create audiences, panels, and otherwise service advertising needs—all of which is tied back to the universal SambaID and user profiles it creates for specific individuals through its Identity Graph." (*Id*. at ¶ 111 (emphasis added).)  That Samba processes the data once it is on its servers suggests the contents are not "read" or "learned" while in transit.

The cases Plaintiffs cite are distinguishable.  In *Riganian v. LiveRamp Holdings, Inc.*, 791 F.Supp.3d 1075, 1092 (N.D. Cal. 2025), for example, the plaintiff alleged the defendant

intercepted *and incorporated* the content before the content was completely loaded onto the requested page; these allegations plausibly supported an inference of in transit reading.   And in *Doe v. FullStory, Inc.*, 712 F. Supp. 3d 1244, 12609, n.13 (N.D. Cal. 2024), the plaintiff alleged "[t]he TikTok Pixel intercepts these communications immediately after they are sent and before they are received by" the website.   In *Rodriguez v. Aquatic Sales Sols. LLC*, 735 F. Supp. 3d 1208 (C.D. Cal. 2024), the court concluded allegations the defendant's "secret code" routed "chat communications [] though Zendesk's servers after visitors send their communications" were "sufficient to suggest that the alleged interception occurs while the communications are still in transit," but did not specifically address the requirement that they be *read* in transit.   *Id.* at 1228; *see also Krzyzek v. OpenX Techs., Inc.*, No. 25-CV-05588-SI, 2026 WL 206855, at *7 (N.D. Cal. Jan. 27, 2026) (similarly focusing on the "in transit" requirement).

As pled, Plaintiffs' allegations do not support a plausible inference Samba *read* or *learned* the contents of Plaintiffs' communications while in transit as Section 631 requires.   As Plaintiffs concede liability under the third and fourth prong depends on the same predicate interception, those claims are likewise dismissed.   (Dkt. No. 60 at 22.)

### 2.   Section 632

California Penal Code § 632 addresses eavesdropping on or recording confidential communications by authorizing fines and imprisonment for

> [a] person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio ...

Cal. Penal Code § 632(a).

Samba contends Plaintiffs have not alleged a claim under this section because they had no reasonable expectation of privacy regarding the information Samba allegedly collects.   This argument fails for the same reason it fails as to Plaintiffs' invasion of privacy and intrusion upon seclusion claims.   Plaintiffs' allegations support a plausible inference they had a reasonable expectation of privacy in the breadth of information Samba allegedly collected.   *See, e.g., Griffith*

*v. TikTok, Inc.*, 697 F. Supp. 3d 963, 970 (C.D. Cal. 2023) (holding the same for allegations TikTok "collect[ed] information about internet users' browsing activities that can be compiled to 'assemble a comprehensive profile of these non-TikTok users,' all without the users' permission" including "information about the videos she searched for and watched, as well as products she browsed, bought, and sold on multiple websites.").

The motion to dismiss Plaintiffs' Section 632 claim is denied.

### 3.   Sections 638.5 and 638.51

California Penal Code Section 638.51(a) prohibits any person from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order." The statute defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b). Samba insists these provisions only apply to the recording of information through incoming or outgoing telephone calls and thus does not apply here.

Plaintiffs allege Samba's ACR technology and its identity solution are pen registers and/or trap and trace devices which "captured 'routing, addressing, or signaling information' because they intercept, at least (1) the Samba TV domain being contacted (e.g., events.cid.samba.tv, manager.tvp.samba.tv, etc.); (2) the IP address of both the sender and receiver; (3) the time the connection was made; and (4) other identifiers, like SambaID." (Dkt. No. 56 at ¶¶ 247-48.)

Samba relies on language from other statutory provisions and legislative history to argue the pen register provisions only apply to telephone surveillance. (Dkt. No. 58 at 25 (citing Cal. Penal Code §§ 638,32(c), 638.32(d)(1)).) Numerous courts have rejected this argument noting these provisions apply to a particular type of pen register; but, Section 638.50—the section at issue here—simply refers to "device[s] or process[es]" that record or capture certain information from "a wire or electronic communication." Cal. Penal Code §§ 638.50(b)–(c); *see also Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Though § 638.52 refers to pen registers and trap and trace devices as physically attached to telephone lines, the definitions set forth under § 638.50 do not state any such requirement."); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d

United States District Court
Northern District of California

924, 930 (N.D. Cal. 2024) ("Section 638.52, however, merely lists requirements relating to a particular type of pen register: one that is installed on a telephone line…But that does not alter the statutory definition of a pen register stated in § 638.50(b) or the prohibition on non-law enforcement use of such pen registers."). Further, "[t]he overwhelming majority of courts that have considered this question have similarly concluded that third-party internet trackers meet the technical requirements of a pen register under CIPA." *Harris v. iHeartMedia, Inc.*, No. 25-CV-06038-EKL, 2026 WL 247875, at *3 (N.D. Cal. Jan. 29, 2026) (collecting cases).

Because Samba has not shown as a matter of law that Sections 638.5 and 638.51 only apply to surveillance technology over telephone lines, its motion to dismiss these claims is denied.

\*\*\*

For the reasons stated above, Samba's motion to dismiss Plaintiffs' CIPA claims is granted in part and denied in part. The motion is granted as to the Section 631 claim and denied as to Plaintiffs' Sections 632, 638.5 and 638.51 claims.

### D.    CDAFA Claim

A person who "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation" violates CDAFA. Cal. Penal Code § 502(c)(2). An "owner ... of a computer ... who suffers damage or loss by reason of a violation" of CDAFA "may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief." *Id*. § 502(e)(1). These "[c]ompensatory damages [] include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access." *Id*.

Samba contends Plaintiffs' CDAFA claim must be dismissed because Plaintiffs have not plausibly alleged damage or loss. Plaintiffs insist their allegation that "Samba TV's practices have deprived Plaintiffs and the Class Members of control over their valuable property (namely, their sensitive personal data), the ability to receive compensation for that data, and the ability to withhold their data for sale," are sufficient to state a claim under CDAFA. (Dkt. No. 56 at ¶ 263.)

13

According to Plaintiffs, the "damage" or "loss" requirement in CDAFA is satisfied "whenever an entity obtains 'unjust profits' from data it misappropriated." (Dkt. No. 60 at 25.)

Section 502(e)(1) requires the person or entity bringing the claim to have suffered damage or loss. That Samba may have gained from Plaintiffs' data does not mean Plaintiffs have suffered a loss. *See Cottle v. Plaid Inc*., 536 F. Supp. 3d 461, 488 (N.D. Cal. 2021) (rejecting argument "the loss of the right to control their own data, the loss of the value of their data, and the loss of the right to protection of the data, [constitute] 'damage or loss' within the meaning of the CDAFA").

The case on which Plaintiffs rely, *Smith v. Rack Room Shoes, Inc*., No. 24-CV-06709-RFL, 2025 WL 2210002, at *3 (N.D. Cal. Aug. 4, 2025), does not persuade the Court otherwise. *Smith* relied on language from *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020), regarding Article III standing to bring a CDAFA claim. *Smith*, 2025 WL 2210002, at *3 (holding *In re Facebook's* logic as to Article III standing "applies equally to the issue of whether plaintiffs have suffered 'damage' under CDAFA") (citing *Facebook*, 956 F.3d at 601). But *In re Facebook* did not address CDAFA's damage or loss requirement. And injury for purposes of Article III standing and "damage" or "loss" under CDAFA are not necessarily equivalent. Moreover, *Facebook's* reasoning that "California law recognizes a right to disgorgement of profits resulting from unjust enrichment, *even where an individual has not suffered a corresponding loss*," *id*. at 599 (emphasis added), "does not align with the [subsequent] analysis adopted in *TransUnion* [*v. Ramirez*, 594 U.S. 413, 430–31, (2021)]," *Popa v. Microsoft Corp*., 153 F.4th 784, 792 (9th Cir. 2025).

Plaintiffs' disgorgement theory might be availing if they alleged they intended to profit from their data and Samba's collection and dissemination of their data diminished its value to Plaintiffs. But Plaintiffs do not make such allegations. And, indeed, it would be inconsistent for them to do so in light of their privacy claims. *See Doe v. Tenet Healthcare Corp*., 789 F. Supp. 3d 814, 845 (E.D. Cal. June 9, 2025) (holding plaintiffs "cannot base their CDAFA damages on a theory that they lost a benefit to sell [their] data" when alleging invasion of privacy in data collection context).

14

Accordingly, Samba's motion to dismiss Plaintiffs' CDAFA claim is granted.

### E.    Federal Wiretap Act Claim

The Electronic Communications Privacy Act ("ECPA" or "Wiretap Act"), 18 U.S.C. § 2510 et seq., provides for civil penalties against any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). The Federal Wiretap Act is a one-party consent statute. 18 U.S.C. § 2511(2)(d); *see also In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1026 (N.D. Cal. 2014) ("[T]he consent of one party is a complete defense to a Wiretap Act claim.").

Samba insists Plaintiffs cannot state a Wiretap Act claim because it only protects the contents of a communication and thus the claim fails for the same reason as the CIPA claim.  The Court, however, rejected this argument above.  Next, Samba maintains dismissal is required because it was a party to the communication and thus the statute does not apply.  Plaintiffs respond Samba was not a party to the communication, but rather, an interloper, and regardless, the crime-tort exception applies.

Plaintiffs' allegations compel the inference Samaba is a party to the communications. Plaintiffs allege Samba's chip is embedded in their televisions and integrated into the smart TV's communication process.  (Dkt. No. 56 at ¶¶ 2, 14, 22, 30, 38, 46, 54, 62, 70, 104-118.)  The Wiretap Act "contain[s] an exemption from liability for a person who is a 'party' to the communication, whether acting under the color of law or not."  *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020) (citing 18 U.S.C. § 2511(2)(c), (d)).

However, the party exception does not apply when an "interceptor acts 'for the purpose of' committing any crime or tort in violation of state or federal law." *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1077 (N.D. Cal. 2023) (quoting 18 U.S.C. § 2511(2)(d)).  This so-called crime-tort exception only applies to interceptions "where the primary motivation or a determining factor in [the interceptor's] actions has been to injure plaintiffs tortiously." *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *18 n.3 (N.D. Cal. Mar. 18, 2014) (cleaned up). "Under this exception, Plaintiffs must allege that either the primary motivation or a determining factor in the

15

interceptor's actions has been to injure plaintiffs tortiously." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021) (cleaned up).

Plaintiffs insist the exception applies here because Samba "had 'an independent prohibited purpose' beyond the act of interception itself,' such as to disclose the intercepted data to third parties, use it 'for advertising,' or compile comprehensive user files." (Dkt. No. 60 at 28 (quoting *Smith*, 2025 WL 2210002, at *4-5).) Samba counters this "type of commercial behavior, absent an ulterior tortious motive, is insufficient to invoke the crime-tort exception. (Dkt. No. 62 at 17-18 (citing *Lakes v. Ubisoft*, 777 F.Supp.3d 1047, 1057-58 (N.D. Cal. 2025); *Roe v. Amgen Inc.*, 2024 WL 2873482, at *6 (C.D. Cal. June 5, 2024)).)

Samba's contention is unpersuasive. To be sure, other district courts have taken this position, but still others have taken the contrary position concluding "even where a defendant is arguably motivated by monetary gain, the crime-tort exception may nonetheless apply if plaintiffs have adequately alleged that the defendant's conduct violated state law, including state law privacy claims." *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 901 (C.D. Cal. 2024) (collecting cases); *see also Krzyzek v. OpenX Techs., Inc.*, No. 25-CV-05588-SI, 2026 WL 206855, at *8 (N.D. Cal. Jan. 27, 2026) (concluding because "plaintiffs adequately alleged invasion of privacy, the Court is not convinced [the Wiretap Act's] crime-tort exception does not apply."); *Riganian v. LiveRamp Holdings, Inc.*, 791 F. Supp. 3d 1075, 1090-91 (N.D. Cal. 2025) ("Put simply, committing a tort and seeking a profit are not mutually exclusive (if anything, the latter is often the reason for the former)"). So too here. Plaintiffs are not simply bootstrapping their Wiretap Act claim to their CIPA claims, but have alleged Samba tortiously invaded their privacy to sell their personal data for a profit. At this early litigation stage, the Court declines to find this is not a basis for a Wiretap claim as a matter of law. Accordingly, Samba's motion to dismiss the Federal Wiretap Act claim is denied.

### F.    UCL Claim

Samba maintains Plaintiffs lack statutory standing to bring a UCL claim because they have not alleged economic loss. "While the substantive reach of [the UCL] remains expansive," to establish statutory standing to enforce the UCL's provisions, a plaintiff must "(1) establish a loss

16

or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 322 (2011) (emphasis in original); *see also* Cal. Bus. & Prof. Code § 17204 ("Actions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction ... by a person who has suffered an injury in fact and has lost money or property as a result of the unfair competition.").

Plaintiffs allege they "have suffered injury, including the loss of money and/or property as a result of Samba TV's unfair and unlawful practice of intercepting Plaintiffs' and Class Members' personal information and private communications, which have economic value." (Dkt. No. 56 at ¶ 288.)  Plaintiffs also emphasize their allegation that they "would not have purchased and/or used their Samba TV-enabled televisions had they known of its conduct." (*Id.* at ¶ 292.) These allegations, however, are conclusory.

First, as to the economic value of their personal information, Plaintiffs' allegations are insufficient—"just because Plaintiffs' data is valuable in the abstract, and because [Samba] might have made money from it, does not mean that Plaintiffs have 'lost money or property' as a result." *Hazel v. Prudential Fin., Inc.*, No. 22-CV-07465-CRB, 2023 WL 3933073, at *6 (N.D. Cal. June 9, 2023); *see also Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1040 (N.D. Cal. 2019) ("That the information has external value, but no economic value to plaintiff, cannot serve to establish that plaintiff has personally lost money or property.").

Plaintiffs' reliance on *Brown v. Google LLC*, No. 20-CV-03664-LHK, 2021 WL 6064009, at *15 (N.D. Cal. Dec. 22, 2021), is unpersuasive as the plaintiff there alleged a specific cash value was attached to the allegedly misappropriated data and identified a market for the data. Plaintiffs' allegations here do not plausibly support an inference the misappropriated data likewise had an economic value in an identified market.  In any event, "[t]he weight of the authority in the district and the state . . . point in the opposite direction [from cases like *Brown*]: "the 'mere misappropriation of personal information' does not establish compensable damages." *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 943 (N.D. Cal. 2023) (quoting *Pruchnicki v. Envision*

United States District Court
Northern District of California

*Healthcare Corp.*, 845 F. App'x 613, 615 (9th Cir. 2021) (citations omitted)); *see also Moore v. Centrelake Med. Grp., Inc.*, 83 Cal. App. 5th 515, 540-41, n.13 (2022) (finding unpersuasive federal cases that held that a loss of privacy in one's information was sufficient to allege UCL standing).

Second, while Plaintiffs' allegations they would not have purchased the product if they had known of Samba's conduct could demonstrate statutory standing, Plaintiffs must also allege a misrepresentation. "[T]he Ninth Circuit has repeatedly held that when a consumer alleges that she would not have purchased property, or would have paid less for it had the seller not misrepresented the property or failed to disclose its limitations, the consumer has plausibly alleged an injury-in-fact." *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 764 (C.D. Cal. 2022); *see also Kwikset*, 51 Cal. 4th at 317 ("'[P]laintiffs who can truthfully allege they were deceived by a [company's representations] into spending money to purchase [a] product, and would not have purchased it otherwise,' ... have suffered an economic injury sufficient to confer standing under the UCL and Article III of the Constitution."). Plaintiffs do not allege Samba made any misrepresentations.

Accordingly, Plaintiffs' UCL claim is dismissed for lack of statutory standing.

### G.    Equitable Relief Claims

Plaintiffs bring equitable relief claims for injunctive relief and unjust enrichment under California law. Although the Court previously dismissed the injunctive relief claim noting it was not a standalone claim for relief (Dkt. No. 49 at 10), Plaintiffs re-pled the claim in their Second Amended Complaint. However, Plaintiffs do not oppose Samba's motion to dismiss the claim—it is therefore dismissed for the reasons previously stated and as abandoned. *See Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) (finding plaintiff "effectively abandon[s]" a claim by failing to oppose arguments challenging it in a motion to dismiss).

As to the unjust enrichment claim, Samba insists this claim must be dismissed because Plaintiffs have not alleged they lack an adequate remedy at law because they seek compensatory damages for the same conduct. Generally, a federal court lacks jurisdiction of equitable claims when a plaintiff has an adequate legal remedy for the same conduct. *Guzman v. Polaris Indus.*

United States District Court
Northern District of California

*Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022); *Sonner v. Premier Nutrition Corp.*, 971 F. 3d 834, 844 (9th Cir. 2020).  Here, however, Plaintiffs seek disgorgement which would be a distinct remedy— that is, even if Plaintiffs were unable to prevail on their privacy claims, they still might be able to prevail on their claim that Samba is not entitled to profit off their personal information. *See Gabrielli v. Haleon US Inc.*, No. 25-CV-02555-WHO, 2025 WL 2494368, at *15 (N.D. Cal. Aug. 29, 2025) (collecting cases holding "even if plaintiffs have suffered no economic loss from the disclosure of their plausibly private information, they are allowed to proceed through the pleadings stage with a claim for unjust enrichment to recover the gains that a defendant realized from its allegedly improper conduct.") Samba's motion to dismiss Plaintiff's unjust enrichment claim based on a disgorgement theory is therefore denied.

## II.      MOTION TO STRIKE

Samba moves to strike Plaintiffs' allegations referencing the Video Privacy Protection Act (VPPA) and Plaintiffs' nationwide class allegations in support of their common law claims for intrusion upon seclusion, unjust enrichment, and injunctive relief.  (Dkt. No. 56 at ¶¶ 193-205, 295-304.)  Plaintiffs concede the references to the VPPA should be stricken based on the Court's prior order dismissing claims under this statute.  (Dkt. No. 59 at 2, n1.)  For the reasons discussed at oral argument, the Court declines to strike Plaintiffs' class allegations at this stage.  At the initial case management conference, the Court will discuss a discovery and case schedule to potentially resolve this issue on an early motion for summary judgment given its relevance to the breadth of the proposed class.

<b>CONCLUSION</b>

For the reasons stated above, the motion to dismiss is GRANTED IN PART and DENIED IN PART.  The motion is granted as to Plaintiffs' claims under CIPA Section 631, CDAFA, UCL, and independent injunctive relief claim, and otherwise denied.  These claims are dismissed with leave to amend to the extent Plaintiffs can amend the claims consistent with Federal Rules of Civil Procedure 11.  Absent amendment, the case will proceed on the non-dismissed claims.  On or before May 12, 2026, Plaintiffs shall file their further amended complaint or a statement indicating they intend to stand on the current complaint.  Samba's responsive pleading is due 21 days after

United States District Court
Northern District of California

Plaintiffs' filing.

The motion to strike is GRANTED as to the VPAA claims, but otherwise DENIED without prejudice.

The Court sets an initial case management conference for June 10, 2026 at 2:00 p.m. via Zoom videoconference.  A joint case management conference statement is due June 3, 2026.

This Order disposes of Docket Nos. 57, 58.

**IT IS SO ORDERED.**

Dated: April 21, 2026

_____
JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

20